JUDGE JONES

08 CV 7147

UNITED STATES DISTRIC T COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

VINCENT EMILIO, individually and on behalf
of all others similarly situated,

                      Petitioner,

        -vs.-

SPRINT SPECTRUM L.P. d/b/a/ SPRINT PCS,

                  Respondent.

-----------------------------------------------------------------X



RECEIVED
No.
AUG 1 1 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## PETITION TO COMPEL ARBITRATION AND FOR RELATED RELIEF

    Pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, Petitioner

Vincent Emilio ("Petitioner"), individually and on behalf of all others similarly situated, by

his undersigned attorneys, alleges upon personal information and/or upon information and

belief, for his Petition to Compel Arbitration and Related Relief against respondent Sprint

Spectrum L.P. d/b/a Sprint PCS ("Sprint" or "Respondent"), as follows:

## NATURE OF THE PETITION

    1.      Petitioner's Petition arises out of an attempt by Respondent to avoid and

circumvent its obligation – imposed under the terms of Respondent's arbitration agreement

with Petitioner (the "Arbitration Agreement") – to continue to arbitrate the class action

arbitration between Petitioner and Respondent in the JAMS arbitration forum that

Respondent has participated in for more than three years regarding Respondent's allegedly

deceptive practices in connection with New York State Excise Tax charges imposed on

Petitioner and Respondent's other New York customers (the "Arbitration").

    2.      By Decision dated and issued on July 16, 2008 (the "July 16, 2008 Decision"),

the Honorable Kathleen A. Roberts (the presiding JAMS Arbitrator) ("Judge Roberts"), *inter*

*alia,* denied Respondent's motion seeking to apply the settlement release in a settled Kansas state court class action (the *"Benney/Lundberg* Settlement") to Petitioner's claims in the Arbitration.  In her July 16, 2008 Decision, Judge Roberts held that the *Benney/Lundberg* Settlement could not satisfy the constitutional requirement of "adequacy of representation" as applied to Petitioner's claims, for reasons including: (i) the failure of the *Benney/Lundberg* class representatives to assert the same claims based on the same factual predicate; (ii) the lack of standing of the *Benney/Lundberg* class representatives to assert claims pertaining to the New York State Excise Tax; (iii) the admission of Respondent's counsel that the issue of state excise taxes was never a subject of discussion between the parties to the *Benney/Lundberg* Settlement at any time; and (iv) the fact that "it is impossible for any consideration to have been paid for the release of the excise tax claims that no one ever discussed in the course of the settlement, no certified class representative or class counsel knew existed, and no certified class representative had standing to assert or release."

3.    Unhappy with Judge Robert's refusal to apply the *Benney/Lundberg* Settlement release to dismiss Petitioner's claims, Respondent advised counsel for Petitioner and Judge Roberts on Friday, August 8, 2008 that Respondent that day had filed a motion in the Kansas state court which approved the *Benney/Lundberg* Settlement seeking to enjoin Petitioner from continuing to arbitrate Petitioner's individual and class claims against Respondent in the Arbitration in the JAMS arbitration forum or in any other judicial forum (the "August 8, 2008 Motion").  Respondent's August 8, 2008 Motion is based on arguments substantially identical to those raised by Respondent and disposed of as a result of Judge Roberts' July 16, 2008 Decision.

4.      Respondent's conduct -- running outside of the JAMS arbitration forum to relitigate the same issue already decided by Judge Roberts, seeking to obtain judicial relief in a perceived "friendlier forum" to preclude Petitioner from continuing to arbitrate claims that Respondent has arbitrated in the Arbitration for more than three years, and thereby enabling Respondent to circumvent and avoid its binding obligation to continue to participate in the Arbitration -- is a blatant, unlawful and bad faith failure, neglect and refusal to honor Respondent's agreement to arbitrate under the terms of the Arbitration Agreement between Respondent and Petitioner and the New York customers he seeks to represent.

5.      By this Petition, Petitioner seeks an Order, pursuant to 9 U.S.C. § 4: (i) compelling Respondent to continue to arbitrate in the Arbitration in accordance with the terms of the Arbitration Agreement; (ii) enjoining Respondent from pursuing or continuing to pursue its (or any) claim for injunctive relief against Petitioner and the class he seeks to represent; and (iii) requiring Respondent to withdraw its August 8, 2008 Motion. Additionally and/or alternatively, if necessary, Petitioner seeks an Order by the Court, pursuant to 28 U.S.C. § 2283, staying the Kansas state court proceedings "as necessary in aid of its jurisdiction, or to protect or effectuate its judgments" in connection with the granting of Petitioner's Petition.

## THE PARTIES

6.      Petitioner Emilio is a resident of the City of Mount Vernon, County of Westchester, New York, and is a Sprint wireless telephone service customer who has been charged and paid to Respondent the New York State Excise Tax that is the subject of the class action Arbitration in the JAMS arbitration forum captioned by JAMS as *Emilio, Vincent v. Sprint Spectrum L.P. d/b/a Sprint PCS, Binding Arbitration Reference # 1425000444.*

3

(a)    Petitioner, at all relevant times, has been the named Claimant in the Arbitration and the putative class representative on behalf of a class comprised of all persons who, during the relevant class period, were Sprint wireless telephone service customers who paid "New York State Excise Tax" as part of their monthly charges.

7.    Respondent Sprint is a Delaware limited partnership with its principal offices located in Kansas.   Sprint is wholly owned by Sprint Nextel Corporation, a Kansas corporation with its principal executive offices located in Shawnee Mission, Kansas.   Sprint is a global telecommunications company offering, among other services, wireless telephone services.

(a)    According to the Form 10-Q recently filed by Sprint Nextel Corporation for the period ending June 30, 2008, Respondent had about 52 million wireless subscribers nationwide as of that date.   It is conservatively estimated that more than 2 million New York customers comprise the class that Petitioner seeks to represent as class representative in the Arbitration.

## JURISDICTION AND VENUE

8.    (a)    This Court has jurisdiction over this Petition because it would have subject matter jurisdiction over the dispute and claims asserted in the Arbitration if those claims were filed in federal court, pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005 (109 P.L. 2; 119 Stat. 4; effective February 18, 2005) ("CAFA"), for the following reasons:

i.    the number of members of the proposed class Petitioner seeks to represent is 100 or more;

ii.    there is diversity of citizenship between *any one* member of the class (named and unnamed) and Respondent; Petitioner Emilio is a citizen of New York State while Respondent Sprint is a citizen of Delaware and/or Kansas; and

iii.    the amount in controversy – which may be calculated by aggregating the claims of the putative class members – *exceeds $5 million*.

(b)    Additionally or alternatively, the Court has diversity jurisdiction over this Petition under 28 U.S.C. 1332(a), because Petitioner and Respondent are citizens of different states, and the matter in controversy, based on the amounts Petitioner seeks in the Arbitration as damages, disgorgement and/or restitution, and the attorney's fees to which Petitioner is statutorily entitled under the Kansas Consumer Protection Act ("KCPA"), exceed the sum or value of $75,000, exclusive of interest and costs.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a), in that a substantial part of the events or the omissions giving rise to Petitioner's claims and Petition occurred in this District, and additionally because Respondent is subject to personal jurisdiction in this District.

## BACKGROUND, INCLUDING THE ARBITRATION AGREEMENT WITH WHICH RESPONDENT IS FAILING, NEGLECTING AND REFUSING TO COMPLY

10.    Petitioner filed his initial Demand for Class Action Arbitration in January, 2005, asserting claims for violations of New York Tax Law § 186-e, New York General Obligations Law § 349, and unjust enrichment.

11.    Annexed to Petitioners' initial Demand was a copy of the Arbitration Agreement governing the arbitration obligations between Petitioner and Respondent. The Arbitration Agreement (Exhibit A annexed hereto) specifically provides, in relevant part, as follows:

**MANDATORY ARBITRATION OR DISPUTES.** INSTEAD OF SUING IN COURT, YOU AND SPRINT AGREE TO ARBITRATE ANY AND ALL CLAIMS, CONTROVERSIES OR DISPUTES AGAINST EACH OTHER ARISING OUT OF OR RELATING TO THIS AGREEMENT . . . ("CLAIMS"). THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT AND ITS PROVISIONS, NOT STATE LAW, GOVERN ALL QUESTIONS OF WHETHER A CLAIM IS SUBJECT TO ARBITRATION. THIS PROVISION DOES NOT PREVENT YOU OR SPRINT FROM BRINGING APPROPRIATE CLAIMS IN SMALL CLAIMS COURT, BEFORE THE FEDERAL COMMUNICATIONS COMMISSION OR A STATE PUBLIC UTILITIES COMMISSION.

YOU AND SPRINT FURTHER AGREE THAT NEITHER SPRINT NOR YOU WILL JOIN ANY CLAIM WITH THE CLAIM OF ANY OTHER PERSON OR ENTITY IN A LAWSUIT OR OTHER PROCEEDING; THAT NO CLAIM EITHER SPRINT OR YOU HAS [sic] AGAINST THE OTHER SHALL BE RESOLVED ON A CLASS-WIDE BASIS; AND THAT NEITHER YOU NOR SPRINT WILL ASSERT A CLAIM IN A REPRESENTATIVE CAPACITY ON BEHALF OF ANYONE ELSE. IF FOR ANY REASON THIS ARBITRATION PROVISION DOES NOT APPLY TO A CLAIM, WE AGREE TO WAIVE TRIAL BY JURY.

A single arbitrator engaged in the practice of law will conduct the arbitration. The arbitration will be filed with and the arbitrator will be selected according to the rules of either JAMS or the National Arbitration Forum ("NAF"), or, alternatively, as we may mutually agree. We agree to act in good faith in selecting an arbitrator. *The arbitration will be conducted by and under the then-applicable rules of JAMS* or the NAF, wherever the arbitration is filed or, if the arbitrator is chosen by mutual agreement of the parties, the then-applicable rules of JAMS will apply unless the parties agree otherwise. All expedited procedures prescribed by the applicable rules will apply. We agree to pay our respective arbitration costs, except as otherwise required by rules of JAMS or NAF, as applicable, but the arbitrator can apportion these costs as appropriate. The arbitrator's decision and award is final and binding, and the judgment of the award may be entered in any court with jurisdiction. (emphasis added)

If any party files a judicial or administrative action asserting a claim that is subject to arbitration and another successfully stays such action or compels arbitration, the party filing that action must pay the other party's costs and expenses incurred in seeking such stay or compelling arbitration, including attorneys' fees.

*If any portion of this Mandatory Arbitration of Disputes is determined to be invalid or unenforceable, the remainder of the Section remains in full force and effect.* (emphasis added)

12.     After Petitioner's initial Demand was filed, a commencement letter was issued by JAMS requiring the parties to select an arbitrator. Respondent, however, had objected to the jurisdiction of JAMS to adjudicate Petitioner's claims as a class action in light of the above-quoted class action waiver in the Arbitration Agreement. Thus, JAMS also required the parties to brief to the JAMS National Arbitration Committee the issue raised by Respondent's jurisdictional objection. Petitioner and Respondent thereafter submitted letter briefs addressing the issue of JAMS' jurisdiction to administer Petitioner's class action Arbitration.

13.     By letter dated March 17, 2005 from JAMS Deputy General Counsel Kimberly Taylor, JAMS advised Petitioner and Respondent as follows regarding Respondent's objection and Petitioner's class claims:

> . . . In determining whether to accept an arbitration as a class action matter, JAMS will follow the law in the jurisdiction in which the case is filed, or the law as agreed upon the parties. If there is no clear law within the jurisdiction regarding the validity of the class action preclusion clause, JAMS will follow the agreement of the parties as set forth in their arbitration agreement.
>
> We are not aware of any clear law in this jurisdiction on this issue. Therefore JAMS will administer this arbitration only as an individual matter. If the claimant believes that the relevant law of the jurisdiction compels a different result, the claimant may either raise that issue with the arbitrator or with a court of competent jurisdiction.

In its March 17, 2005 letter, JAMS also advised the parties to the Arbitration that Judge Roberts had been appointed as the Arbitrator in the Arbitration.

14.     Rule 11 of the applicable rules of JAMS incorporated by Respondent in its Arbitration Agreement provides, in relevant part, as follows:

> (a)     Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.

\*   \*   \*

    (c)    Jurisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

15.    Nothing happened in the Arbitration for some nine months after Judge Roberts was appointed Arbitrator in March, 2005 because, upon information and belief, Respondent failed to pay to JAMS the retainer costs of the arbitration that the JAMS rules required Respondent to deposit in connection with the Arbitration.

16.    Finally, at the end of December, 2005, counsel for Petitioner was advised that Respondent had paid the required fees, and a conference with Judge Roberts was scheduled for the middle of January, 2006 to discuss how to proceed with the Arbitration.  During the January conference, it was agreed that the parties would submit letter briefs on the issue of the enforceability of the class action waiver under the applicable law.  Petitioner and Respondent thereafter submitted letter briefs and reply briefs to Judge Roberts during February, 2006.

17.    A telephonic Hearing with Judge Roberts on Respondent's jurisdictional objection was held on May 30, 2006.  The hearing lasted for several hours.  During the hearing, counsel for Respondent affirmatively represented to Judge Roberts and counsel for Petitioner that upholding the class action preclusion clause would *not* affect Petitioner's ability to seek injunctive relief under the KCPA on behalf of Petitioner *and* the putative class he seeks to represent (assuming *arguendo* the challenged New York State Excise Tax practices were determined to be improper).

18.    Consistent with discussions among Judge Roberts and counsel for the parties during the May 30, 2006 Hearing, Petitioner on June 2, 2006 filed a request to amend his arbitration demand specifically adding a claim under the KCPA, and accompanied his request with his First Amended Demand for Class Action Arbitration. By email dated June 9, 2006, Respondent stated that it did not oppose the amendment request, but did reserve all of its rights and defenses regarding the amended claims asserted by Petitioner.

19.    On October 25, 2006, Judge Roberts issued her Decision on Enforceability of Class Action Preclusion Clause. Judge Roberts held (at p. 9), "[b]ased on the clear provisions of the KCPA . . . that the class action preclusion provision in the Arbitration Agreement is unenforceable because it violates the anti-waiver provisions of Kan. Stat. 50-625." Judge Roberts also held that she had jurisdiction to resolve the dispute regarding the enforceability of the class action waiver, both under the broad provisions of the Arbitration Agreement and the relevant JAMS rules incorporated under the Arbitration Agreement, including JAMS Comprehensive Rule 11(c).

## THE *BENNEY/LUNDBERG* SETTLEMENT AND THE ARBITRATION PROCEEDINGS RELATING THERETO

20.    After Judge Roberts issued her October 25, 2006 Decision on the unenforceability of the class action preclusion clause, Petitioner's counsel wrote to Respondent's counsel inquiring about how Respondent wished to proceed with the Arbitration in light of the Decision.

21.    During a call between counsel on November 8, 2006, Respondent's counsel first informed Petitioner's counsel about the existence and final approval of the *Benney/Lundberg* Settlement, and the fact that the *Benney/Lundberg* Settlement release included a reference to "excise taxes." In response to a direct inquiry from Petitioner's

counsel regarding this "excise tax" reference during the call, Respondent's counsel refrained from taking a firm position regarding the purported impact of the *Benney/Lundberg* Settlement on the Arbitration, but instead provided Petitioner's counsel with copies of the November 8, 2006 Final Order of the Kansas state court approving the *Benney/Lundberg* Settlement, and copy of the underlying Stipulation of Settlement that had been entered into by Respondent in February, 2006. Thereafter, by email on December 1, 2006, Respondent asserted its position that the *Benney/Lundberg* Settlement released and precluded Petitioner's claims in the Arbitration.

22.    Tellingly (and disturbingly), neither Respondent nor its counsel had advised either Judge Roberts or counsel for Petitioner at any time prior to November 8, 2006 of the existence of the *Benney/Lundberg* Settlement and the pendency of the related preliminary and final approval proceedings -- including during the May 30, 2006 Hearing with Judge Roberts on the enforceability of the class action preclusion clause. During this Hearing, Respondent's counsel affirmatively represented to Judge Roberts that upholding the class action preclusion clause would *not* affect Petitioner's ability to seek injunctive relief under the KCPA on behalf of Petitioner *and* the putative class he seeks to represent (assuming *arguendo* the challenged New York State Excise Tax practices were determined to be improper).

23.    In light of this development, Petitioner's counsel wrote Judge Roberts on December 6, 2006 to advise her of what was occurring, and raised a number of issues that would require factual exploration before any determination regarding the preclusive effect of the *Benney/Lundberg* Settlement on Petitioner's claims in the Arbitration could be

determined. Respondent responded to Judge Roberts by letter dated December 12, 2006, and Petitioner replied by letter dated December 15, 2006.

24.    By email dated December 16, 2006, Judge Roberts directed the parties to schedule a telephone conference of two hours expected duration for the middle of January, 2006, and directed Respondent to produce, no later than three business days prior to the conference, documentation and responses to procedural questions regarding the *Benney/Lundberg* Settlement (including a chronology of settlement discussions, and the submissions to the Kansas court) requested by counsel for Petitioner in his December correspondence.

25.    In accordance with Judge Robert's directive, Respondent produced to Petitioner and Judge Roberts several boxes of documents relating to the *Benney/Lundberg* Settlement, including (i) copies of all twenty-three (23) underlying complaints settled by the *Benney/Lundberg* Settlement, (ii) the *Benney/Lundberg* Settlement Agreement and the papers filed in connection with its approval, and (iii) a chronology of settlement discussions.

26.    A telephonic Hearing with Judge Roberts was held on January 22, 2007 (and a transcript of the Hearing was requested and obtained by Petitioner's counsel). During the January 22, 2007 Hearing, and as a result of follow-up discovery directed by Judge Roberts, the following undisputed facts were established:

      i.    None of the *Benney/Lundberg* class representatives asserted the same claims regarding excise taxes based on the same factual predicate, and no excise tax claim was asserted in any of the 23 different complaints settled and dismissed as a result of *Benney/Lundberg* Settlement;

      ii.    None of the *Benney/Lundberg* class representatives had standing to assert claims pertaining to the New York State Excise Tax;

      iii    As conceded by Respondent's counsel, the issue of state excise taxes was never a subject of discussion between the parties to the

*Benney/Lundberg* Settlement at any time, and there was no evidence that any certified class representative or class counsel knew that such an issue existed;

iv.    The term "excise taxes" was inserted into the agreed-to release language in the Mediation Memorandum setting out the basic terms of the *Benney/Lundberg* Settlement on June 21, 2005 -- the day that the binding Mediation Memorandum was finalized and agreed to and executed by the parties to the *Benney/Lundberg* Settlement; and

v.    No consideration was paid for the release of the excise tax claims effected by the *Benney/Lundberg* Settlement release.

27.    As a result of information learned at the January 22, 2007 Hearing, Petitioner requested and was granted leave by Judge Roberts to file a Second Amended Demand for Class Action Arbitration (the "Second Amended Demand"). Petitioner's Second Amended Demand was filed on February 20, 2007.

28.    As also discussed during the January 22, 2007, Respondent requested and was granted leave by Judge Roberts to file motions seeking dismissal of Petitioner's Second Amended Demand on a number of grounds, including: (i) the alleged preclusive effect of the *Benney/Lundberg* Settlement; (ii) federal preemption; (iii) Petitioner's alleged failure to state claims under relevant state law; and (iv) the alleged preclusive effect of the class action waiver and lack of jurisdiction over class claims under the applicable JAMS rules.

29.    The parties submitted briefs in support of and in opposition to the motions during the period April-July, 2007. A telephonic Hearing with Judge Roberts on the motions was held on December 20, 2007. Thereafter, during the first half of 2008, Respondent and Petitioner each advised Judge Roberts by letter and/or email of subsequently issued authority they regarded as additional support for their respective positions, and the parties responded to those submissions.

30.    As noted in the Nature of the Petition, *supra*, by Decision dated and issued on July 16, 2008, Judge Roberts denied Respondent's motion seeking to apply the *Benney/Lundberg* Settlement release to Petitioner's claims in the Arbitration, holding that the *Benney/Lundberg* Settlement could not satisfy the constitutional requirement of "adequacy of representation" as applied to Petitioner's claims, for reasons including: (i) the failure of the *Benney/Lundberg* class representatives to assert the same claims based on the same factual predicate; (ii) the lack of standing of the *Benney/Lundberg* class representatives to assert claims pertaining to the New York State Excise Tax; (iii) the admission of Respondent's counsel that the issue of state excise taxes was never a subject of discussion between the parties to the *Benney/Lundberg* Settlement at any time; and (iv) the fact that "it is impossible for any consideration to have been paid for the release of the excise tax claims that no one ever discussed in the course of the settlement, no certified class representative or class counsel knew existed, and no certified class representative had standing to assert or release." In support of her decision, Judge Roberts expressly cited to the seminal decision of the United States Court of Appeals for the Second Circuit in *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981).

(a)    Judge Roberts also denied the other grounds asserted by Respondent in its dismissal motions, holding, *inter alia,* that: (i) Respondent essentially conceded that Petitioner's contract and KCPA claims as framed in the Second Amended Demand were not preempted by federal law, (ii) Petitioner's claim under the KCPA stated a cause of action under relevant state law; (iii) no reason had been presented by Respondent for Judge Roberts to diverge from her prior Decisions regarding the unenforceability of the class action waiver

under Kansas law or her jurisdiction under JAMS rules to preside over the class action Arbitration.

31.    At the conclusion of her July 16, 2008 Decision, Judge Roberts directed the parties to the Arbitration to schedule a telephonic conference "to discuss class certification procedures with respect to Claimant's KCPA claim."

32.    Counsel for Petitioner had several discussions with counsel for Respondent in furtherance of Judge Roberts' concluding directive.   Nevertheless, on Friday, August 8, 2008, Respondent advised counsel for Petitioner and Judge Roberts that Respondent that day had filed its August 8, 2008 Motion in the *Benney/Lundberg* Kansas State District Court seeking to enjoin Petitioner from continuing to arbitrate Petitioner's individual and class claims against Respondent in the Arbitration in the JAMS arbitration forum or in any other judicial forum.   Respondent's memorandum in support of the August 8, 2008 Motion was silent on the relevance under the FAA of the Arbitration Agreement and Respondent's ongoing participation in the Arbitration, and raised arguments substantially identical to those raised by Respondent and disposed of as a result of Judge Roberts' July 16, 2008 Decision.

## FIRST CAUSE OF ACTION

33.    Petitioner repeats and realleges each of the foregoing allegations as if fully set forth herein.

34.    Section 4 of the FAA, 9 U.S.C. § 4, provides in relevant part as follows:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure

to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

35.    Respondent's August 8, 2008 Motion seeking to enjoin Petitioner from continuing to arbitrate Petitioner's individual and class claims against Respondent in the Arbitration in the JAMS arbitration forum or in any other judicial forum constitutes the "failure, neglect, or refusal of [Respondent] to arbitrate under a written agreement for arbitration [for which] the making of the agreement for arbitration or the failure to comply therewith is not in issue" under FAA § 4.

36.    Petitioner is entitled to the entry of an Order by the District Court: (i) compelling Respondent to continue to arbitrate in the Arbitration in accordance with the terms of the Arbitration Agreement; (ii) enjoining Respondent from pursuing or continuing to pursue its (or any) claim for injunctive relief against Petitioner and the class he seeks to represent; and (iii) requiring Respondent to withdraw its August 8, 2008 Motion.

37.    Additionally and/or alternatively, if necessary, the District Court should issue an Order, pursuant to 28 U.S.C. § 2283, staying the Kansas state court proceedings "as necessary in aid of its jurisdiction, or to protect or effectuate its judgments" in connection with the granting of Petitioner's Petition.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner, on behalf of himself and the putative class he seeks to represent in the Arbitration and herein, prays for relief, and an Order in his favor, as follows:

A.    Declaring that Petitioner and Respondent are parties to the Arbitration Agreement, the making of which is not an issue;

B.      Declaring that the conduct of Respondent in connection with the August 8, 2008 Motion constitutes the "failure, neglect, or refusal of [Respondent] to arbitrate under a written agreement for arbitration" under FAA § 4;

C.      Compelling Respondent to continue to arbitrate in the Arbitration in accordance with the terms of the Arbitration Agreement;

D.      Enjoining Respondent from pursuing or continuing to pursue its (or any) claim for injunctive relief against Petitioner and the class he seeks to represent;

E.      Requiring Respondent to withdraw its August 8, 2008 Motion;

F.      Additionally and/or alternatively, staying the Kansas State Court *Benney/Lundberg* proceedings pursuant to 28 U.S.C. § 2283 "as necessary in aid of its jurisdiction, or to protect or effectuate its judgments" in connection with the granting of Petitioner's Petition;

G.      Awarding the costs and disbursements incurred in connection with this Petition, including reasonable attorneys' fees and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      August 11, 2008

                              Respectfully submitted,

                              SANFORD WITTELS & HEISLER LLP

                              By: _____
                                    William R. Weinstein (WW-4289)
                                    950 Third Avenue, 10th Floor
                                    New York, NY 10022
                                    (646) 723-2947

                              ATTORNEYS FOR PETITIONER
                              AND THE CLASS

# Exhibit A



## Terms & Conditions

- Important Service/Product Specific Terms
- Terms and Conditions of Service
- Copyright and Trademark
- Digital Millennium Copyright Act
- Security Policy
- Sprint PCS Web Site Privacy Policy

By accessing any areas of this Internet site or by ordering any product or service through the use of this Internet site, user agrees with Sprint PCS that user is bound by the terms set forth below. The terms of this agreement include terms on use of this Internet site, terms on the purchase of products and services, and terms regarding copyright and trademark matters.

"Sprint PCS" means (1) entities controlled by, under common control with or controlling Sprint Spectrum Holding Company, L.P., including without limitation Sprint. , SprintCom Inc., and PhillieCo L.P., (2) any contractual affiliate of the entities in (1) above that are authorized to use the Sprint PCS brand name and which either sell wireless services or manage a portion of the Sprint PCS wireless network, and (3) any entity which is a member of the PCS Group as defined from time to time by Sprint Corporation.

### Important Service/Product Specific Terms

Your Agreement with Sprint PCS includes terms of your service plan (including those outlined below) and the most recent Sprint PCS Terms and Conditions of Service ("Ts and Cs") - carefully read these all terms which include, among other things, a MANDATORY ARBITRATION of disputes provision. For business customers only, your Agreement with Sprint also includes (a) the Sprint Standard Terms and Conditions for Communication Services ("Standard Terms and Conditions"), and (b) the Wireless Services Product Annex ("Product Terms and Conditions"), both as posted at www.sprint.com/ratesandconditions on the date you signed your wireless service agreement. In the event of conflicting terms or inconsistency for business customers only, your wireless service agreement controls followed by the Product Terms and Conditions, then the Standard Terms and Conditions. For business customers, dispute resolution procedures are described in the Standard Terms and Conditions.

**Term Agreements:** If your Agreement requires you to keep a phone active/maintain a line service for a minimum Term, the Term begins on the phone activation date; for customers changing service plans, the Term begins when the new service plan is selected. You may terminate any line of service before its Term ends by calling *2, however you will be responsible for an EARLY TERMINATION FEE of $150 ("Fee") for each line of service terminated early. Business customers are only liable for the Fee on lines of service that are the responsibility of the business. Business customers are not liable for the Fee on lines of service that are the responsibility of any employees. You do not have to pay the Fee if you terminate under our return policy or where the Ts and Cs allow you to do so without the Fee. Payment of the Fee does not satisfy other outstanding obligations owed to us, including maintaining Term Commitments on other lines of service, or service or equipment related charges.

**Service Provisions:** Coverage is not avai'l everywhere. See our mapping brochure or visit our website for approximate outdoor coverage information. Plans are subject to credit approval. Prices do not include taxes, national Sprint surcharges such as a USF charge and cost recovery fees of $0.65, and local Sprint surcharges of up to 15% in certain areas but in most instances less than 2%. Surcharges are not taxes or government required charges. Call 1-866-770-6690 for the up to date amount of the USF charge and information on cost recovery charges. A non-refundable $36.00 phone activation fee

applies to new activations, certain service plan changes or upgrades of equipment. A deposit of up to $500 may be required to establish service. Service requires a phone compatible with our network. Monthly service charges are not refundable if service is terminated before your billing cycle ends.

**Basic Services:** All phone usage, including incoming and outgoing calls, incur charges. Unused plan minutes do not carry forward. Except with certain plans, included plan minutes are not good for local or long-distance off network roaming calls. International roaming rates will vary. On a call that crosses time periods, minutes are deducted or charged based on the call start time. Calls are rounded up to the next whole minute. Sprint PCS to PCS Calling only avai'l on calls placed directly between separate Sprint PCS Phones (not through voicemail, Directory Assistance, or other indirect methods) while each are on the Sprint Nationwide PCS Network.

**Sprint PCS Vision Services:** Services require a Sprint PCS Vision Phone or device and are not avai'l while roaming off the Sprint Nationwide PCS Network. Data usage is calculated on a per kilobyte basis and rounded up to the next whole kilobyte. Kilobyte usage will be rounded up to the next full cent. Rounding occurs at the end of each session or each clock hour and, at that time, we will deduct accumulated data usage from your plan, or assess overage or casual usage charges. You are responsible for all data activity from and to your phone/device, regardless of who initiates the activity. Estimates of data usage will vary from actual use. In certain instances, we may delete premium and non-premium items downloaded to avai'l storage areas (e.g., personal vault), including any pictures, games, ringers or screen savers. Your invoice will not separately identify the number of kilobytes attributable to your use of specific sites, sessions or services used. Premium Services (games, ringers, etc.) priced separately.

**Sprint PCS Vision.** Not avai'l where use is in connection with server devices or host computer applications, other systems that drive continuous heavy traffic or data sessions, or as substitutes for private lines or frame relay connections. Sprint PCS Vision Packs are not avai'l: (1) with any other device used in connection with a computer or PDA - including phones, smart phones or other devices used with connection kits or similar phone-to-computer/PDA accessories; and (2) with Bluetooth Vision capable PCS Phones used as a modem in connection with other devices. Sprint reserves the right to deny or to terminate service without notice for any misuse. Credits for premium services do not carry forward and are not avai'l for use with all services.

**Roaming Included Plans.** Not avai'l with single-band or digital mode only phones, or to customers residing in an area not covered by the Sprint Nationwide PCS Network. Sprint may terminate service if a majority of minutes in a given month are used while roaming off the Sprint Nationwide PCS Network. International calling including in Canada & Mexico, not included. Usage in Expanded Voice Coverage areas may, in some instances, be invoiced after 30-60 days. When calling from Expanded Voice Coverage Areas: (a) PCS Vision and PCS to PCS calling services are not avai'l; and (b) certain calling features (Voicemail, Caller I.D., Call Waiting, etc.) may not work.

**Add-a-Phone.** Requires a minimum two-year Term agreement for each phone/line of service added ("Secondary Line"). The first phone activated on the service plan ("Primary Line") and Secondary Lines may have different Term commitment end dates. If the Primary Line on the account is terminated prior to the expiration of the Term of any Secondary Line, a Secondary Line must move to the Primary Line position.

**Voice Command.** Not avai'l while roaming off the Sprint Nationwide PCS Network. Calls to 911 or similar emergency numbers cannot be placed through Voice Command. You may dial "911" on your phone in an emergency. Airtime and applicable long distance charges begin when you press or activate the TALK or similar key.

**Roadside Rescue.** Must be with vehicle and have your Sprint PCS Phone with you at the time of service. Limit 4 calls per program year (starts when service is added to your account). Allow approx. 72 hours to provision service to your account. Covers light passenger cars &

trucks. Excludes RVs, motorcycles, boats, trailers, limousines, taxis and commercial or heavy-duty vehicles. This is not a reimbursement service and is not valid when operating vehicle off-road. Services are provided by AAA, AAA clubs, CAA clubs and, in CA, the National Automobile Club. Sprint is not a motor club.

**Sprint PCS International and Sprint PCS Call Canada:** For verification purposes, activation of plan may take approximately 1 to 3 days, additional information may be required during verification process.

**2 Month Free Offers.** If you do not wish to continue with the service after the initial 2 months, you must contact us prior to the billing end date of your second invoice to avoid charges. Additional charges apply for premium content.

**Sprint PCS Risk-Free Guarantee.** Requires return of your complete, undamaged Sprint PCS Phone with the original retailer's proof of purchase within 14 days (30 days for California residents). You must still pay all charges based on actual usage (partial monthly service charges, taxes and Sprint surcharges).

**Sprint PCS Clear Pay Program.** In most instances a deposit between $125 and $500 applies. We may require a deposit of up to $1000 in certain instances. A preset account spending limit of between $125 and $500 will apply - ask the specific amount. We may limit the number of phones you can activate on your account. Monthly service plan charges accrue even if your service is turned off, when you exceed your spending limit or in instances of nonpayment. Roaming usage may be invoiced after 30 - 60 days.

Top of page

## Sprint PCS Terms and Conditions of Service

A Para solicitar esta literatura en español, por favor contactar a 1-888-211-4PCS(4727).

**General.** This agreement ("Agreement") covers the terms on which we agree to provide and you agree to accept any service or product we make available to you, including your wireless services, wireless devices, etc. (collectively "Services"). You accept this Agreement when you do any of the following: (a) provide your written or electronic signature; (b) accept through an oral or electronic statement; © attempt to or in any way use any of the Services; (d) pay for any Services; or (e) open any materials or package that says you are accepting when you open it. The Agreement includes the terms in this document together with the terms associated with the Services you select (as described in our marketing materials, e.g., service plan brochures, or on our website). You represent that you are at least 18 years old. In this document, we use the words "we," "us," "our" or "Sprint" to refer to Sprint Spectrum L.P. and its affiliates doing business as Sprint PCS.

**Agreement.** We may change the Agreement at any time with notice. Any changes to the Agreement are effective when we publish them. If you use our Services or make any payment to us on or after the effective date of the changes, you accept the changes. If we change a material term of the Agreement and that change has a material adverse effect on you, you may terminate the Agreement without an Early Termination Fee by calling 1-888-567-5528 within 30 days after the changes go into effect. You understand and agree that taxes, Universal Service fees and other charges imposed by the government or based on government calculations may increase or decrease on a monthly basis, and that this paragraph does not apply to any increases in such taxes, Universal Service fees or other charges.

**Activating Service.** Before activation, we may check your credit and verify your identity. You must have and maintain satisfactory credit to receive and continue to receive Services. We may charge a nonrefundable activation fee, deposit, prepayment or other fee to establish or maintain Services.

**Term Commitments.** Unless we specifically tell you otherwise, our

service plans require that you maintain service for a minimum term ("Term Service Plan"), usually 1 or 2 years. After satisfying this minimum term, your service plan will continue on a month-to-month basis unless you have agreed to extend the term for additional period (s). Certain service, promotional or product offers may require that you agree to or extend a Term Service Plan. As discussed below, we may charge you an Early Termination Fee if you deactivate a Term Service Plan before the end of the term.

**Using Services.** You agree to not use our Services in an unlawful, fraudulent or abusive manner. You may not resell or lease Services to anyone. Sprint is not responsible for any opinions, advice, statements, services applications or other information provided by third parties and accessible through our various Services, including the Internet. Neither Sprint, its vendors or licensors guarantees the accuracy, completeness or usefulness of information that is obtained through these Services. You are responsible for evaluating such content. **You are also responsible for any use of our Services through any wireless device on your account including, but not limited to, use by children or minors. We strongly recommend that you closely monitor any such usage.**

**Changing Services.** Changes to Services will generally be effective at the start of your next full invoicing cycle. In certain instances, the changes may take place sooner, in which case your invoice will reflect pro-rated changes. Certain changes may be conditioned upon payment of an Early Termination Fee or certain other charges.

**Termination of Services.** Consistent with this Agreement: (a) we may terminate Services at any time with notice to you and, in certain instances, without notice; and (b) you may terminate Services at any time with prior notice to us. Except as otherwise provided in this Agreement, IF YOU TERMINATE YOUR **TERM SERVICE PLAN** EARLY, OR WE DO SO FOR GOOD CAUSE, YOU WILL BE REQUIRED TO PAY THE APPLICABLE EARLY TERMINATION FEE ASSOCIATED WITH YOUR SERVICES. We will not charge an Early Termination Fee for deactivations consistent with our Return Policy or for service plans being provided on a month-to-month basis. If any Services are terminated before the end of your current invoicing cycle, we will not prorate charges to the date of termination, and you will not receive a credit or refund for any unused Services.

**Wireless Devices, Numbers & E-mail Addresses.** We did not manufacture your wireless device and we are not responsible for any defects or for the acts or omissions of the manufacturer. The only warranties on your device are any limited warranties extended by the manufacturer directly to you or passed on to you through us. Your device may not accept Services directly from any other carrier. You do not have any rights to any number, e-mail address or other identifier we may assign to your device or account; you may not modify, change or transfer any of these except as we allow or as allowed for by law. In certain instances, you may transfer your number from another carrier to us, or from us to another carrier. We do not guarantee that transfers to or from us will be successful. If you transfer your number away from us, the terms of this Agreement (e.g., Early Termination Fee, etc.) still apply. If a transfer to Sprint is not successful, you will be responsible for any discounts provided to you with the purchase of your device. See our printed in-store materials or visit www.sprintpcs.com for additional important information on number transfers.

**Coverage.** Available coverage areas for Services are generally identified in our mapping brochures and at www.sprintpcs.com. This may include coverage on our digital network (the "Sprint Nationwide PCS Network") as well as coverage we make available to you through agreements with other carriers ("off network" or "roaming" coverage). **All coverage maps are high level representations of outdoor coverage and there are gaps in coverage within areas shown as covered on the maps. Coverage is not available everywhere, nor can we guarantee you will receive coverage at all times, or without interruptions or delays (e.g., dropped calls, blocked calls, etc.) in the coverage areas we identify. Actual coverage and quality of Services may be affected by conditions within or beyond our control, including network problems, software, signal strength, your equipment, structures (including buildings in which you may be located), atmospheric, geographic, or topographic conditions.**

**Roaming Coverage.** You are roaming anytime your phone indicates that you are roaming. Roaming coverage is only available with certain devices and, unless included as part of your Services, will result in additional charges. Roaming calls placed "manually" (through an operator or with a credit card) will always incur separate and additional charges. Depending on your phone settings, you may automatically roam if there is a gap or interruption in coverage within the Sprint Nationwide PCS Network coverage area and roaming coverage areas. See your phone guide for how to adjust phone settings. Certain features and services may not be available in roaming coverage areas (including PCS Vision, voicemail, call waiting, call forwarding, etc.).

**Charges.** Carefully review the terms of your Services. You will be assessed charges based on the terms of your Services including, without limitation, monthly recurring charges and charges based on actual usage (e.g., charges for long distance, roaming, call forwarding, directory assistance, etc.). Airtime and other time based usage charges are calculated from when your device first initiates contact with a network until the network connection is broken, whether or not you were actually successful in connecting to the intended destination. However, you will not be charged for voice calls that ring and do not pick up, or if you get a busy signal. For voice calls received by your device, you are charged from the time shortly before the phone starts ringing until the call is terminated. You are charged for an entire voice call based on the time period in which the call is initiated. Partial minutes of use are rounded up to the next minute.

**Sprint PCS Vision Charges.** Vision usage is measured in bytes, not in minutes. Bytes are rounded up to kilobytes. Usage rounding occurs at the top of each clock hour while in a session and at the end of each session and is then charged to you based on the terms of your Services. Depending on your Services, usage may be charged against an allowance or on a fixed price per kilobyte. Usage charges may be rounded up to the next cent at monthly or other intervals. In certain instances, you may not know that your session has not ended. As long as your device is connected to our network, you will incur data usage charges. You will be charged for all data directed to the internet address (or "IP address") assigned to your device, regardless of who initiates the activity or whether your device actually receives the data. This includes, but is not limited to, the amount of data associated with the particular information/item (e.g. game, ringer, email, etc.), additional data used in accessing, transporting and routing this information/item on our network, data from partial or interrupted downloads, re-sent data, and data associated with unsuccessful attempts to reach websites or use applications. Based on these and a number of other factors (e.g., the specific application, network performance, etc.) data used and charged to you will vary widely, even for the same activity. Estimates of data usage - for example, the size of downloadable files - will not be accurate or a reliable predictor of actual usage. Your invoice will not separately identify the number of kilobytes attributable to your use of specific sites, sessions or services.

**Taxes and Surcharges.** We invoice you for taxes, fees and other charges levied by or remitted directly to federal, state, local or foreign governments including, without limitation, sales, gross receipts, Universal Service, use, and excise taxes. If you claim any tax exemption, you must provide us with a valid tax-exempt document. Tax exemptions are not applied retroactively. We also invoice you for surcharges that we collect and keep to pay for the costs of complying with government programs such as number pooling and portability, and Enhanced 911 service; these charges are not the taxes nor government imposed assessments.

**Invoicing & Payment.** Invoicing cycles and dates may change from time to time. Monthly recurring and related charges for Services are generally invoiced one invoicing cycle in advance. Other charges are invoiced soon after they are incurred. Most usage is generally applied to the invoicing cycle in which they are incurred, but in some instances may be applied to subsequent invoicing cycles. You are responsible for all charges associated with any device activated on your account, regardless of who used the device. You must pay all charges by the due date on the invoice. **Past due amounts accrue late charges until paid at the rate of 5% per month or at the highest rate allowed by law and may result in immediate suspension of your account.** If you agree to any auto-payment option through banking or credit

account, we may initiate payment from the account for all amounts we invoice you without additional authorization or notice. Based on your credit or payment history, we may require certain forms of guaranteed payment as a condition of maintaining Services. If we invoice you for amounts on behalf of a third-party, payments received are first applied to amounts due to us. You may be charged additional fees for certain methods of payment and for payments denied by a financial institution. Acceptance of payments (even if marked "paid in full") does not waive our right to collect all amounts that you owe us.

**Disputed Charges.** Disputes concerning any charges invoiced must be raised within 60 days of the date of the invoice. You accept all charges not disputed in this time period. Disputes can only be made by calling or writing us as directed on your invoice.

**Account Spending Limit & Deposits.** We may impose an account spending limit ("ASL") on any account without notice. We will notify you of an ASL based on your credit or payment history and may reduce the ASL at any time with prior notice. An ASL should not be relied on to manage usage on your account. We may suspend an account without prior notice when the account balance reaches the ASL, even if the account is not past due. Services can be restored upon payment of an amount that brings the account balance below the ASL and any past due amounts. If we require a deposit for you to establish or maintain an account, we will hold the deposit as partial guarantee of payment for Services. We may change the deposit amount at any time with notice for good reason. Except as we allow, a deposit may not be used to pay any invoice or delay payment. The deposit amount, the length of time we hold the deposit and changes to the deposit amount are determined based on your credit and payment history. The rate of interest, if any, on the deposit is subject to change. We may mix deposits with our other funds. If your account is terminated for any reason, we may without notice apply your deposit to any outstanding charges. We may send any remaining deposit amounts to your last known address within 75 days after account termination. If the funds are returned to us, you may claim these funds for one year from the date of return. Any money held during this one-year period will not accrue interest for your benefit and are subject to a servicing fee charged against the balance. You forfeit any portion of the money left after the one-year period.

**Other Sprint PCS Vision PCS Terms.** You will not receive voice calls while using Vision. Vision is not available for use with server devices or host computer applications, other systems that drive continuous heavy traffic or data sessions, or as substitutes for private lines or frame relay connections. Unlimited Vision plans/options may not be used with Sprint PCS phones or smart phones being used as a modem in connection with other equipment (e.g., computers, etc.) through use of connection kits or other phone-to-computer/PDA accessories, or Bluetooth or other wireless technology. We may terminate services without notice for any misuse. You may have access to certain games, ringers, screen savers and other items on our Vision site ("Premium Services") that are available for an additional charge. You will be billed for Premium Service purchases on your Sprint PCS invoice based on the charges as specified at purchase. Subject to the terms of the content purchased, we may delete premium and non-premium items downloaded to any storage areas we may provide, including any pictures, games and other content. We may limit the amount of Premium Services you may purchase in a specific timeframe (month, week, day, or other time period).

**Voice Command.** Calls to 911 or similar emergency numbers cannot be placed through the Voice Command feature. See our printed in-store materials or visit www.sprintpcs.com for additional important information on this option.

**Wireless Web.** Wireless Web Services may be available depending on your device and Service plan/option. This is not a Vision service. Usage is calculated on minutes used and generally deducts from your Service plan minutes. See our printed in-store materials or visit www.sprintpcs.com for additional important information on this option.

**Lost or Stolen Equipment.** If your device is lost or stolen, please notify us immediately by calling 1-888-211-4PCS. **You are responsible for all charges incurred before you notify us of the loss or theft.** You agree to cooperate reasonably with us in investigating suspected

unlawful or fraudulent use.

**Messaging.** You may incur charges in accessing, sending or receiving messages on your device. We may impose limits on the number of voicemail, text, email or other messages that can be retained through your account. Indicators of messages on your device, including mailbox icons, may not always provide an up to date indication of new messages and you may at times need to manually reset or clear your mailbox indicator. Legitimate messages may be interrupted by software aimed at prevention of SPAM or similar messages.

**Caller ID.** If you do not want people you call to receive the number assigned to your phone, call us at 1-888-211-4PCS for information about automatic Caller ID blocking. The number assigned to your phone can be blocked on a per-call basis by dialing *67 + Destination Number + TALK (or similar key). Caller ID blocking is not available when using Vision or Wireless Web services.

**TTY Access.** A TTY (also known as TDD or Text Telephone) is a telecommunications device that allows people who are deaf or hard of hearing, or who have speech or language disabilities, to communicate by telephone. TTY doesn't work with all devices. If you have a TTY-capable device, it may not function effectively, or at all, when attempting 911 calls and should not be relied on for such calls.

**Disclaimer of Warranties.** WE MAKE NO REPRESENTATIONS OF WARRANTIES, EXPRESS OR IMPLIED, INCLUDING (TO THE EXTENT ALLOWED BY LAW) ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE CONCERNING YOUR SERVICES OR WIRELESS DEVICE. WE DO NOT PROMISE UNINTERRUPTED OR ERROR-FREE SERVICES AND YOU AGREE TO HOLD US HARMLESS FOR ALL SUCH PROBLEMS.

**Limitation of Liability.** Neither we nor our vendors, suppliers or licensors are liable for any damages arising out of or in connection with any: (a) act or omission by your, or another person or company; (b) providing or failing to provide Services, including deficiencies or problems with your wireless device, our network coverage or Services (e.g., dropped, blocked, interrupted calls/messages, etc.); © traffic or other accidents, or any health-related claims allegedly arising from the use of Services, any wireless devices or related accessories; (d) content or information accessed while using our Services, such as through the internet; (e) interruption or failure in accessing or attempting to access emergency services from your phone, including through 911, E911 or otherwise; or (f) events due to factors beyond our control, including acts of God (including, without limitation, weather-related phenomena, fire or earthquake), war, riot, strike, or orders of governmental authority. **In the event we are found to be responsible to you for monetary damages relating to the Services (including wireless devices), you agree that any such damages will not exceed the pro-rated monthly recurring charge for your Services during the affected period.**

**NO CONSEQUENTIAL OR OTHER DAMAGES.** UNDER NO CIRCUMSTANCES ARE WE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH PROVIDING OR FAILING TO PROVIDE SERVICES, PHONES OR OTHER EQUIPMENT USED IN CONNECTION WITH THE SERVICES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOSS OF BUSINESS, OR COST OF REPLACEMENT PRODUCTS AND SERVICES. THIS SECTION SURVIVES TERMINATION OF THIS AGREEMENT.

**MANDATORY ARBITRATION OF DISPUTES.** INSTEAD OF SUING IN COURT, YOU AND SPRINT AGREE TO ARBITRATE ANY AND ALL CLAIMS, CONTROVERSIES OR DISPUTES AGAINST EACH OTHER ARISING OUT OF OR RELATING TO THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE SERVICES, ANY PHONES/EQUIPMENT, OR ADVERTISING, EVEN IF IT ARISES AFTER YOUR SERVICES HAVE TERMINATED, AND INCLUDING CLAIMS YOU MAY BRING AGAINST SPRINT'S EMPLOYEES, AGENTS, AFFILIATES OR OTHER REPRESENTATIVES, OR THAT

SPRINT MAY BRING AGAINST YOU ("CLAIMS"). THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT AND ITS PROVISIONS, NOT STATE LAW, GOVERN ALL QUESTIONS OF WHETHER A CLAIM IS SUBJECT TO ARBITRATION. THIS PROVISION DOES NOT PREVENT EITHER YOU OR SPRINT FROM BRINGING APPROPRIATE CLAIMS IN SMALL CLAIMS COURT, BEFORE THE FEDERAL COMMUNICATIONS COMMISSION OR A STATE PUBLIC UTILITIES COMMISSION.

YOU AND SPRINT FURTHER AGREE THAT NEITHER SPRINT NOR YOU WILL JOIN ANY CLAIM WITH THE CLAIM OF ANY OTHER PERSON OR ENTITY IN A LAWSUIT, ARBITRATION OR OTHER PROCEEDING; THAT NO CLAIM EITHER SPRINT OR YOU HAS AGAINST THE OTHER SHALL BE RESOLVED ON A CLASS-WIDE BASIS; AND THAT NEITHER SPRINT NOR YOU WILL ASSERT A CLAIM IN A REPRESENTATIVE CAPACITY ON BEHALF OF ANYONE ELSE. IF FOR ANY REASON THIS ARBITRATION PROVISION DOES NOT APPLY TO A CLAIM, WE AGREE TO WAIVE TRIAL BY JURY.

A single arbitrator engaged in the practice of law will conduct the arbitration. The arbitration will be filed with and the arbitrator will be selected according to the rules of either JAMS or the National Arbitration Forum ("NAF"), or, alternatively, as we may mutually agree. We agree to act in good faith in selecting an arbitrator. The arbitration will be conducted by and under the then-applicable rules of JAMS or NAF, wherever the arbitration is filed or, if the arbitrator is chosen by mutual agreement of the parties, the then-applicable rules of JAMS will apply unless the parties agree otherwise. All expedited procedures prescribed by the applicable rules will apply. We agree to pay our respective arbitration costs, except as otherwise required by rules of JAMS or NAF, as applicable, but the arbitrator can apportion these costs as appropriate. The arbitrator's decision and award is final and binding, and judgment on the award may be entered in any court with jurisdiction.

If any party files a judicial or administrative action asserting a claim that is subject to arbitration and another party successfully stays such action or compels arbitration, the party filing that action must pay the other party's costs and expenses incurred in seeking such stay or compelling arbitration, including attorneys' fees.

If any portion of this Mandatory Arbitration of Disputes section is determined to be invalid or unenforceable, the remainder of the Section remains in full force and effect.

**Miscellaneous.** You may notify us by calling us at 1-888-211-4PCS, or use that number to get our current address for written notice. We may send you notice to your last known address in our invoicing records, or by calling leaving you a voice message on your wireless device or home phone. Properly addressed written notice is effective three days after deposit in the U.S. mail, postage prepaid. This Agreement is governed by and must be construed under federal law and the laws of the State of Kansas, without regard to choice of law principles. If either of us waives or fails to enforce any requirement under this Agreement in any one instance, that does not waive our right to later enforce that requirement. If any part of this Agreement is held invalid or unenforceable, the rest of this Agreement remains in full force and effect. Section headings are for descriptive, non-interpretive purposes only. You may not assign this Agreement to any other person or entity without our prior written approval. This Agreement (including any referenced documents and attachments) makes up the entire agreement between us and replaces all prior written or spoken agreements.

Top of page

## Copyright and Trademark

© 1998-2001 Sprint. All rights reserved. Sprint and the diamond logo are registered trademarks of Sprint Communications Company L.P., used under license. Sprint PCS is a service mark of Sprint Communications Company L.P.

This Internet site contains information, data, software, photographs, graphs, videos, graphics, music, sounds and other material (collectively, "Content") that are protected by copyrights, trademarks, trade secrets or other proprietary rights. These rights are valid and protected in all forms, media and technologies existing now or hereafter developed. All Content is copyrighted as a collective work under the U.S. copyright laws, and Sprint PCS owns a copyright in the selection, coordination, arrangement, and enhancement of such Content. User may not modify, remove, delete, augment, add to, publish, transmit, participate in the transfer or sale of, create derivative works from, or in any way exploit any of the Content, in whole or in part. All Content is copyrighted and Sprint PCS owns a copyright in the selection, coordination, arrangement and enhancement of the Content, page headers, custom graphics and button icons.

Sprint PCS grants you permission to copy electronically and to print in hard copy portions of the Content for (1) personal use if you maintain all copyright notices, trademark legends and other proprietary rights notices, (2) using this Internet site as a personal shopping resource, (3) communicating with Sprint PCS about a Sprint PCS product or service, or (4) placing an order with Sprint PCS. Any other use of materials on this site, including reproduction for purposes other than permitted above, uploading, modification or distribution, is prohibited without Sprint PCS' prior written permission.

All other trademarks, product names, and company names and logos appearing on Sprint PCS are the property of their respective owners. User must obtain permission from the those owners before copying or using the owner's trademarks, product names and company names and logos.

Top of page

## Digital Millennium Copyright Act

Sprint PCS respects the intellectual property rights of others and is committed to complying with U.S. Copyright laws. Sprint PCS policy is to respond to notices of alleged infringement that comply with the Digital Millennium Copyright Act. The Digital Millennium Copyright Act of 1998 ("DMCA") provides recourse for owners of copyrighted material who believe their rights under U.S. copyright law have been infringed on the Internet.

Sprint generally provides transitory digital network communications under 17 U.S.C. 512 (a) of the DMCA ("512(a) Service Provider"). Sprint is therefore not obligated to respond to a copyright owner or an agent on behalf of the owner nor does Sprint have a duty to remove or disable access to material transmitted, routed or connected to the Sprint network that is initiated and/or directed by an individual Internet user.

If you believe your work has been copied in a way that may constitute copyright infringement and is accessible in a way that may constitute copyright infringement by Sprint as not merely providing transitory digital communications other than as a 512(a) Service Provider under 17 U.S.C. 512(a) of the DMCA, please provide notice to our Designated Agent. The notice must include the following information as provided by the Digital Millennium Copyright Act, 17 U.S.C. 512 (c) (3), in addition the notice should include the basis for your belief that Sprint is not merely providing transitory digital communications under 17 U.S.C. 512 (a) of the DMCA:

- A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;
- Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site;
- Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled; and information reasonably sufficient to permit the service provider to locate the material;

PCS Terms & Conditions

- Information reasonably sufficient to permit the service provider to contact the complaining party, such as address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted;
- A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law;
- A statement that the information in the notification is accurate and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

The Designated Agent for notice of copyright infringement claims may be reached as follows:

By Mail:
Timothy A. Nehls
6450 Sprint Parkway
Mailstop: KSOPHN0312-3A418
Overland Park, Kansas 66251

By Fax: (913) 315-9259

By email: copyrightnotice@mail.sprint.com

Counter Notification to Claimed Copyright Infringement
If a copyright infringement notice has been wrongly filed against you as a result of mistake or a misidentification of the material, you may file a counter notification with Sprint PCS Designated Agent. The counter notification must provide the following information:

- Physical or electronic signature of the subscriber;
- Identification of the material that has been removed or to which access has been disabled and the location at which the material appeared before it was removed or access to it was disabled;
- A statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification;
- The subscribers name, address, telephone number and email address, and a statement that the subscriber consents to the jurisdiction of the Federal District Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notification or an agent of such person.

Sprint PCS will terminate all account holders and subscribers who are repeat infringers of intellectual property laws.

Top of page

## Security Policy

Sprint PCS uses reasonable precautions to protect the privacy of your credit card and other ordering information by utilizing a Secure Socket Layer ("SSL") connection. Accordingly, your credit card and other ordering information, such as your name and address, is encrypted using the SSL connection and is not expected to be read in an intelligible form as it travels to Sprint PCS' order processing system. Sprint PCS' order processing systems is not connected to the Internet and is not accessible to the public.

Many web browsers support the use of an SSL connection, but if your browser does not support the use of an SSL connection or if you prefer not to send your credit card number over the Internet, you can place your order by calling Sprint PCS toll free at **1-888-253-1315** (U.S. only). Sprint PCS Telesales Representatives are available 7 days a week, Monday through Friday from 6:00 a.m. to 11:00 p.m. and Saturday and Sunday 8:00 a.m. to 6:00 p.m. to take your order.

Top of page

## Sprint PCS Web Site Privacy Policy

Effective: July 30, 2004

Sprint respects the privacy of its customers, and other individuals and businesses using the Web sites owned and operated by Sprint and its affiliates ("Sprint Sites"). This updated Privacy Policy is posted to keep you informed about the types of information collected on Sprint Sites and how the information is used and protected. The revised Privacy Policy includes information about advertisements on Sprint Sites and access to your account information.

Sprint protects the privacy of its local, long distance and wireless customers consistent with the Federal Telecommunications Act and rules and regulations issued by the Federal Communications Commission.

Sprint's Privacy Policy for its Internet services (including Sprint Vision, wireless Internet access, prepaid dial-up Internet access, and high speed Internet services) can be accessed at: www.sprint.com/privacypolicy/broadbandservices.

There are two types of information that may be exchanged between the Sprint Site and the user during each visit to a Sprint Site. They are:

- General technical data transmitted between your computer and the Sprint Site that does not identify you personally.
- Personally identifiable information that you voluntarily share. The types of personally identifiable information that you might share include your name, address, telephone number, social security card number, e-mail address and credit card number.

### ANONYMOUS INFORMATION

In order to provide you with the information and services that you look for from the Sprint Sites, Sprint gathers certain types of information from you that are not personally identifiable. This is called anonymous information and includes:

- The type of Internet browser you use when you visit
- The types of computer operating system you use
- The search engine you use to access the Sprint Sites (such as "AOL.com," "Yahoo.com" or "Go.com")
- The specific Sprint Site that you visit (SprintPCS.com, Sprint.com, etc.).

The anonymous information collected is not associated with you personally or your business. Sprint uses this anonymous information in the aggregate to improve Sprint Sites and the services we provide through those sites.

### USE OF COOKIES

Sprint Sites may use "cookies" to collect the anonymous information described in this Privacy Policy. Cookies are bits of encrypted data that are loaded by Sprint's server onto your computer when you visit a Sprint Site. The server can retrieve the cookies the next time you visit a site and use them to identify the computer as a return visitor. Sprint uses cookies to collect non-personally identifiable information and generically track usage patterns on the Sprint Sites in order to monitor activity and administer the sites. Sprint also uses information obtained from cookies to improve Sprint Sites, and make decisions concerning advertising, product offerings and services. Most users can disable cookies from their Internet browsers, receive a warning before a cookie is placed on their computer, and erase all cookies from their computer hard drives by following the instructions provided by the browser.

### ADVERTISEMENTS ON SPRINT SITES

Advertising companies deliver ads on some Sprint Sites. You should be aware that when you click on these ads, the advertising companies

may also deploy cookies to receive anonymous information about ad viewing by Internet users on Sprint Sites and other Web sites. This information is associated with your Web browser, but cannot be associated with your name or e-mail address without your permission. Therefore, advertising companies may know where your computer goes on the Web, but they do not know who you are unless you tell them. Sprint does not provide personally identifiable information about its customers or Sprint Site visitors to these advertising companies.

PERSONALLY IDENTIFIABLE INFORMATION

Sprint may ask you to provide what is often referred to as "personally identifiable information" such as your name, address, telephone number, social security number, and e-mail address when you use Sprint Sites to: purchase a service or product online, enter a contest or sweepstakes, ask to receive information, respond to a survey, register with a Sprint Site, access your account, ask for a personalized service, request customer service online, or apply for a job. You always have the alternative of mailing or calling Sprint with the information requested if you do not wish to provide it online. Personally identifiable information provided at a Sprint Site to order Sprint services other than Internet services will be protected in the same manner as when the information is provided by other means such as over the telephone or by mail. We protect customer information obtained from Sprint's local, long distance and wireless service customers consistent with federal laws governing telecommunications services and with regulations issued by the Federal Communications Commission. Sprint's Privacy Policy for its Broadband services can be accessed at:
www.sprint.com/privacypolicy/broadbandservices.

We use personally identifiable information provided at a Sprint Site in the following ways unless otherwise specified:

- For its intended purpose (such as to complete an online order for service),
- To provide you with information about new Sprint products and services or products and services offered in conjunction with Sprint business partners.

DISCLOSURE TO THIRD PARTIES

Sprint will not sell personally identifiable information to third parties. We may share information with business partners that assist Sprint in providing you service. We are committed to giving you the choice whether or not we use your information for marketing purposes or share information with business partners for marketing purposes. We will not otherwise disclose to outside parties any personally identifiable information obtained from a Sprint online service or the registration at a Sprint Site without your consent except under the following circumstances:

- When required by law,
- When disclosure is necessary to protect the safety of a customer, third party or Sprint's property,
- If it is required in connection with any sale or transfer of all or a portion of Sprint's assets.

To assist in providing you services, Sprint may share the anonymous information described in this Privacy Policy with third parties from time-to-time. When Sprint uses agents, contractors or other companies to perform services on its behalf, Sprint will require that they protect your personally identifiable information consistent with this Privacy Policy.

E-MAIL COMMUNICATIONS

E-mail is an increasingly popular communication tool through which you and your business may communicate with Sprint. Likewise, Sprint may use e-mail to communicate with you, respond to your e-mail, and to tell you about new products and services. If you do not wish to receive e-mail promotions and new products and service announcements from Sprint, please follow the instructions that appear at the end of the e-mail communication that you receive from Sprint to have your name removed from the list.

PCS Terms & Conditions

SECURITY

Sprint utilizes several encryption methods to ensure that the data you submit on any of the Sprint Sites is secure. Through this "secure session," information that you input into a Sprint online order form will be sent and will arrive privately and unaltered at a Sprint server. This security prohibits access to your information by other companies and Web users.

CHILDREN

Sprint does not intend to collect personally identifiable information from individuals under 18 years of age. If Sprint becomes aware that a user who is under 18 is using a Sprint Site, Sprint will specifically instruct that individual that they are not to submit information on Sprint Sites without a parent or guardian's consent. If a child has provided Sprint with personally identifiable information without Sprint's knowledge, a parent or guardian of the child may contact Sprint at privacy@mail.sprint.com and Sprint will delete the child's information from our existing files.

LINKS

Some Sprint Sites contain links to other Web sites that are owned and operated by parties other than Sprint. Please be aware that this Privacy Policy does not extend to any Web sites other than those owned and controlled by Sprint.

ACCOUNT INFORMATION

If you do not want your personally identifiable information collected, please do not submit it to us. If you have already submitted this information and would like for us to remove it from our records or if you wise to update your information, please contact us at privacy@mail.sprint.com or by telephone or mail. You may verify or update your name, address, e-mail address, telephone number, social security number and/or billing information. Sprint will use reasonable efforts to correct any information that is inaccurate or update our records, as appropriate.

QUESTIONS

If you have questions or comments regarding this Privacy Policy, you may contact us at privacy@mail.sprint.com. If you have submitted personally identifiable information, and would like that information deleted from our records, please contact us at our e-mail address, privacy@mail.sprint.com. We will use reasonable efforts to delete that information from our files.

UPDATES

From time to time Sprint may update its website privacy policy. When it does so, it will post the updated policy on its website, note the effective date of the new policy, and, if the changes are deemed by Sprint to be material, Sprint will provide an overview of the material changes for 30 days after the effective date at the top of the updated policy to provide notice of the changes.

Top of page

Print | Close