UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
VINCENT EMILIO, individually and on behalf          :
of all others similarly situated,                   :
                                                    :
                              Petitioner,           :          No. 08-CV-7147 (BSJ)
                                                    :
              -vs.-                                  :
                                                    :
SPRINT SPECTRUM L.P. d/b/a/ SPRINT PCS,             :          **ECF Filed**
                                                    :
                              Respondent.           :
------------------------------------------------------------------------X


### <u>DECLARATION OF WILLIAM R. WEINSTEIN IN SUPPORT OF</u>
### <u>PETITION TO COMPEL ARBITRATION AND FOR RELATED RELIEF</u>


WILLIAM R. WEINSTEIN, under penalty of perjury pursuant to 28 U.S.C. §1746,

hereby declares as follows:

1.      I am a partner of the law firm of Sanford Wittels & Heisler, LLP, counsel for

Petitioner Vincent Emilio ("Petitioner"), individually and on behalf of all others similarly

situated.  I respectfully submit this Declaration in support of Petitioner's Petition against

respondent Sprint Spectrum L.P. d/b/a Sprint PCS ("Sprint" or "Respondent"), for an Order

pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4: (i) compelling

Respondent to continue to arbitrate in Petitioner's class action arbitration presently pending

in the JAMS arbitration forum against Respondent (the "Arbitration") in accordance with the

terms of the arbitration agreement between Petitioner and Respondent (the "Arbitration

Agreement"); (ii) enjoining Respondent from pursuing or continuing to pursue its (or any)

claim for injunctive relief against Petitioner and the class he seeks to represent that would

preclude or otherwise interfere with the right and ability of Petitioner to continue to

participate in and prosecute the Arbitration, either individually or on behalf of the class he

seeks to represent; (iii) requiring Respondent to withdraw its August 8, 2008 motion filed in

the Kansas State District Court seeking to enjoin Petitioner from continuing to participate or

pursue his claims in the Arbitration, either individually or on behalf of the class Petitioner

seeks to represent; (iv) additionally and/or alternatively, if necessary, pursuant to 28 U.S.C. §

2283, staying the Kansas state court proceedings "as necessary in aid of [the Court's]

jurisdiction, or to protect or effectuate its judgments" in connection with the granting of

Petitioner's Petition; and (v) awarding Petitioner's attorneys' fees and expenses incurred in

connection with these proceedings.   I am personally familiar with the facts stated herein.

## I.      BACKGROUND, INCLUDING THE ARBITRATION AGREEMENT WITH WHICH RESPONDENT IS FAILING, NEGLECTING AND REFUSING TO COMPLY

2.      Petitioner filed his initial Demand for Class Action Arbitration with the JAMS

arbitration forum in New York City in January, 2005, asserting claims for violations of New

York Tax Law § 186-e, New York General Obligations Law § 349, and unjust enrichment

based on Respondent's allegedly deceptive practices in connection with New York State

Excise Tax charges imposed on Petitioner and Respondent's other New York customers.

Annexed to Petitioners' initial Demand was a copy of the Arbitration Agreement governing

the arbitration obligations between Petitioner and Respondent. A copy of the Arbitration

Agreement is annexed as Exhibit A to the Petition, and relevant portions are quoted at ¶ 11 of

the Petition.

3.      After Petitioner's initial Demand was filed, a commencement letter was issued

by JAMS requiring the parties to select an arbitrator.  Respondent, however, had objected to

the jurisdiction of JAMS to adjudicate Petitioner's claims as a class action in light of the

class action waiver in the Arbitration Agreement. Thus, JAMS also required the parties to brief to the JAMS National Arbitration Committee the issue raised by Respondent's jurisdictional objection. Petitioner and Respondent thereafter submitted letter briefs addressing the issue of JAMS' jurisdiction to administer Petitioner's class action Arbitration.

4.      By letter dated March 17, 2005 from JAMS Deputy General Counsel Kimberly Taylor, JAMS advised Petitioner and Respondent of the procedure to be followed regarding Petitioner's right and ability to challenge the enforceability of the class action waiver in the Arbitration Agreement. The letter also advised the parties to the Arbitration that the Honorable Kathleen A. Roberts ("Judge Roberts") had been appointed as the Arbitrator in the Arbitration. A copy of the March 17, 2005 letter, which is quoted in relevant part at ¶ 13 of the Petition, is annexed as Exhibit 1 hereto.

5.      Rule 11 of the applicable rules of JAMS incorporated by Respondent in its Arbitration Agreement provides, in relevant part, as follows:

>       (a)      Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.

*   *   *

>       (c)      Jurisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

A copy of JAMS Rule 11 is annexed as Exhibit 2 hereto.

6.      Nothing happened in the Arbitration for some nine months after Judge Roberts was appointed in March, 2005 because, based on information provided to me during regular inquiries with JAMS personnel about the status of the Arbitration, Respondent failed

3

to pay to JAMS the retainer costs of the arbitration that the JAMS rules required Respondent to deposit in connection with the Arbitration.

7.    Finally, at the end of December, 2005, I was advised by JAMS personnel that Respondent had actually paid the required fees, and a conference with Judge Roberts was scheduled for the middle of January, 2006 to discuss how to proceed with the Arbitration in light of the March 17, 2005 letter from JAMS Deputy General Counsel Taylor.  During the January, 2006 conference, Judge Roberts agreed with counsel for Respondent and me that the parties would submit letter briefs on the issue of the enforceability of the class action waiver under the applicable law.  Petitioner and Respondent thereafter submitted letter briefs and reply briefs to Judge Roberts during February, 2006.

8.    A telephonic Hearing with Judge Roberts on Respondent's class action waiver jurisdictional objection was held on May 30, 2006.  The hearing lasted for several hours. During the hearing, counsel for Respondent, Mark Hinderks of Stinson Morrison Hecker LLP in Overland Park, Kansas ("Hinderks") affirmatively represented to Judge Roberts and me that upholding the class action preclusion clause would *not* affect Petitioner's ability to seek injunctive relief under the Kansas Consumer Protection Act ("KCPA") on behalf of Petitioner *and* the putative class he seeks to represent (assuming *arguendo* the challenged New York State Excise Tax practices were determined to be improper).

9.    Consistent with discussions among Judge Roberts and counsel for the parties during the May 30, 2006 Hearing, Petitioner on June 2, 2006 filed a request to amend his arbitration demand specifically adding a claim under the KCPA, and accompanied his request with his First Amended Demand for Class Action Arbitration.  By email dated June 9, 2006, Respondent's counsel stated that Respondent did not oppose the amendment request,

but did reserve all of its rights and defenses regarding the amended claims asserted by Petitioner. A copy of the June 9, 2006 email from Respondent's counsel is annexed as Exhibit 3 hereto.

10. On October 25, 2006, Judge Roberts issued her "Decision on Enforceability of Class Action Preclusion Clause." Judge Roberts held (at p. 9), "[b]ased on the clear provisions of the KCPA . . . that the class action preclusion provision in the Arbitration Agreement is unenforceable because it violates the anti-waiver provisions of Kan. Stat. 50-625." Judge Roberts also held that she had jurisdiction to resolve the dispute regarding the enforceability of the class action waiver, both under the broad provisions of the Arbitration Agreement and the relevant JAMS rules incorporated under the Arbitration Agreement, including JAMS Comprehensive Rule 11(c). A copy of Judge Roberts' October 25, 2006 Decision is annexed as Exhibit 4 hereto.

## II.    THE *BENNEY/LUNDBERG* SETTLEMENT AND THE ARBITRATION PROCEEDINGS RELATING THERETO

11. After Judge Roberts issued her October 25, 2006 Decision on the unenforceability of the class action preclusion clause, I wrote Respondent's counsel (Hinderks) by email inquiring about how Respondent wished to proceed with the Arbitration in light of that Decision.

12. During a call between Hinderks and me on November 8, 2006, Hinderks first informed me about the existence and final approval of the nationwide settlement in a Kansas state court of a number of cases challenging certain Sprint surcharges -- the *Benney/Lundberg* Settlement. Hinderks also informed me that the *Benney/Lundberg* Settlement release included a reference to "excise taxes." In response to my direct inquiry regarding this "excise tax" reference during the call, Hinderks refrained from taking a firm

position regarding the purported impact of the *Benney/Lundberg* Settlement on the Arbitration, but instead provided me with a copy of the November 8, 2006 Final Order of the Kansas State District Court for Wyandotte County approving the *Benney/Lundberg* Settlement, and copy of the underlying Stipulation of Settlement that had been entered into by Respondent in February, 2006. Thereafter, by email on December 1, 2006, Hinderks on behalf of Respondent asserted its position that the *Benney/Lundberg* Settlement released and precluded Petitioner's claims in the Arbitration.

13.     Tellingly (and disturbingly), neither Respondent nor its counsel had advised either Judge Roberts or me at any time prior to November 8, 2006 of the existence of the *Benney/Lundberg* Settlement and the pendency of the related preliminary and final approval proceedings -- including during the May 30, 2006 Hearing with Judge Roberts on the enforceability of the class action preclusion clause. To the contrary, during this May 30, 2006 Hearing, Hinderks affirmatively represented to Judge Roberts that upholding the class action preclusion clause would *not* affect Petitioner's ability to seek injunctive relief under the KCPA on behalf of Petitioner *and* the putative class he seeks to represent (assuming *arguendo* the challenged New York State Excise Tax practices were determined to be improper).

14.     In light of this development, I wrote on behalf of Petitioner to Judge Roberts on December 6, 2006 to advise her of what was occurring, and raised a number of issues that would require factual exploration before any determination regarding the potential preclusive effect of the *Benney/Lundberg* Settlement on Petitioner's claims in the Arbitration could be determined. Respondent responded by letter to Judge Roberts dated December 12, 2006, and Petitioner replied by letter dated December 15, 2006.

15.    By email dated December 16, 2006, Judge Roberts directed the parties to schedule a telephone conference of two hours expected duration for the middle of January, 2007, and directed Respondent to produce, no later than three business days prior to the conference, documentation and responses to procedural questions regarding the *Benney/Lundberg* Settlement (including a chronology of settlement discussions, and the submissions to the Kansas court) that I had requested and raised in my December correspondence to Judge Roberts.

16.    In accordance with Judge Robert's directive, Respondent produced to Petitioner and Judge Roberts several boxes of documents relating to the *Benney/Lundberg* Settlement, including (i) copies of all twenty-three (23) underlying complaints settled by the *Benney/Lundberg* Settlement, (ii) the *Benney/Lundberg* Settlement Agreement and the papers filed in connection with its approval, and (iii) a chronology of settlement discussions.

17.    A telephonic Hearing with Judge Roberts was held on January 22, 2007 (and a transcript of the Hearing was requested and obtained by me).  During the January 22, 2007 Hearing, and as a result of follow-up discovery directed by Judge Roberts, the following undisputed facts were established:

      i.    None of the *Benney/Lundberg* class representatives asserted the same claims regarding excise taxes based on the same factual predicate, and no excise tax claim was asserted in any of the 23 different complaints settled and dismissed as a result of *Benney/Lundberg* Settlement;

      ii.    None of the *Benney/Lundberg* class representatives had standing to assert claims pertaining to the New York State Excise Tax;

      iii    As conceded by Respondent's counsel (Hinderks), the issue of state excise taxes was never a subject of discussion between the parties to the *Benney/Lundberg* Settlement at any time, and there was no evidence that any certified class representative or class counsel knew that such an issue existed;

7

iv.    The term "excise taxes" was inserted into the agreed-to release language in the Mediation Memorandum setting out the basic terms of the *Benney/Lundberg* Settlement on June 21, 2005 -- the day that the binding Mediation Memorandum was finalized and agreed to and executed by the parties to the *Benney/Lundberg* Settlement (*see* Exhibit 5 annexed hereto (Hinderks email establishing insertion date of "excise taxes")); and

v.    No consideration was paid for the release of any excise tax claims effected by the *Benney/Lundberg* Settlement release.

18.    As a result of information learned at the January 22, 2007 Hearing, Petitioner requested and was granted leave by Judge Roberts to file a Second Amended Demand for Class Action Arbitration (the "Second Amended Demand").  Petitioner's Second Amended Demand, a copy of which is annexed as Exhibit 6 hereto, was filed on February 20, 2007.

19.    As also discussed during the January 22, 2007 Hearing, Respondent requested and was granted leave by Judge Roberts to file motions seeking dismissal of Petitioner's Second Amended Demand on a number of grounds, including: (i) the alleged preclusive effect of the *Benney/Lundberg* Settlement; (ii) federal preemption; (iii) Petitioner's alleged failure to state claims under relevant state law; and (iv) the alleged preclusive effect of the class action waiver and lack of jurisdiction over class claims under the applicable JAMS rules.

20.    The parties submitted briefs in support of and in opposition to Respondent's motions during the period April-July, 2007.  Copies of Respondent's brief and reply brief regarding the alleged preclusive effect of the *Benney/Lundberg* Settlement are annexed as Exhibits 7 and 8 hereto, respectively.

21.    A telephonic Hearing with Judge Roberts on the motions was held on December 20, 2007.  Thereafter, during the first half of 2008, Respondent and Petitioner each advised Judge Roberts by letter and/or email of subsequently issued authority they regarded

as additional support for their respective positions, and the parties responded to those submissions.

22.     By Decision dated and issued on July 16, 2008, Judge Roberts denied Respondent's motion seeking to apply the *Benney/Lundberg* Settlement release to Petitioner's claims in the Arbitration, holding that the *Benney/Lundberg* Settlement could not satisfy the constitutional requirement of "adequacy of representation" as applied to Petitioner's claims, for reasons including: (i) the failure of the *Benney/Lundberg* class representatives to assert the same claims based on the same factual predicate; (ii) the lack of standing of the *Benney/Lundberg* class representatives to assert claims pertaining to the New York State Excise Tax; (iii) the admission of Respondent's counsel that the issue of state excise taxes was never a subject of discussion between the parties to the *Benney/Lundberg* Settlement at any time; and (iv) the fact that "it is impossible for any consideration to have been paid for the release of the excise tax claims that no one ever discussed in the course of the settlement, no certified class representative or class counsel knew existed, and no certified class representative had standing to assert or release." In support of her decision, Judge Roberts expressly cited to the seminal decision of the United States Court of Appeals for the Second Circuit in *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.,* 660 F.2d 9 (2d Cir. 1981). A copy of Judge Roberts' July 16, 2008 Decision is annexed as Exhibit 9 hereto.

23.     In her July 16, 2008 Decision, Judge Roberts also denied the other grounds asserted by Respondent in its dismissal motions, holding, *inter alia,* that: (i) Respondent essentially conceded that Petitioner's contract and KCPA claims as framed in the Second Amended Demand were not preempted by federal law, (ii) Petitioner's claim under the KCPA stated a cause of action under relevant state law; and (iii) no reason had been

presented by Respondent for Judge Roberts to diverge from her prior Decisions regarding the unenforceability of the class action waiver under Kansas law or her jurisdiction under JAMS rules to preside over the class action Arbitration.

24.    At the conclusion of her July 16, 2008 Decision, Judge Roberts directed the parties to the Arbitration to schedule a telephonic conference "to discuss class certification procedures with respect to Claimant's KCPA claim."   Counsel for Petitioner had several preliminary discussions and email communications with counsel for Respondent regarding subsequent proceedings in the Arbitration.

## III.    RESPONDENT COMMENCES A JUDICIAL PROCEEDING TO ENJOIN PETITIONER FROM CONTINUING TO PARTICIPATE IN THE ARBITRATION

25.    On Friday, August 8, 2008, Respondent advised Judge Roberts and me that Respondent that day had filed its August 8, 2008 Motion in the *Benney/Lundberg* Kansas State District Court seeking to enjoin Petitioner from continuing to arbitrate Petitioner's individual and class claims against Respondent in the Arbitration in the JAMS arbitration forum or in any other judicial forum.  A copy of Respondent's August 8, 2008 email to Judge Roberts's is annexed as Exhibit 10 hereto.  A copy of Respondent's Motion is annexed as Exhibit 11 hereto.

26.    Respondent's memorandum in support of the August 8, 2008 Motion (a copy of which is annexed as Exhibit 12 hereto) is silent on the relevance under the FAA of the Arbitration Agreement and Respondent's ongoing participation in the Arbitration. Furthermore, Respondent's memorandum raises arguments regarding the *Benney/Lundberg* Settlement substantially identical to those raised by Respondent in its prior briefs and

supplemental correspondence that were considered and disposed of as a result of Judge Roberts' July 16, 2008 Decision.

## IV.    FACTS SUPPORTING THE EXISTENCE OF DIVERSITY JURISDICTION

27.    Petitioner asserts two alternative grounds for the jurisdiction of the Court in connection with his Petition:  (a) diversity jurisdiction pursuant to 28 U.S.C. § 1332(d), as amended by the Class Action Fairness Act of 2005 (109 P.L. 2; 119 Stat. 4; effective February 18, 2005) ("CAFA"); and (b) individual diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

28.    With respect to CAFA jurisdiction, as reflected in Petitioner's Second Amended Demand (Exhibit 6 hereto, ¶¶ 1, 7), Petitioner seeks to represent in the Arbitration and in this Court, and Respondent seeks to enjoin Petitioner from representing in the Arbitration, a class "comprised of all persons who, during the period commencing no less than three years or more than six years prior to the filing of Claimant's original arbitration demand on or about January 4, 2005 and continuing to the present (the "Class Period"), were Sprint wireless telephone service customers who paid "New York State Excise Tax" ("Excise Tax(es)") as part of their monthly charges (the "Class")."

29.    Petitioner, whom I have known personally and as a client for more than five years, resides in Mount Vernon, New York in Westchester County.

30.    Based on my research of the records of the New York Secretary of State and Forms 10-Q filed with the Securities and Exchange Commission ("SEC") (Exhibit 13 annexed hereto), Respondent is a Delaware limited partnership with its principal place of business located on Sprint Parkway in Overland Park, Kansas.

31.     Annexed as Exhibit 14 hereto is a copy of excerpts of the Form 10-Q recently filed with the SEC by Sprint Nextel Corporation, Respondent's owner, for the period ending June 30, 2008.  According to the Form 10-Q, Respondent had about 52 million wireless subscribers nationwide as of that date.

32.     In connection with the preparation of this Declaration, I used the internet to view the Sprint Wireless website, www.sprint.com, and utilized the available store locator on the website to identify stores within ten miles of Petitioner's residence in Mount Vernon, New York, and within 10 miles of my offices at 950 Third Avenue in Manhattan.  The Sprint store locator identified 35 Sprint dealers within ten miles of Petitioner's residence, and 98 Sprint dealers within ten miles of my office.

33.     After Judge Roberts issued her July 16, 2008 Decision, I spoke with Hinderks and his colleague, William Hanna, on July 29, 2008 about possible avenues for proceeding with the Arbitration.  Among other things, I had requested information about the size of the Class Petitioner seeks to represent.  During the discussion, I estimated the Class size to be at least one million members, and perhaps as much as three million members.  Hinderks did not have or provide any specific number, but agreed with me that the number of Class members is "a lot."

33.     Based on all of this information, it is conservatively estimated that more than 2 million New York customers comprise the class that Petitioner seeks to represent as class representative in the Arbitration.  In addition, because the amount of Excise Taxes Petitioner was charged by Respondent monthly generally equaled $3, it is conservatively estimated that the total Excise Taxes potentially recoverable in the class action, either as damages or

pursuant to Petitioner's claims for disgorgement or restitution under the KCPA, exceed $100 million.

34.     Thus, CAFA jurisdiction exists for the following reasons:

        i.     the number of members of the proposed class Petitioner seeks to represent is 100 or more;

        ii.     there is diversity of citizenship between *any one* member of the class (named and unnamed) and Respondent; Petitioner Emilio is a citizen of New York State while Respondent Sprint is a citizen of Delaware and/or Kansas; and

        iii.     the amount in controversy – which may be calculated by aggregating the claims of the putative class members – *exceeds $5 million*.

35.     Additionally or alternatively, the Court has diversity jurisdiction over this Petition under 28 U.S.C. 1332(a), because Petitioner and Respondent are citizens of different states, and the matter in controversy, based on the amounts Petitioner seeks in the Arbitration as damages, disgorgement and/or restitution, and the attorney's fees to which Petitioner is statutorily entitled under Kan. Stat. 50-634 of the KCPA, exceed the sum or value of $75,000, exclusive of interest and costs.  In this regard, the KCPA expressly creates an entitlement to attorneys' fees, and the total attorneys' fees incurred to date by me and the firms with which I have been affiliated since the Arbitration began exceed $100,000.

## V.     THE ARBITRATION AGREEMENT EXPRESSLY REQUIRES RESPONDENT TO PAY PETITIONER'S LEGAL FEES AND EXPENSES INCURRED IN CONNECTION WITH HIS PETITION

36.     Finally, I have personally incurred 44 hours in connection with the drafting and filing of the Petition and supporting papers and these papers and other related legal matters since first learning of Respondent's August 8, 2008 Motion and taking necessary

actions in response.  The Arbitration Agreement (Petition, Exhibit A) expressly entitles

Petitioner to recover these fees and also expenses incurred, as follows:

> If any party files a judicial or administrative action asserting a claim that is
> subject to arbitration and another successfully stays such action or compels
> arbitration, the party filing that action must pay the other party's costs and
> expenses incurred in seeking such stay or compelling arbitration, including
> attorneys' fees.

37.    At my current hourly rate of $600 per hour, Respondent is presently obligated

to pay $26,400 in fees in connection with the Petition, as well as filing costs of $350.  These

fees and expenses ultimately will be supplemented by additional fees incurred in connection

with the preparation of reply papers and any appearance in this Court, and may also be

supplemented by fees and expenses incurred in connection with the submission of papers and

travel to and from and an appearance in the Kansas State District Court (if necessary)

regarding Respondent's August 8, 2008 Motion.


I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

Executed on September 5, 2008


                              /s/William R. Weinstein
                              WILLIAM R. WEINSTEIN (WW-4289)



**JAMS**

THE RESOLUTION EXPERTS

March 17, 2005

William R. Weinstein                        Mark Hinderks Esq.
Wechsler Harwood LLP                        Stinson Morrison Hecker LLP
488 Madison Avenue                          9 Corporate Woods, Suite 450
8th Floor                                   9200 Indian Creek Park
New York, NY 10022                          Overland Park, KS 66210
212-935-7400                                913-344-6706
212-753-3630 (fax)                          913-451-6352 (fax)

Re:        Emilio, Vincent vs. Sprint Spectrum L.P. d/b/a/ Sprint PCS
Ref. No.:  1425000444

Dear Counsel:

When this arbitration was commenced on January 19, 2005, we informed the parties that JAMS Policy
Regarding Class Action Preclusion Clauses would apply to this matter.   That policy provided that JAMS
would not enforce an arbitration provision that restricted the right of a consumer to initiate a class action
arbitration.  Respondent, Sprint Spectrum L.P. objected to JAMS administering the matter as a class
action, and both sides submitted briefs to JAMS National Arbitration Committee.

On March 10, 2005, JAMS withdrew the Policy, and a copy of the Press Release announcing this change
is enclosed.  In determining whether to accept an arbitration as a class action matter, JAMS will follow
the law in the jurisdiction in which the case is filed, or the law as agreed upon by the parties. If there is
no clear law within the jurisdiction regarding the validity of a class action preclusion clause, JAMS will
follow the agreement of the parties as set forth in their arbitration agreement.

We are not aware of any clear law in this jurisdiction on this issue. Therefore, JAMS will administer this
arbitration only as an individual matter.  If the claimant believes that the relevant law of the jurisdiction
compels a different result, the claimant may either raise that issue with the arbitrator or with a court of
competent jurisdiction.

Accordingly, based on the responses from each party to the arbitrator candidates set forth in the January
19, 2005 Commencement Letter, Hon. Kathleen Roberts will be appointed as the Arbitrator in this
matter.  Case Manager Jessica Centeno will confirm this appointment shortly.

Very truly yours,

Kimberly Taylor
Deputy General Counsel

Enclosure

Revised February 19,

# JAMS Comprehensive Arbitration Rules & Procedures

## Table of Contents

Rule 1. Scope of Rules ............................................................ 2
Rule 2. Party-Agreed Procedures ......................................... 2
Rule 3. Amendment of Rules ................................................ 2
Rule 4. Conflict with Law ...................................................... 2
Rule 5. Commencing an Arbitration ..................................... 2
Rule 6. Preliminary and Administrative Matters.................. 3
Rule 7. Number of Arbitrators and Appointment of Chairperson ..... 3
Rule 8. Service ....................................................................... 3
Rule 9. Notice of Claims ....................................................... 4
Rule 10. Changes of Claims ................................................... 4
Rule 11. Interpretation of Rules and Jurisdictional Challenges........... 4
Rule 12. Representation ......................................................... 5
Rule 13. Withdrawal from Arbitration .................................. 5
Rule 14. *Ex Parte* Communications ..................................... 5
Rule 15. Arbitrator Selection and Replacement .................. 5
Rule 16. Preliminary Conference........................................... 6
Rule 17. Exchange of Information ......................................... 6
Rule 18. Summary Disposition of a Claim or Issue ............. 7
Rule 19. Scheduling and Location of Hearing ..................... 7
Rule 20. Pre-Hearing Submissions ....................................... 7
Rule 21. Securing Witnesses and Documents
         for the Arbitration Hearing .................................... 8
Rule 22. The Arbitration Hearing .......................................... 8
Rule 23. Waiver of Hearing ................................................... 9
Rule 24. The Award ................................................................ 9
Rule 25. Enforcement of the Award ...................................... 10
Rule 26. Confidentiality and Privacy .................................... 10
Rule 27. Waiver ...................................................................... 10
Rule 28. Settlement and Consent Award ............................. 10
Rule 29. Sanctions ................................................................. 11
Rule 30. Disqualification of the Arbitrator as a Witness
         or Party and Exclusion of Liability ......................... 11
Rule 31. Fees .......................................................................... 11
Rule 32. Bracketed (or High-Low) Arbitration Option ....... 11
Rule 33. Final Offer (or Baseball) Arbitration Option ........ 12
Rule 34. Optional Arbitration Appeal Procedure ............... 12

## Rule 9.  Notice of Claims

(a)  If a matter has been submitted for Arbitration after litigation has been commenced in court regarding the same claim or dispute, the pleadings in the court case, including the complaint and answer (with affirmative defenses and counterclaims), may be filed with JAMS within fourteen (14) calendar days of the date of commencement, and if so filed, will be considered part of the record of the Arbitration. It will be assumed that the existence of such pleadings constitutes appropriate notice to the Parties of such claims, remedies sought, counterclaims and affirmative defenses. If necessary, such notice may be supplemented pursuant to Rule 9(b).

(b)  If a matter has been submitted to JAMS prior to or in lieu of the filing of a case in court or prior to the filing of an answer, the Parties shall give each other notice of their respective claims, remedies sought, counterclaims and affirmative defenses (including jurisdictional challenges). Such notice may be served upon the other Parties and filed with JAMS, in the form of a demand for Arbitration, response or answer to demand for Arbitration, counterclaim or answer or response to counterclaim. Any pleading shall include a short statement of its factual basis.

(c)  Notice of claims, remedies sought, counterclaims and affirmative defenses may be served simultaneously, in which case they should be filed with JAMS within fourteen (14) calendar days of the date of commencement of the Arbitration, or by such other date as the Parties may agree. The responding Parties may, however, in their sole discretion, wait to receive the notice of claim before serving any response, including counterclaims or affirmative defenses. In this case, the response, including counterclaims and affirmative defenses, should be served on the other Parties and filed with JAMS within fourteen (14) calendar days of service of the notice of claim. If the notice of claim has been served on the responding Parties prior to the date of commencement, the response, including counterclaims and affirmative defenses, shall be served within fourteen (14) calendar days from the date of commencement.

(d)  Any Party that is a recipient of a counterclaim may reply to such counterclaim, including asserting jurisdictional challenges. In such case, the reply must be served on the other Parties and filed with JAMS within fourteen (14) calendar days of having received the notice of counterclaim. No claim, remedy, counterclaim or affirmative defense will be considered by the Arbitrator in the absence of prior notice to the other Parties, unless all Parties agree that such consideration is appropriate notwithstanding the lack of prior notice.

## Rule 10.  Changes of Claims

After the filing of a claim and before the Arbitrator is appointed, any Party may make a new or different claim. Such claim shall be made in writing, filed with JAMS and served on the other Parties. Any response to the new claim shall be made within fourteen (14) calendar days after service of such claim. After the Arbitrator is appointed, no new or different claim may be submitted except with the Arbitrator's approval. A Party may request a Hearing on this issue. Each Party has the right to respond to any new claim in accordance with Rule 9(c).

## Rule 11.  Interpretation of Rules and Jurisdictional Challenges

(a)  Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.

(b)  Whenever in these Rules a matter is to be determined by "JAMS" (such as in Rules 6, 11(d), 15(d), (f) or (g), 24(i) or 31(e)), such determination shall be made in accordance with JAMS administrative procedures.

(c)  Jurisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

(d)  Disputes concerning the appointment of the Arbitrator and the venue of the Arbitra-

4

tion, if that determination is relevant to the selection of the Arbitrator, shall be resolved by JAMS.

(e)  The Arbitrator may upon a showing of good cause or sua sponte, when necessary to facilitate the Arbitration, extend any deadlines established in these Rules, provided that the time for rendering the Award may only be altered in accordance with Rules 22(i) or 24.

## Rule 12.  Representation

The Parties may be represented by counsel or any other person of the Party's choice. Each Party shall give prompt written notice to the Case Manager and the other Parties of the name, address and telephone and fax numbers of its representative. The representative of a Party may act on the Party's behalf in complying with these Rules.

## Rule 13.  Withdrawal from Arbitration

(a)  No Party may terminate or withdraw from an Arbitration after the issuance of the Commencement Letter (see Rule 5) except by written agreement of all Parties to the Arbitration.

(b)  A Party that asserts a claim or counterclaim may unilaterally withdraw that claim or counterclaim without prejudice by serving written notice on the other Parties and on the Arbitrator. However, the opposing Parties may, within fourteen (14) calendar days of service of notice of the withdrawal of the claim or counterclaim, request that the Arbitrator order that the withdrawal be with prejudice.

## Rule 14.  *Ex Parte* Communications

No Party may have any *ex parte* communication with a neutral Arbitrator regarding any issue related to the Arbitration. Any necessary *ex parte* communication with JAMS, whether before, during or after the Arbitration Hearing, shall be conducted through JAMS. The Parties may agree to permit *ex parte* communication between a Party and a non-neutral Arbitrator.

## Rule 15.  Arbitrator Selection and Replacement

(a)  Unless the Arbitrator has been previously selected by agreement of the Parties, JAMS may attempt to facilitate agreement among the Parties regarding selection of the Arbitrator.

(b)  If the Parties do not agree on an Arbitrator, JAMS shall send the Parties a list of at least five (5) Arbitrator candidates in the case of a sole Arbitrator and ten (10) Arbitrator candidates in the case of a tripartite panel. JAMS shall also provide each Party with a brief description of the background and experience of each Arbitrator candidate.

(c)  Within seven (7) calendar days of service upon the Parties of the list of names, each Party may strike two (2) names in the case of a sole Arbitrator and three (3) names in the case of a tripartite panel, and shall rank the remaining Arbitrator candidates in order of preference. The remaining Arbitrator candidate with the highest composite ranking shall be appointed the Arbitrator.  JAMS may grant a reasonable extension of the time to strike and rank the Arbitrator candidates to any Party without the consent of the other Parties.

(d)  If this process does not yield an Arbitrator or a complete panel, JAMS shall designate the sole Arbitrator or as many members of the tripartite panel as are necessary to complete the panel.

(e)  If a Party fails to respond to the list of Arbitrator candidates within seven (7) calendar days of service by the Parties of the list, JAMS shall deem that Party to have accepted all of the Arbitrator candidates.

(f)  Entities whose interests are not adverse with respect to the issues in dispute shall be treated as a single Party for purposes of the Arbitrator selection process. JAMS shall determine whether the interests between entities are adverse for purposes of Arbitrator selection, considering such factors as whether the entities are represented by the same attorney and whether the entities are presenting joint or separate positions at the Arbitration.

(g)  If, for any reason, the Arbitrator who is selected is unable to fulfill the Arbitrator's duties, a successor Arbitrator shall be chosen in accordance with this Rule. If a member of a panel of Arbitrators becomes unable to fulfill his or her duties after the beginning of a Hear-

## Bill Weinstein

**From:** Hinderks, Mark [mhinderks@stinsonmoheck.com]
**Sent:** Friday, June 09, 2006 5:16 PM
**To:** karoberts@prodigy.net; CEmanuele@JAMSADR.com
**Cc:** William Weinstein; Lauridsen, Lee T [LEG]
**Subject:** RE: Emilio, Vincent vs. Sprint Spectrum L.P. - REF# 1425000444 - Claimant's First Amended Demand for Class Action Arbitration


Judge Roberts,

In our telephone conference argument session on May 30, you asked Mr. Weinstein to move for leave to file his amended claim document by last Friday, and then gave us until today to lodge any objection to leave for him to amend. Although we certainly do not believe that Mr. Emilio's proposed amended claim sets forth any more valid claim than his original claim, reserve all rights and arguments to dispute its validity, and do not believe that it states any claim as to which a class claim may be advanced, we do not oppose Mr. Weinstein's request to amend.

In addition, we have reviewed the disclosure that you provided. Based upon your assurances, we do not object to your continued service as arbitrator in this matter.

Pleasant weekend to all.


Mark D. Hinderks
Stinson Morrison Hecker LLP
12 Corporate Woods
10975 Benson, Suite 550
Overland Park, Kansas 66210-2008
(913) 344-6706 Office
(913) 707-6706 Sprint Nextel mobile
(888) 221-9755 Toll-free fax


**From:** William Weinstein [mailto:wweinstein@whesq.com]
**Sent:** Friday, June 02, 2006 4:09 PM
**To:** karoberts@prodigy.net
**Cc:** Hinderks, Mark; CEmanuele@JAMSADR.com
**Subject:** Emilio, Vincent vs. Sprint Spectrum L.P. - REF# 1425000444 - Claimant's First Amended Demand for Class Action Arbitration

Dear Judge Roberts:  On behalf of Claimant Vincent Emilio, and in accordance with Your Honor's directive during the May 30, 2006 hearing/argument, we respectfully submit Claimant's First Amended Demand for Class Action Arbitration.  In so doing, we are unclear whether the amended pleading must be accompanied by a formal motion for leave to amend, and hope that this email will be deemed to constitute such a motion or request.  If necessary, a more formal request can be submitted in support of filing the amended Demand.

Additionally, this is to advise Your Honor that Claimant has no objection to Your Honor continuing to preside over this matter notwithstanding the facts raised in the May 31, 2006 Supplemental Disclosure.

Respectfully submitted.

William R. Weinstein
WECHSLER HARWOOD LLP
488 Madison Ave., 8th Floor
New York, NY 10022
Telephone: 212.935.7400, x256
Telecopier: 212.753.3630
www.whesq.com
wweinstein@whesq.com

This communication is from a law firm and may contain confidential and/or privileged information. If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

8/13/2008



JAMS NEW YORK

------------------------------------------------X

Vincent Emilio,

Claimant,

-v-

Sprint Spectrum L.P.,

Respondent.

DECISION ON
ENFORCEABILITY OF
CLASS ACTION
PRECLUSION CLAUSE

------------------------------------------------X

This Decision addresses the enforceability of a class action preclusion clause contained in an agreement between Claimant and Respondent with respect to the arbitration of disputes regarding wireless telephone services.

## BACKGROUND

The Arbitration Demand in this case was filed with JAMS on January 4, 2005, by Claimant Vincent Emilio ("Emilio" or "Claimant"), "individually and on behalf of all others similarly situated," against Respondent Sprint Spectrum L.P. d/b/a Sprint PCS ("Sprint" or "Respondent"). Claimant is a resident of Mt Vernon, New York. Sprint is alleged to be a "global telecommunications company, structured as a Delaware limited partnership with its principal offices located in Kansas. Sprint is alleged to be wholly owned by Sprint Corporation, a Kansas corporation with its principal executive offices located in Kansas.

The Arbitration Demand asserts that Respondent charges and collects New York State Excise Tax ("Excise Tax") from wireless telephone customers, even though the obligation to pay Excise Tax under New York law is imposed solely and directly on

1

Respondent, *i.e.*, Respondent is not authorized under New York law to pass this tax obligation on to consumers.

The Arbitration Demand asserts that Claimant brings this class action individually and on behalf of a class comprised of "all persons who, during the period commencing six years prior to the filing of this arbitration demand and continuing to the present (the "Class Period"), were Sprint wireless telephone service customers who paid "New York State Excise Tax" ("Excise Tax(es)") as part of their monthly charges (the "Class")".

The Arbitration Demand asserts that Respondent has "unlawfully, deceptively and inequitably" collected the Excise Tax in a "wholly improper attempt to obtain reimbursement for amounts that Respondent has and had no right to pass on to its customers," and that as a result of Respondent's conduct, "Claimant and the Class are and have been wrongfully subjected to the Excise Tax."

In the Arbitration Demand, Claimant and the putative Class seek an injunction, as well as compensatory damages, restitution and/or other relief to redress Respondent's "unlawful, deceptive and inequitable conduct," which is claimed to violate New York Tax Law Sec. 186-e, New York General Business Law Sec. 349, and to constitute unjust enrichment. In an Amended Demand, submitted on June 2, 2006, Claimant added a claim for violation of the Kansas Consumer Protection Act, Kan. Stat. 50-623 *et seq.*

Pursuant to Sprint's Terms and Conditions of Service ("Agreement"), under the heading "MANDATORY ARBITRATION OF DISPUTES," Claimant is required to arbitrate "ANY AND ALL CLAIMS, CONTROVERSIES OR DISPUTES * * * ARISING OUT OF OR RELATING TO" Sprint's Services. (Capital lettering in original.)

2

Under the heading "MANDATORY ARBITRATION OF DISPUTES," the

Agreement also provides that:

> "YOU AND SPRINT FURTHER AGREE THAT NEITHER SPRINT
> NOR YOU WILL JOIN ANY CLAIM WITH THE CLAIM OF ANY OTHER
> PERSON OR ENTITY IN A LAWSUIT, ARBITRATION OR OTHER
> PROCEEDING; THAT NO CLAIM EITHER SPRINT OR YOU HAS
> AGAINST THE OTHER SHALL BE RESOLVED ON A CLASS-WIDE BASIS;
> AND THAT NEITHER SPRINT NOR YOU WILL ASSERT A CLAIM IN A
> REPRESENTATIVE CAPACTIY ON BEHALF OF ANYONE ELSE. IF FOR
> ANY REASON THIS ARBITRATION PROVISION DOES NOT APPLY TO A
> CLAIM, WE AGREE TO WAIVE TRIAL BY JURY."

(Capital lettering in original.)

In a subsequent paragraph, headed "Miscellaneous," the Agreement provides that

it "is governed by and must be construed under federal law and the laws of the State of

Kansas, without regard to choice of law principles." The Agreement provides that an

arbitration may be filed with either JAMS or the National Arbitration Forum, and that

"the arbitration will be conducted by and under the then-applicable rules of JAMS or

NAF."

None of the JAMS arbitration rules in effect at the time this arbitration was filed

addressed the issue of class action preclusion. However, at the time the Demand was

filed, JAMS had adopted and announced a "Policy Regarding Use of Class Action

Preclusion Clauses in Consumer Cases," ("Class Action Preclusion Policy") which

provided, in relevant part, that "[i]f a class action arbitration is filed at JAMS and there is

a class action preclusion clause, JAMS will accept the case and not enforce the clause."

In an "Addendum: Implementation of JAMS Class Action Arbitration Preclusion Policy

in Consumer Cases," JAMS stated that where a consumer arbitration contains a class

action arbitration preclusion clause:

"At some point in this process, one of the parties may go to court to either enforce the preclusion clause or to have it declared unenforceable. This could happen either before or after the arbitration has been filed at JAMS.

> 1) If the court declares the preclusion clause to be valid and sends it back to JAMS as an individual case, JAMS will proceed on that basis and appoint an arbitrator.*

> 2) If the court declares the preclusion to be invalid, then JAMS will proceed with the arbitration as a class action arbitration.

> 3) Obviously if neither party goes to court, JAMS will proceed with the administration of the arbitration as a class arbitration.

> *Note that under *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003), the Claimant is free to argue the invalidity of the preclusion clause to the arbitrator and, under *Bazzle*, the arbitrator has the authority to determine whether the arbitration can proceed as a class action. Neither JAMS nor any other ADR Administrator has the authority to dictate a result to the arbitrator."

See Claimant's February 1, 2006 Letter Brief, Exhibit C (November 12, 2004 Press Release and Class Action Policy).

The parties to this arbitration were initially informed that the Class Action Preclusion Policy would apply to this matter. Sprint objected to JAMS administering the matter as a class action, and both sides submitted briefs to the JAMS National Arbitration Committee ("NAC"). While this issue was pending before the NAC, JAMS withdrew the Class Action Preclusion Policy, and promulgated "JAMS Class Action Procedures" (dated February 2005) with respect to purported class arbitrations. In a press release dated March 10, 2005, JAMS noted that "court decisions on the validity of class action preclusion clauses have varied by jurisdiction," and that JAMS and its arbitrators would "apply the law on a case by case basis in each jurisdiction." JAMS looks to the law in the jurisdiction in which the case is filed, or the law as agreed upon by the parties. In general, if there is no clear law within the jurisdiction regarding the validity of a class

action preclusion clause, JAMS will follow the terms of the clause, without prejudice to claimant's right to raise the issue with the appointed arbitrator or with a court of competent jurisdiction.

Rule 2 of the JAMS Class Action Procedures provides that "the Arbitrator shall determine as a threshold matter whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class," and that "the Arbitrator may set forth his or her determination in a partial final award subject to immediate court review." Although not explicitly stated in Rule 2, it is the position of JAMS that the inquiry contemplated by Rule 2 includes the question of whether an express class action preclusion provision is enforceable.

By letter dated March 17, 2005, the parties were informed that JAMS would follow the JAMS Class Action Procedures in this matter, that JAMS was "not aware of any clear law in this jurisdiction" on this issue, and that JAMS would therefore administer the arbitration only as an individual matter, but that "[i]f claimant believes that the relevant law of the jurisdiction compels a different result, the claimant may either raise that issue with the arbitrator or with a court of competent jurisdiction." The parties were also advised that this Arbitrator had been appointed to adjudicate the claims asserted in the Demand.

The arbitration was thereafter administratively dormant until January 2006, when Claimant requested that the issue of the enforceability of the class action preclusion provision be determined by the Arbitrator. Thereafter, the parties briefed issues relating to JAMS' jurisdiction and the enforceability of the class action preclusion provision, and, on June 2, 2006, Claimant submitted his First Amended Demand for Class Action

Arbitration, which added a claim under the Kansas Consumer Protection Act. Sprint did

not oppose the amendment, but reserved all of its rights and defenses regarding the

amended claims asserted by Claimant.

## DISCUSSION

The central issue before this Arbitrator is whether the class action preclusion

provision of the Agreement is valid and enforceable under applicable law.[1] Before

turning to that issue, however, several preliminary issues must be addressed.

### Preliminary Issues

Claimant first argues that this arbitration should proceed as a class action because

the Demand was filed when the short-lived Class Action Policy was in effect. Claimant's

argument is based upon the provision of the Arbitration Agreement that "an arbitration

may be filed with either JAMS or the National Arbitration Forum," and that "the

arbitration will be conducted by and under the then-applicable rules of JAMS or NAF."

It is Claimant's position that the Class Action Policy constitutes a then-applicable JAMS

rule. Accordingly, Claimant contends that this arbitration should be administered as a

class action unless and until Respondent obtains a court order declaring the class action

preclusion clause enforceable. This argument has been considered and rejected by

JAMS. It is the position of JAMS that the withdrawn Class Action Preclusion Policy was

---

[1] The Arbitrator has jurisdiction to determine the enforceability of the class action preclusion clause pursuant to the Arbitration Agreement and JAMS arbitration rules. The instant "controversy or dispute" regarding the enforceability of the class action preclusion clause is one "arising out of or relating to" the Arbitration Agreement. In addition, the JAMS rules incorporated into the Arbitration Agreement provide that "[j]urisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of the agreement under which Arbitration is sought * * * shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." JAMS Comprehensive Rule 11(c); see also JAMS Streamlined Rule 8(c). See *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (incorporation of rules of arbitration forum governing arbitrability and jurisdiction "serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator").

6

at no time a JAMS "rule," or incorporated by reference into any of JAMS arbitration rules. I note that the Class Action Preclusion Policy does not use the term "rule"; nor is the Class Action Preclusion Policy referenced in any JAMS arbitration rules. *Cf.* JAMS Class Action Procedures (referring to specific provisions as "rules," and expressly stating that the Class Action Procedures supplement JAMS arbitration rules).

Claimant next argues that the class action preclusion provision of the Arbitration Agreement is unenforceable because it conflicts with JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness ("Minimum Standards"). Under this policy, JAMS declines to accept for administration any arbitration agreement that does not comply with the Minimum Standards. Minimum Standard 3 requires that "[r]emedies that would otherwise be available to the consumer under applicable federal, state or local laws must remain available under the arbitration clause, unless the consumer retains the right to pursue the unavailable remedies in court." Claimant argues that the ability to pursue a class action is a "remedy" that would otherwise be available to him under federal and state law. This issue has already been considered and rejected by JAMS. In any event, even if Claimant were correct, the result would be that JAMS would refuse to administer the arbitration, not that JAMS would be required to administer the arbitration as a class action.

## Enforceability of Class Action Preclusion

Claimant asserts that the class action preclusion provision of the Agreement is unenforceable under the law of Kansas because it conflicts with specific provisions of the Kansas Consumer Protection Statute. Although not expressly pleaded, Claimant also asserts that the class action preclusion provision is unconscionable under the common law of contract as applied by the courts of Kansas.

### Kansas Consumer Protection Act

Kansas has enacted a comprehensive Unfair Trade and Consumer Protection Act, Kansas Statutes, Chapter 50, Article 6 (the "KCPA"). The KCPA is designed, *inter alia*, to "simplify, clarify and modernize the law governing consumer transactions," and to "protect consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. 50-623. The KCPA prohibits a "supplier" from engaging in any deceptive act or practice, or any unconscionable act or practice in connection with a "consumer transaction." A "consumer transaction" is defined as "a sale, lease, assignment or other disposition for value of property or services within this state * * * to a consumer." Kan. Stat. 50-624(c). Deceptive acts and practices are defined in Kan. Stat. 50-626; unconscionable acts and practices are defined in Kan. Stat. 50-627.

Kan. Stat 50-634 sets forth the "private remedies" available to consumers under the KCPA. "A consumer who suffers loss as a result of a violation of this act may bring a class action for the damages caused by an act or practice," Kan. Stat. 50-634(2)(d). "Whether a consumer seeks or is entitled to recover damages or has an adequate remedy at law, a consumer may bring a class action for declaratory judgment, an injunction and appropriate ancillary relief" against an act or practice that violates the KCPA, Kan. Stat.

50-634(2)(d). The KCPA further provides that "[e]xcept as otherwise provided in this act, a consumer may not waive or agree to forego rights or benefits under this act." Kan. Stat. 50-625. There is no exception to this provision in the KCPA that pertains to waiver of the right to bring a class action.

Based upon the clear provisions of the KCPA, I find that the class action preclusion provision in the Arbitration Agreement is unenforceable because it violates the anti-waiver provisions of Kan. Stat. 50-625.

Relying on a decision by another JAMS arbitrator, Sprint argues that "[t]he opportunity given a consumer to pursue a class action under the KCPA is procedural and subject to waiver."[2] Arbitration between Donald Rodkin and Sprint PCS Group, JAMS Arbitration No. 134005293, Interim Order of February 6, 2006. I respectfully disagree. Neither the *Rodkin* arbitrator nor Sprint cites any authority for this interpretation of the KCPA anti-waiver provision.[3] Notably, the provision itself makes no distinction between

---

[2] Sprint has also argued in this case and in *Rodkin* that the KCPA does not apply to Sprint's contract with Claimant because the services provided to Claimant do not constitute a "sale lease, assignment or other disposition for value of property or services within this state * * * to a consumer." Kan. Stat. 624(c) (defining "consumer transaction"). I agree with the *Rodkin* arbitrator that this argument is meritless. Sprint's operations are headquartered in Kansas, from which it unquestionably provides services to its customers throughout the United States. Moreover, it would be manifestly unfair for Sprint to require its customers to agree to the application of Kansas law, and at the same time deny application of its consumer protection statute. Having chosen to impose Kansas law upon its customers, Sprint cannot be permitted to make a self-serving determination of *which* laws of Kansas will apply to disputes under the Arbitration Agreement.

[3] *Billings v. Clinitec Int'l, Inc.*, No. 00-1236-JTM, 2000 U.S. Dist. LEXIS 10904 (D. Kan. July 25, 2000), cited by Sprint in the *Rodkin* case, does not address waiver of the provisions of Kan. Stat. 50-634, and accordingly provides little if any support for the *Rodkin* arbitrator's decision on this point. Notably, the court held in that case that the plaintiff "did not waive or agree to forego any rights or benefits" by agreeing to litigate disputes arising out of or related to the Agreement in a Pennsylvania state court, because he could bring his KCPA claims in that court. The court made no distinction between

"substantive" and "procedural" rights or benefits. I therefore find that the class action

preclusion provision is unenforceable with respect to Claimant's claims under the KCPA.

<u>Unconscionability</u>

     Federal and state courts are divided regarding the enforceability of class action

preclusion provisions in consumer contracts, and application of the law of

unconscionability to such provisions.[4] No state court in Kansas has ruled on this issue.

---

"substantive" and "procedural" rights under the KCPA. *Cf. Am. Online v. Superior Court*, 90 Cal. App. 4th 1, (2001), *rev. denied*, 2001 Cal. LEXIS 7051 (refusing to enforce contractual forum selection clause because, *inter alia*, enforcement would effectively waive the right to bring a class action under the California consumer protection statute, which provides that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void")

[4] A number of federal and state courts have found arbitration agreements containing class action preclusion clauses "substantively" unconscionable under state law, primarily on the ground that the preclusion of class actions in certain cases is contrary to public policy. *Kristian v. Comcast*, 446 F.3d 25, 53 (1st Cir. 2006); *Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254, 1260-61 (9th Cir. 2005); *Ting v. AT&T Corp.*, 319 F.3d 1126, 1150 (9th Cir. 2003); *Luna v. Household Fin. Corp.*, 236 F.Supp.2d 1166, 1179 (W.D. Wash. 2002); *Lozada v. Dale Baker Oldsmobile*, 91 F.Supp.2d 1087, 1105 (W.D. Mich. 2000); *Muhammad v. County Bank of Rehoboth Beach*, 2006 N.J. LEXIS 1154 (New Jersey Supreme Court); *Discover Bank v. Superior Court*, 36 Cal.4th 148, 161 (2005); *Whitney v. Alltell Communications, Inc.*, 173 S.W.3d 300, 311-314 (Mo. Ct. App. W.D. 2005); *Kinkel v. Cingular Wireless, LLC*, 357 Ill. App.3d 556, 564 (Ill. App. 5th Dist. 2005); *Leonard v. Terminix Int'l*, 854 So.2d 529, 538 (Ala. 2002); *State ex rel. Dunlap v. Berger*, 567 S.E.2d 265, 283 (W. Va. 2002); *Bellsouth Mobility LLC v. Christopher*, 819 So.2d 171, 173 (Fla. App. 2002); *Powertel, Inc. v. Bexley*, 743 So.2d 570, 576 (Fla. App. 1999), *rev. denied*, 763 So.2d 1044 (2000).
    Other courts have found class action preclusion clauses not unconscionable. *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002) (STATE law?); *Spann v. American Express Travel*, 2006 Tenn. App. LEXIS 582 (2006); *Ranieri v. Bell Atlantic Mobile*, 304 A.D.2d 353, 354 (1st Dep't), *appeal denied*, 1 N.Y.3d 502 (2003); *Rains v. Foundation Health Sys.*, 23 P.3d 1249, 1253 (Colo. App. 2001); *Edelist v. MBNA America Bank*, 790 A.2d 1249, 1261 (Del. Super. 2001.

The leading Kansas case on the subject of unconscionability is *Wille v.*

*Southwestern Bell Tel. Co.*, 219 Kan. 755 (1976).

In *Wille*, the Court observed that "American courts have traditionally taken the

view that competent parties may make contracts on their own terms, provided they are

neither illegal nor contrary to public policy, and that in the absence of fraud, mistake, or

duress a party who has fairly and voluntarily entered into such a contract is bound

thereby, notwithstanding it was unwise or disadvantageous to him [citation omitted].

Gradually, however, this principle of freedom of contract has been qualified by the courts

as they were confronted by contracts so one-sided that no fair minded person would view

them as just or tolerable." *Wille*, 219 Kan. at 757.[5]

The court held that

> "Although the doctrine of unconscionability is difficult to define
> precisely[,] courts have identified a number of factors or elements as aids for
> determining its applicability to a given set of facts. These factors include: (1) The
> use of printed form or boilerplate contracts drawn skillfully by the party in the
> strongest economic position, which establish industry wide standards offered on a
> take it or leave it basis to the party in a weaker economic position; (2) a
> significant cost-price disparity or excessive price; (3) a denial of basic rights and
> remedies to a buyer of consumer goods; (4) the inclusion of penalty clauses; (5)
> the circumstances surrounding the execution of the contract, including its
> commercial setting, its purpose and actual effect; (6) the hiding of clauses which
> are disadvantageous to one party in a mass of fine print trivia or in places which

---

[5] The *Wille* court also endorsed the general principle set forth by Williston that "'[p]eople
should be entitled to contract on their own terms without the indulgence of paternalism
by courts in the alleviation of one side or another from the effects of a bad bargain. Also,
they should be permitted to enter into contracts that actually may be unreasonable or
which may lead to hardship on one side. It is only where it turns out that one side or the
other is to be penalized by the enforcement of the terms of a contract so unconscionable
that no decent, fairminded person would view the ensuing result without being possessed
of a profound sense of injustice, that equity will deny the use of its good offices in the
enforcement of such unconscionability.'" *Wille*, 219 Kan. at 762 (quoting 14 Williston on
Contracts, 3d Ed., § 1632).

are inconspicuous to the party signing the contract; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate; and (10) inequality of bargaining or economic power."

*Wille* at 758-59 (citations omitted).

The *Wille* court further held that "mere disparity of bargaining strength, without more, is not enough to make out a case of unconscionability" and that in addition to unequal bargaining power, there must be "some element of deception or substantive unfairness." *Wille* at 759 (*quoting* Ellinghaus, *In Defense of Unconscionability*, 78 YLJ 757, 766-67). The court concluded that "[t]he cases seem to support the view that there must be additional factors such as deceptive bargaining conduct as well as unequal bargaining power to render the contract between the parties unconscionable. In summary, the doctrine of unconscionability is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences per se of uneven bargaining power or even a simple old-fashioned bad bargain." *Wille*, 219 Kan. at 755-60 (citation omitted).[6]

---

[6] Although *Wille* was decided under Kansas common law, the court relied extensively on the provisions of the Uniform Commercial Code (UCC) relating to unconscionability, Kan. Stat. 84-2-302, and on cases and articles pertaining to unconscionability under the UCC. *Wille*, 219 Kan. at 757-59. The *Wille* court quoted the following exerpt from the comment to the Kansas UCC: "The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract * * *. The principle is one of the prevention of oppression and unfair surprise * * * and not of disturbance of risks because of superior bargaining power * * *." *Id.* at 758. The court also observed that the UCC is designed to deal with "two types of situations": "unfair surprise," where there has actually been no assent to the "fine print terms" of the contract,

Relying on *Wille*, the Kansas Supreme Court has repeatedly held that there must be some element of deceptive bargaining conduct or practice as well as unequal bargaining power to render the contract between the parties unconscionable. *E.g., Stovall v. Confimed.com, LLC*, 272 Kan. 1313 (2002); *Aves v. Shah*, 258 Kan. 506 (1995); *Hawes v. Kansas Farm Bureau*, 238 Kan. 404, 406 (1985); *Willman v. Ewen*, 230 Kan. 262, 266 (1981) (all cases involving allegations of unconscionability under the KCPA). The Kansas Supreme Court has also held that there is no claim of unconscionable conduct where a record is "devoid of any evidence of any deceptive or oppressive practices, overreaching, intentional misstatements, or concealment of facts." *See, e.g., Stovall v. Confimed.com*, 272 Kan. at 1323; *Gonzales v. Associates Financial Serv. Co. of Kansas*, 266 Kan. 141, 166-67 (1998) (both KCPA cases).

With respect to the factors to be considered in addition to unequal bargaining power, the Kansas courts have frequently focused on whether the challenged contract terms were concealed or unclear. *See, e.g., Wille*, 219 Kan. at 763-64; *Frets v. Capitol Federal Savings & Loan Association*, 238 Kan. 614, 622 (1986) *see also John Deere Leasing Company v. Blubaugh*, 636 F. Supp. 1569, 1574 (D. Kan. 1986). The Kansas Supreme Court has also considered the extent to which a consumer had other sources for the product in question. *See, e.g., Frets*, 238 Kan. at 623 (1986); *see also, Wight v. Agristor Leasing*, 652 F. Supp. 1000, 1012-13 (D. Kan. 1987).

---

and "oppression," where, although there has been actual assent, the agreement, surrounding facts, and relative bargaining of the parties result in vulnerability to a "grossly unequal bargain." *Id. (quoting* Note, "*The Doctrine of Unconscionability*," 19 Maine L.Rev. 81, 85, and *citing* Spanogle, "*Analyzing Unconscionability Problems*," 117 U.Pa.L.Rev. 931).

Applying these principles, a Kansas federal court recently rejected a claim of unconscionability with respect to an arbitration agreement contained in another Sprint contract.[7] *In re Universal Service Fund Telephone Billing Practices Litigation*, 300 F. Supp. 2d 1107, 1125-1126 (D. Kan. 2003). In that case it was "undisputed that Sprint was of superior bargaining strength and presented its terms and conditions of service, including the arbitration clause, to its customers as a form contract on a take-it-or-leave-it basis." The court found, however, that Sprint's arbitration clause was enforceable because "there was no element of deception." *Id.*, at 1125. The court noted that "[t]he arbitration clause is written in relatively plain language, not confusing terms, and emphasizes important aspects in bold all-capital lettering," and that "there is no evidence in the record that plaintiffs could not have readily purchased this same fungible product from another long distance carrier, who, unlike Sprint * * *, did not require its customers to arbitrate disputes. *Id.*, at 1126.

In this case, Claimant has not alleged or submitted evidence of deceptive bargaining conduct. Nor, apart from assertions of unequal bargaining power and a contract of adhesion, has Claimant alleged or provided evidence of any of the other factors that Kansas courts have considered significant in evaluating a claim of unconscionability, such as unclear or hidden terms. Moreover, Claimant acknowledges that at the time he entered into the agreement with Sprint, other wireless providers did not prohibit class actions.

---

[7] The Sprint arbitration agreement in *Universal Service Fund* did not preclude class actions; the claim of unconscionability was addressed to the mandatory arbitration provision of the agreement .

14

Significantly, Claimant has not cited, nor has my research uncovered any case decided under Kansas law that found a contract unconscionable based solely on the ground that a contract term was unfair or contrary to public policy, in the absence of deceptive bargaining conduct or other factors, such as concealment of the term in question.[8] Under these circumstances, I find that Claimant has not established that the class action preclusion provision of the Sprint contract is unconscionable under Kansas law.

## CONCLUSION

This arbitration is governed by the JAMS Class Action Procedures and not by the withdrawn Class Action Preclusion Policy. The class action preclusion provision in the Sprint agreement at issue is unenforceable with respect to Claimant's claims under the KCPA. Claimant has not established that the class action preclusion provision is unconscionable under Kansas law.

---

[8] Although I have not conducted an exhaustive search, I have found only one case decided under Kansas law in which a contract has been found unconscionable: *John Deere Leasing Company v. Blubaugh*, 636 F. Supp. 1569 (D. Kan. 1986). In that case, the court found a provision in a lease relating to the lessor's remedy on default to be unconscionable where not only was the remedy "unduly harsh and one-sided," but the term itself was "buried" and "indecipherable."

Counsel are requested to contact Elizabeth Ryan at 212-607-2711 to schedule a telephone conference regarding the next steps to be taken in the arbitration, including whether Respondent wishes to have the Arbitrator set forth the above determination in a partial final award subject to immediate court review.

SO ORDERED.

KATHLEEN A. ROBERTS
ARBITRATOR

DATED: October 25, 2006

## *PROOF OF SERVICE BY FACSIMILE*

I, Elizabeth Ryan, not a party to the within action, hereby declare that on October 25, 2006, I served the attached Decision on Enforceability of Class Action Preclusion Clause on the parties in the within action by faxing true copies thereof, at New York, NEW YORK, addressed as follows:

William R. Weinstein
Wechsler Harwood LLP
488 Madison Avenue
8th Floor
New York, NY 10022
Tel: 212-935-7400
Fax: 212-753-3630

Mark Hinderks Esq.
Stinson Morrison Hecker LLP
12 Corporate Woods
10975 Benson, Suite 550
Overland Park, KS 66210
Tel: 913-451-8600
Fax: 913-451-6352

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on October 25, 2006.

Elizabeth Ryan

## Bill Weinstein

**From:** Hinderks, Mark [MHinderks@stinson.com]
**Sent:** Wednesday, April 11, 2007 7:06 PM
**To:** Bill Weinstein
**Cc:** karoberts@prodigy.net; Lauridsen, Lee T [CC]; Hanna, William; eryan@jamsadr.com
**Subject:** RE: Emilio v. Sprint; REF# 1425000444

Bill,

In response to your email on Friday requesting yet additional information, we object to the continued one-sided discovery, and cannot understand how the answers to the questions you have asked can have any impact on these proceedings, whatever those answers are. We are also unwilling to incur the expense and burden of fully searching through all of our files and electronic files relating to the Benney/Lundberg matter in order to assemble definitive answers to these additional questions. That said, here are answers based upon my recollection and some limited review of the materials:

It is my belief that the term "excise taxes" appeared for the first time in the June 21, 2005 mediation statement; we certainly know that the term appeared in the mediation statement signed by both sides on that date. We consider prior discussions and exchanges confidential settlement negotiations, and the mediation sessions were confidential under Kansas law and by specific agreement under the auspices of Judge McClain.

There were many exchanges and edits of the documents, in which many people on both sides were involved, not all of which were saved, and not all of which I have reviewed. I cannot say if the words "excise taxes" were in the release paragraph of every draft, but if they were not, they should have been, as reflected in the fact that they were in the Mediation Statement from which the drafting process began, and ended up in the final product of the Settlement Agreement, as well as the Final Order approved and entered by the District Court.

Mark

Mark D. Hinderks
Stinson Morrison Hecker LLP
12 Corporate Woods
10975 Benson, Suite 550
Overland Park, Kansas 66210-2008
(913) 344-6706 Office Direct
(913) 707-6706 Sprint Nextel mobile
(913) 344-6794 Direct Fax
mhinderks@stinson.com

*Note: New direct fax number and email address effective March 1, 2007.*

---

**From:** Bill Weinstein [mailto:wweinstein@nydclaw.com]
**Sent:** Friday, April 06, 2007 10:14 AM
**To:** Hinderks, Mark
**Cc:** karoberts@prodigy.net; Lauridsen, Lee T [CC]; Hanna, William; eryan@jamsadr.com
**Subject:** RE: Emilio v. Sprint; REF# 1425000444

Mark – Thank you for your response. I am most interested at this point in the information provided with respect to No. 2, the timing and insertion of "excise taxes" into the release language. I note that you have provided the

executed mediation statement dated June 21, 2005 and apparently signed on the same date (at least by one of the parties thereto per the last page fax).

Your response, however, is somewhat unclear, and while I don't want this to appear like written deposition questions, I do think a few questions can clarify matters.

(1)    Does your response mean that the first time the term "excise taxes" was inserted into the mediated Settlement Terms was on or about June 21, 2005, on the day the final mediation statement was executed by all parties? If that is so, could you please confirm that the term "excise taxes" did not appear in any prior mediation statement circulated?

(2)    Did your office prepare the executed mediated statement for signatures of all parties and the mediator? If so, was it first submitted on June 21, 2005 for execution, or was it circulated earlier and subject to comment and revision by the parties in advance of June 21, 2005? I understand from the January 22, 2007 hearing with Judge Roberts that in any event, the term "excise taxes" was never discussed by the parties in connection with the mediation and settlement.

(3)    Did the term "excise taxes" thereafter appear consistently in the release language of all drafts of the settlement agreement and exhibits that were thereafter submitted?

I observe that you have stated that the mediation proceedings are by law and agreement confidential. I see nothing to that effect in the executed mediation statement, and I am not sure what law you are referring to otherwise, as we are not attempting to use the settlement/mediation negotiations as admissions of liability. But hopefully you do not view the above questions as running afoul of such purported confidentiality proscriptions.
    Please advise at your earliest convenience.


Finally, I note that despite your email and cover letter to Judge Roberts, my fed-ex package does not appear to include any printed copy of the notice. Since you indicated you have no other copies, could you please contact the administrator or whomever mailed out the notice, as I would hope they have one around somewhere.

Thank you. BW

William R. Weinstein, Esq.
SANFORD WITTELS & HEISLER LLP
950 Third Avenue, 10th Floor
New York, NY 10022
Direct: 646.723.2451
Office: 646.723.2947
Fax:    646.723.2948
wweinstein@nydclaw.com
www.nydclaw.com

---

**From:** Hinderks, Mark [mailto:MHinderks@stinson.com]
**Sent:** Thursday, April 05, 2007 12:26 PM
**To:** Bill Weinstein
**Cc:** karoberts@prodigy.net; Lauridsen, Lee T [CC]; Hanna, William; eryan@jamsadr.com
**Subject:** RE: Emilio v. Sprint; REF# 1425000444

Bill,

I address with this email responses to the three remaining items of information you had requested. Of course, we contend that all of these requests are beyond the scope of any proper discovery, because the Benney/Lundberg Order may not be collaterally attacked in this proceeding, but we will voluntarily provide the following responses (without waiving any objections or arguments) in the interest of moving this proceeding along:

1.    Disclosures to customers per *Benney/Lundberg* Settlement Agreement para. 9.   I will enclose in the mailing we are sending to you today the current version of Sprint's Terms and Conditions, part of the contract with

wireless subscribers. It may also be viewed by pasting the following address into your web browser: www.sprintpcs.com/common/popups/popLegalTermsPrivacy.html . The relevant portion of Settlement Agreement para. 9 contains Sprint's agreement to "disclose to customers that Federal E911, Federal Wireless Number Pooling and Portability surcharges, or any charge for Sprint's recovery of cost of complying with governmental mandates or regulation, that is not required by a governmental entity to be imposed upon customers, are not taxes or government mandated charges."  The "Surcharge" section of the Terms and Conditions does that. Among other things, it states (emphasis in original):

You agree to pay the surcharges, fees and other charges that we assess to recoup our government costs or costs of complying with certain government programs ("Surcharges"). **Surcharges aren't taxes or government mandated charges; they're charges we collect from you.**

2.    Timing and circumstances of the insertion of "excise taxes" into the *Benney/Lundberg* release language.  I believe that the term "excise taxes" was first included in the *Benney/Lundberg* release language in para. 4 of the Mediation Memorandum agreed to and signed by counsel for the parties on June 21, 2005, in a mediation session before Judge Larry McClain. The *Benney/Lundberg* settlement agreement was subsequently prepared based upon the outline of these terms.  The mediation proceedings are by law and agreement confidential, and in any event, I do not recall whether there was or was not any specific discussion of the inclusion of the term "excise taxes."   A copy of the Mediation Memorandum is enclosed.

3.    A copy of the *Benney/Lundberg* notice.  I will enclose with the mailed packet today an accurate legal-sized photocopy of the notice front and back, marked for paper size and folds. In order that you may check, as sent it was 6.5 inches tall and 14 inches wide on the front, and, of course,  the same size on the back. I am down to my last copy of the actual notice, which I will include in the hard copy packet going to you today, so that you may check the accuracy of the copy.  I would respectfully ask you to please return the original to me for my files once you have done so.

Mark D. Hinderks
Stinson Morrison Hecker LLP
12 Corporate Woods
10975 Benson, Suite 550
Overland Park, Kansas 66210-2008
(913) 344-6706 Office Direct
(913) 707-6706 Sprint Nextel mobile
(913) 344-6794 Direct Fax
mhinderks@stinson.com

*Note: New direct fax number and email address effective March 1, 2007.*

---

**From:** Bill Weinstein [mailto:wweinstein@nydclaw.com]
**Sent:** Monday, April 02, 2007 9:43 AM
**To:** Hinderks, Mark
**Cc:** karoberts@prodigy.net; Lauridsen, Lee T [CC]; Hanna, William; eryan@jamsadr.com
**Subject:** RE: Emilio v. Sprint; REF# 1425000444 -- Outstanding Production Obligations from 1-22-07 Hearing

I did receive that group Mark.  Your email refers to a large group of materials sent "several weeks ago" – which I now take it was intended to refer to the materials sent in January, not the materials discussed at the 1-22 teleconference.

In any event, the documents identified in my 3-29 email were to be produced by 2-22, so ASAP would be appreciated, to avoid any issues of outstanding documents in connection with your upcoming motion papers and

my ability to respond as fully as possible.

Thank you again in advance.  BW

William R. Weinstein, Esq.
SANFORD WITTELS & HEISLER LLP
950 Third Avenue, 10th Floor
New York, NY 10022
Direct:  646.723.2451
Office:  646.723.2947
Fax:     646.723.2948
wweinstein@nydclaw.com
www.nydclaw.com

---

**From:** Hinderks, Mark [mailto:MHinderks@stinson.com]
**Sent:** Monday, April 02, 2007 10:40 AM
**To:** Bill Weinstein
**Cc:** karoberts@prodigy.net; Lauridsen, Lee T [CC]; Hanna, William; eryan@jamsadr.com
**Subject:** RE: Emilio v. Sprint; REF# 1425000444 -- Outstanding Production Obligations from 1-22-07 Hearing

I believe that you did receive a large group of materials in mid-January, Bill. Remember, there was a fire drill around both copy sets having been sent to Judge Roberts' office.

Mark D. Hinderks
Stinson Morrison Hecker LLP
12 Corporate Woods
10975 Benson, Suite 550
Overland Park, Kansas 66210-2008
(913) 344-6706 Office Direct
(913) 707-6706 Sprint Nextel mobile
(913) 344-6794 Direct Fax
mhinderks@stinson.com

*Note: New direct fax number and email address effective March 1, 2007.*

---

**From:** Bill Weinstein [mailto:wweinstein@nydclaw.com]
**Sent:** Monday, April 02, 2007 9:10 AM
**To:** Hinderks, Mark
**Cc:** karoberts@prodigy.net; Lauridsen, Lee T [CC]; Hanna, William; eryan@jamsadr.com
**Subject:** RE: Emilio v. Sprint; REF# 1425000444 -- Outstanding Production Obligations from 1-22-07 Hearing

I received no large group of materials several weeks ago, Mark.  BW

William R. Weinstein, Esq.
SANFORD WITTELS & HEISLER LLP
950 Third Avenue, 10th Floor
New York, NY 10022
Direct:  646.723.2451
Office:  646.723.2947
Fax:     646.723.2948
wweinstein@nydclaw.com
www.nydclaw.com

**From:** Hinderks, Mark [mailto:MHinderks@stinson.com]
**Sent:** Monday, April 02, 2007 8:49 AM
**To:** Bill Weinstein
**Cc:** karoberts@prodigy.net; Lauridsen, Lee T [CC]; Hanna, William; eryan@jamsadr.com
**Subject:** RE: Emilio v. Sprint; REF# 1425000444 -- Outstanding Production Obligations from 1-22-07 Hearing

Bill,

I was out all week last week in depositions on the road. We'll double-check the loose ends you reference below as follow on to the large group of materials we already provided to you several weeks ago, and respond to you this week.

By the way, the Order approving the nationwide settlement is now final; the appeals that had been pending by a small number of objectors have been dismissed.

Mark D. Hinderks
Stinson Morrison Hecker LLP
12 Corporate Woods
10975 Benson, Suite 550
Overland Park, Kansas 66210-2008
(913) 344-6706 Office Direct
(913) 707-6706 Sprint Nextel mobile
(913) 344-6794 Direct Fax
mhinderks@stinson.com

*Note: New direct fax number and email address effective March 1, 2007.*

**From:** Bill Weinstein [mailto:wweinstein@nydclaw.com]
**Sent:** Thursday, March 29, 2007 12:18 PM
**To:** Hinderks, Mark
**Cc:** karoberts@prodigy.net; Lauridsen, Lee T [CC]; Hanna, William; eryan@jamsadr.com
**Subject:** FW: Emilio v. Sprint; REF# 1425000444 -- Outstanding Production Obligations from 1-22-07 Hearing

Dear Mark – I apologize for not following up sooner after my March 3, 2007 email to you, but I ended up with a whopping case of the flu by March 4th that mandated my playing catch-up slowly for several weeks while recovering.

There were a number of documents that you agreed to produce during our January 22, 2007 teleconference with Judge Roberts that still have yet to be provided.  The list, with transcript references, includes:

     —    Whatever document(s) you contend Sprint is now providing to its customers regarding the excise taxes complying with the injunctive part of the Settlement Agreement prescribed at paragraph 9 of the agreement (Tr. 23, 84, 88);

     —    Settlement agreement drafts and related documents and information with respect to the timing and circumstances of the insertion of the term "excise taxes" into the release language of the settlement agreement and related papers (Tr. 41-45); and

     —    A copy of the actual folded mail notice inserted into the bills of current Sprint customers (Tr. 49-50).

During the 1-22-07 teleconference you agreed to produce these documents by February 20, 2007 or even

"sooner." Please advise when I can expect to receive them.

If you have any questions, please feel free to call. Thank you in advance.

William R. Weinstein, Esq.
SANFORD WITTELS & HEISLER LLP
950 Third Avenue, 10th Floor
New York, NY 10022
Direct: 646.723.2451
Office: 646.723.2947
Fax:    646.723.2948
wweinstein@nydclaw.com
www.nydclaw.com

**From:** Bill Weinstein
**Sent:** Saturday, March 03, 2007 11:43 AM
**To:** Hinderks, Mark
**Subject:** RE: Emilio v. Sprint; REF# 1425000444 -- Claimant's Request to Serve/File Second Amended Demand and Modification of Briefing Schedule

Mark -- please let me know when we will get the additional materials you agreed to produce at our hearing.  I confess I do not have the transcript in front of me, but there was some stuff there I thought was due mid-February.  We can catch up Monday.  BW

**From:** Hinderks, Mark [mailto:MHinderks@stinson.com]
**Sent:** Sat 3/3/2007 10:29 AM
**To:** Bill Weinstein; KATHLEEN ROBERTS; Hinderks, Mark
**Cc:** eryan@jamsadr.com; Lauridsen, Lee T [CC]; Hanna, William; SWHNY
**Subject:** RE: Emilio v. Sprint; REF# 1425000444 -- Claimant's Request to Serve/File Second Amended Demand and Modification of Briefing Schedule

Thank you.

Mark D Hinderks
Stinson Morrison Hecker LLP
Message sent from Sprint Nextel smartphone

-----Original Message-----
From: "Bill Weinstein" <wweinstein@nydclaw.com>
To: "KATHLEEN ROBERTS" <karoberts@prodigy.net>; "Hinderks, Mark" <MHinderks@stinson.com>
Cc: "eryan@jamsadr.com" <eryan@jamsadr.com>; "Lauridsen, Lee T [CC]" <lee.lauridsen@sprint.com>; "Hanna, William" <WHanna@stinson.com>; "SWHNY" <NY@nydclaw.com>
Sent: 3/3/07 8:16 AM
Subject: RE: Emilio v. Sprint; REF# 1425000444 -- Claimant's Request to Serve/File Second Amended Demand and Modification of Briefing Schedule

We will change our calendar accordingly.  BW

From: KATHLEEN ROBERTS [mailto:karoberts@prodigy.net]
Sent: Sat 3/3/2007 8:45 AM
To: Hinderks, Mark; Bill Weinstein
Cc: eryan@jamsadr.com; Lauridsen, Lee T [CC]; Hanna, William
Subject: RE: Emilio v. Sprint; REF# 1425000444 -- Claimant's Request to Serve/File Second Amended Demand and Modification of Briefing Schedule

This is fne with me.
KAR

"Hinderks, Mark" <MHinderks@stinson.com> wrote:

Judge Roberts,

Under the formula set forth below, our next submission is due March 22.  Unfortunately, we have a confluence of
staggered unavailability of various people on our side (hearings, business travel and Spring breaks) that is upcoming.
Accordingly, I would like to request an additional two weeks, or until April 5 for our submission. Thank you and good
weekend all.

Mark D. Hinderks
Stinson Morrison Hecker LLP
12 Corporate Woods
10975 Benson, Suite 550
Overland Park, Kansas 66210-2008
(913) 344-6706 Office
(913) 707-6706 Sprint Nextel mobile
(888) 221-9755 Toll-free fax

---

From: KATHLEEN ROBERTS [mailto:karoberts@prodigy.net]
Sent: Friday, February 02, 2007 5:04 PM
To: William Weinstein; Hinderks, Mark
Cc: eryan@jamsadr.com; Lauridsen, Lee T [CC]; Hanna, William
Subject: RE: Emilio v. Sprint; REF# 1425000444 -- Claimant's Request to Serve/File Second Amended Demand and
Modification of Briefing Schedule

Dear Counsel,

I agree that Claimant should file his request for leave to serve a Second Amended Claim within two weeks of receipt of
the materials referenced in the e-mail correspondence.  Respondent is directed to submit its response to this request, as well
as the dispositive motions described in Mr. Hinderks' e-mail within 30 days of receipt of the proposed Second Amended
Claim.  The dates for submission of Claimant's response and Respondent's reply shall be set as previously agreed.

KAR

This communication is from a law firm and may contain confidential and/or privileged information. If it has been
sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use
or disclose the contents to others.

JAMS

-----------------------------------------------------------------------X
VINCENT EMILIO, individually and on behalf            :
of all others similarly situated,                     :
                                                      :
                          Claimant,                   :      **SECOND AMENDED**
                                                      :      **DEMAND FOR CLASS**
              -vs.-                                   :      **ACTION ARBITRATION**
                                                      :
SPRINT SPECTRUM L.P. d/b/a/ SPRINT PCS,               :
                                                      :
                          Respondent.                 :
-----------------------------------------------------------------------X

Pursuant to the applicable JAMS rules, and in accordance with the October 25, 2006

Decision on Enforceability of Class Action Preclusion Clause rendered by the Honorable Kathleen

A. Roberts in this arbitration proceeding (the "October 25, 2006 Decision"), Claimant Vincent

Emilio ("Claimant"), individually and on behalf of all others similarly situated, by his undersigned

attorneys, alleges upon personal information as to himself and upon information and belief as to

all other allegations, for his Second Amended Demand for Class Action Arbitration against

respondent Sprint Spectrum L.P. d/b/a Sprint PCS ("Sprint" or "Respondent"), as follows:

## NATURE OF THE ARBITRATION

1.      Claimant brings this class action arbitration individually and on behalf of a class

comprised of all persons who, during the period commencing no less than three years or more

than six years prior to the filing of Claimant's original arbitration demand on or about January 4,

2005 and continuing to the present (the "Class Period"), were Sprint wireless telephone service

customers who paid "New York State Excise Tax" ("Excise Tax(es)") as part of their monthly

charges (the "Class").

2.      As further alleged herein, the Excise Tax that Respondent has collected from

Claimant and the other members of the Class is an unlawful, deceptive and inequitable attempt by

Sprint to obtain reimbursement for amounts that Respondent was and is not authorized to pass directly on to its customers under New York Tax Law ("Tax Law") § 186-e.  In fact, the Excise Tax collected by Respondent is nothing more than an operating cost that reduces Respondent's operating profit like any other operating cost Respondent must pay as a cost of doing business with Claimant and the Class.  Claimant and the Class, however, are led to believe that these Excise Taxes are amounts imposed directly on customers and collected and remitted by Sprint to the New York taxing authorities on the customers' behalf, when in reality the Excise Taxes are imposed only on Sprint.  By failing to clearly and non-misleadingly disclose the true nature of the Excise Taxes billed and collected, Sprint is able to artificially and deceptively advertise its rates, and to contract for its wireless services with Claimant and the Class, at a materially lower amount than the customers actually will have to pay each month.  As a result of Respondent's unlawful, deceptive and inequitable conduct, Claimant and the Class have been and are wrongfully subjected to the Excise Tax.

3.     By this class action arbitration, Claimant seeks to remedy the harm caused by Respondent's unlawful, deceptive and inequitable conduct.  As set forth below, Claimant and all those similarly situated should be awarded compensatory damages, restitution and/or other relief to redress Respondent's unlawful, deceptive and inequitable conduct (i) violating the Kansas Consumer Protection Act ("KCPA"), Kansas Statutes Annotated ("KSA") 50-623, *et seq.* (or alternatively, the comparable New York consumer protection statute, New York General Business Law ("GBL") § 349), (ii) breaching the contract between Sprint and Claimant and the Class, and (iii) constituting unjust enrichment.  Additionally, Respondent should be enjoined from collecting Excise Tax from all of its customers under its current practices, and should be required

2

to clearly disclose the true nature of the Excise Taxes and the real price of its services at the beginning of and throughout its relationship with each New York customer.

## JURISDICTION

4.    JAMS has jurisdiction over this dispute pursuant to the section entitled "Mandatory Arbitration of Disputes" of the "Terms and Conditions of Services" of the Agreement between Sprint and its wireless customers (the "Agreement"), a copy of which was annexed as Exhibit A to Claimant's original Demand for Class Action Arbitration filed with JAMS on or about January 4, 2005.

## THE PARTIES

5.    Claimant Emilio is a resident of the City of Mount Vernon, County of Westchester, New York.  At all times relevant hereto, Claimant has been a Sprint wireless telephone service customer who has been charged by and paid to Respondent the Excise Tax unlawfully, deceptively and inequitably collected by Respondent, and has been injured thereby.

6.    Respondent Sprint is a Delaware limited partnership with its principal offices located in Kansas.  Sprint is wholly owned by Sprint Corporation, a Kansas corporation with its principal executive offices located in Shawnee Mission, Kansas.  Sprint is a global telecommunications company offering, among other services, wireless telephone services.  Upon information and belief, the actions complained of herein were conceived, directed and controlled by Sprint from its principal executive offices in Kansas, and the Excise Taxes wrongfully and deceptively collected by Sprint redounded to its benefit and were controlled by Sprint from its principal executive offices in Kansas.

3

## CLASS ACTION ARBITRATION ALLEGATIONS

7.    Claimant brings this arbitration as a class action arbitration, pursuant to the JAMS rules and policies referred to herein, as supplemented by KSA 60-223 and/or Article 9 of the New York Civil Practice Law and Rules ("CPLR") and/or the JAMS Class Action Procedures adopted in February, 2005, on behalf of the Class consisting of all persons who, during the Class Period, were Sprint wireless telephone service customers and paid the Excise Tax as part of their monthly charges.  Excluded from the Class are Respondent, and Respondent's directors, officers, parents, affiliates, subsidiaries and successors.

8.    (a)    The JAMS rules promulgated under the JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness (rev. April, 2003), require as follows, at Paragraph 3:

> Remedies that would otherwise be available to the consumer under applicable federal, state or local laws must remain available under the arbitration clause, unless the consumer retains the right to pursue the unavailable remedies in court.

Because the remedy of a class action would be available in this matter were it to be brought by Claimant in state court in absence of the arbitration provision of the uniform Agreement between Claimant and the Class and Respondent, such class action remedy is available in this arbitration pursuant to the above-quoted JAMS rule.

(b)    Furthermore, the remedy of a class action is one of the remedies specifically made non-waivable under the KCPA, as Judge Roberts squarely held in the October 25, 2006 Decision.

4

9.    The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the relevant supplemental class action procedural rules.

10.    The members of the Class are so numerous that joinder of all members is impracticable.  Although the precise number of Class members is unknown to Claimant at this time and can be determined only by appropriate discovery, it is reasonably estimated that the Class consists, at a minimum, of hundreds of thousands of members who are geographically dispersed throughout New York State.

11.    Because Claimant is a customer of Respondent's wireless telephone services who has paid for and been subjected to the unlawful, deceptive and inequitable collection of Excise Tax, Claimant is a member of the Class whose claims are typical of the claims of the members of the Class.  The harm suffered by Claimant and all other Class members was and is caused by the same conduct by Respondent, *viz.*, Respondent's unlawful, deceptive and inequitable collection of the Excise Tax under its practices alleged herein.

12.    Claimant will fairly and adequately represent and protect the interests of the Class, in that Claimant has no interests antagonistic to, nor in conflict with, the Class.  Claimant has retained competent counsel, experienced in consumer and commercial class actions and in arbitration, to further ensure such protection and who intend to prosecute this class action arbitration vigorously.

13.    A class action arbitration is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class members are relatively small, the expense and burden of individual arbitration make it

5

virtually impossible for individual Class members to seek redress for the wrongful conduct alleged herein.  If Class treatment of these claims were not available, Respondent would likely continue its wrongful conduct, and also would unfairly receive many hundreds of thousands or millions of dollars in unlawfully collected and retained Excise Taxes, or would otherwise escape liability for its wrongdoing as alleged in this Demand.

14.     Common questions of law and fact exist as to all members of the Class which predominate over any questions that may affect individual Class members.  Among the questions of law and fact common to the Class are the following:

(a)     whether the Excise Tax was/is unlawfully, deceptively and/or inequitably charged to and collected from Respondent's wireless telephone service customers;

(b)     whether Respondent has breached its contracts with Claimant and the Class by its imposition and collection of the Excise Tax;

(c)     whether Respondent has violated the KCPA (or alternatively, GBL § 349) by its imposition and collection of the Excise Tax;

(d)     whether Respondent has been unjustly enriched by its collection of the Excise Tax;

(e)     whether Respondent should be enjoined from seeking to collect the Excise Tax under its current practices from all of its New York customers, and should be required to clearly disclose the true nature of the Excise Taxes and the real price of its services at the beginning of and throughout its relationship with each New York customer; and

(f)     the appropriate measure of damages, restitution and/or other relief.

15.     The Class is readily definable, and prosecution of this action as a class action arbitration will reduce the possibility of repetitious arbitration.  Information concerning the Excise Taxes collected by Respondent from Claimant and the Class is readily available from Respondent's books and records.  Claimant knows of no difficulty which will be encountered in the management of this arbitration which would preclude its maintenance as a class action arbitration.

## FACTUAL ALLEGATIONS

16.     Sprint provides wireless telephone service to Claimant and the Class at a specific monthly recurring price, depending, inter alia, on the number of minutes of wireless service a customer chooses to use during a one-month period.

17.     Sprint's standard form Agreement with its customers, which is not negotiable and is imposed on a take-it-or-or-leave-it basis, and which can be changed or amended by Sprint at any time with such changes or amendments deemed accepted by any use of Sprint services at anytime thereafter, expressly provides that the Agreement and Sprint's relationship with its customers is to be "governed by and must be construed under . . . the laws of the State of Kansas without regard to choice of law principles."

18.     New York Tax Law, in the first instance, governs Sprint's rights and obligations to assess and collect the New York State Excise Taxes.  Under Tax Law § 186-e, Sprint, as a "provider of telecommunications services," has the sole obligation to pay the Excise Tax, in an amount since 2000 equal to 2.5% of all receipts for wireless telecommunications services it provides to its customers, and in amounts as much as 3.5% during the Class Period prior to 2000.

7

Under Tax Law § 186-e(2)(a), the obligation to pay the Excise Tax is imposed only on Sprint, and specifically is required "to be paid by [Sprint]," not its customers.

19.    (a)    Under New York Tax Law at all times relevant hereto, Sprint was and is not authorized to pass on to customers its obligation to pay Excise Taxes. Specifically, Tax Law § 186-e does not provide such a right, and to the contrary, Tax Law § 186-e(2)(a) states that the Excise Tax is required "to be paid by [Sprint]." Furthermore, there is no existing State regulation that authorizes Sprint to pass on to its wireless customers its obligation to pay Excise Taxes.

(b)    As compared to the Excise Tax under § Tax Law § 186-e(2)(a), the New York Legislature has specifically authorized certain other tax obligations to be passed on to consumers – as in Tax Law § 186-a(6), a provision of Article 9 of the Tax Law, the same Article in which Tax Law § 186-e is found.

(c)    The construction of Tax Law § 186-e not authorizing Respondent to pass on the Excise Tax obligation to Claimant and the Class is further confirmed by New York Statutes § 74 (1 McKinney's 1971). New York Statutes § 74 is the New York Legislature's codification of the rule of construction "expressio unius est exclusio alterius," and states as follows:

A court cannot by implication supply in a statute a provision it is reasonable to suppose the Legislature intended intentionally to omit; and the failure of the Legislature to include a matter within the scope of an act may be construed as an indication that its exclusion was intended.

Under New York Statutes § 74, the Legislature is understood to have intended that the Excise Tax is the obligation of and is to be paid by Sprint – particularly in light of the difference between the Excise Tax statute, § 186-e(2)(a), and the other statute within the same Article 9, § 186-a(6),

which expressly allows the tax obligation imposed under § 186-a to be passed on to the customers of the corporate entities subject to that tax.

20.     Despite the lack of specific authority to do so under New York Tax Law, Sprint has included a charge for the Excise Tax in its bills to its customers, and has collected the Excise Tax from its customers, including Claimant and the Class.  It has accomplished this unlawful, deceptive and inequitable cost shifting through the artifice of vague and misleading language in its customer Agreement and its monthly billing disclosures that would lead any reasonable New York customer to believe that the New York Excise Taxes were a legitimate pass-through of taxes imposed on the customer, rather than a bald assessment by Sprint of certain operating costs that would otherwise diminish its already sizeable profit margin on the advertised and agreed-to monthly rates it promises Claimant and the Class.

21.     (a)     The "Terms and Conditions of Services" governing the relationship between Sprint and its customers as of May 1, 2000 and in effect at the time Claimant opened his wireless account provided as follows:

> **Taxes and Other Regulatory Related Charges.**  We invoice you for taxes, regulatory related obligations and other charges levied by federal, state or local authorities, or foreign government on Services, or mandated to be paid in proportion to receipts from telecommunication services provided, or on sales of equipment (except for taxes based on our net income), if we pay these taxes or other regulatory related charges.  Taxes, regulatory related charges and charges not directly paid by us are not invoiced to you, but payment to the taxing or levying of any applicable taxes, regulatory related charges and charges due from you are your responsibility.

(b)     The standard Sprint billing statement provided to Claimant and the Class during the period governed by the May, 2000 Terms and Conditions included a heading for the subsection "**Additional Billing Information.**  Detail of Taxes, Regulatory and Other Surcharges

and Fees" where the Excise Taxes were included, and also provided the following disclosure on

the back of the first page of the bill:

> **<u>Taxes, Surcharges, and Other Regulatory Related Charges</u>** – these include
> applicable federal, state, city and county taxes.  Other fees and charges are also
> invoiced here, including the Regulatory Obligations and Fees surcharge which
> funds expenses associated with the federal programs such as Federal USF and
> E911.

22.    (a)    The May 1, 2000 "Terms and Conditions of Services" governing the

relationship between Sprint and its customers were amended effective June 1, 2003 to provide as

follows:

> **Taxes and Surcharges.**  We invoice you for taxes, fees and other charges levied
> by or remitted directly to federal, state or local authorities, or foreign government
> on Services including, without limitation, sales, gross receipts, use, and excise
> taxes. . . .
>
> We also invoice you for fees that we collect and remit to the government such as
> Universal Service, and for surcharges the we collect and keep to pay for the costs of
> complying with governmental mandates such as number pooling and portability, and
> Enhanced 911 services.  These charges are neither taxes nor government imposed
> assessments.

(b)    The June 1, 2003 Terms and Conditions of Services were modestly

amended effective June 30, 2004, to provide as follows:

> **Taxes and Surcharges.**  We invoice you for taxes, fees and other charges levied
> by or remitted directly to federal, state, local or foreign governments including,
> without limitation, sales gross receipts, Universal Service, use, and excise taxes.
> . . .  We also invoice you for surcharges that we collect and keep to pay for the
> costs of complying with governmental programs such as number pooling and
> portability, and Enhanced 911 service; these charges are not the taxes nor
> government imposed assessments.

This June 30, 2004 version was the version in effect at the time this arbitration was originally

commenced in January, 2005.

23.    (a)    Shortly before the June 1, 2003 amendment to the "Terms and Conditions of Services" quoted in Paragraph 22(a), supra, the standard Sprint billing statement provided to Claimant and the Class was revised in February 2003 to include an "Explanation of Terms on Your Invoice" which provided the following disclosure on the back of the first page of the bill:

Taxes – These include applicable federal, state, city and county taxes.

Surcharges and Fees – The surcharges in this section generally recover the costs incurred by Sprint in complying with various federal and state mandates.  Charges that appear in this section of your invoice, including charges associated with Federal Telephone Number Pooling, Federal and State Universal Service Funds and Federal E911, are neither taxes nor government-imposed assessments.  Neither federal nor state law requires carriers to impose these charges but carriers are permitted to recover their costs for complying with these federal and state mandates.

(b)    The February 1, 2003 "Explanation of Terms on Your Invoice" disclosures were modestly revised in or around July, 2003 – shortly after the June 1, 2003 amendment to the "Terms and Conditions of Services" quoted in Paragraph 22(a), supra – to provide the following on the back of the first page of the bill:

Taxes – These include applicable federal, state, city and county taxes.

Surcharges and Fees – The surcharges in this section generally recover the costs incurred by Sprint in complying with various federal and state mandates.  Charges that appear in this section of your invoice, including charges associated with Federal Telephone Number Pooling and Portability, Federal and State Universal Service Funds (USF) and Federal E911, are neither taxes nor government-imposed assessments.  The Federal USF charge is calculated using the FCC-prescribed contribution factor, which may change on a quarterly basis.  Neither federal nor state law requires carries to impose these charges but carriers are permitted to recover their costs for complying with these federal and state mandates.

24.    How the Excise Taxes charged to and collected from Claimant and the Class were actually treated on Sprint's monthly bills was as varied and confusing as the ways they were alluded to in the above-quoted versions of the customer agreement and the purportedly "helpful

information" in the disclosures on the back of the first pages of the customer bills. In some months, the Excise Tax charge was included as "New York State Excise Tax" under the Taxes subsection of the "Detail of Taxes, and Surcharges & Fees" section of the bill. In other months, the Excise Tax charge was included as "New York State Excise Tax" under the "Surcharges & Fees" subsection of the "Detail of Taxes, and Surcharges & Fees" section of the bill. And beginning with the December 2004 bill (one month before this arbitration was commenced in January 2005) and continuing to the present, the Excise Tax has been included as a "New York State Excise Tax <u>Surcharge</u>" (emphasis added) under the "Surcharges & Fees" subsection of the "Detail of Taxes, and Surcharges & Fees" section of the bill.

25.     Thus, it is clear that Sprint is simply making it up as it goes along as to what it considers the Excise Taxes to constitute under its Agreement – except that under all scenarios the Excise Tax charges are nothing more than an additional tack-on to unlawfully, deceptively and inequitably increase Sprint's bottom line . Even when the Agreement clearly specifies that the Excise Taxes are precisely that – "excise tax taxes" – the bills nevertheless include the Excise Taxes under the "Surcharges & Fees" subsection of the "Detail of Taxes, and Surcharges & Fees" section of the bill – sometimes with a "'Surcharge' surname" and sometimes without that surname. But if the Excise Tax is a "surcharge" as it is affirmatively described in at least some of the Sprint bills, then the Excise Tax is "not a tax" under its Agreement and its billing disclosures. Except for the fact that the Excise Tax is a tax – but not a tax imposed on or authorized under New York Tax Law to be passed on to Sprint's customers.

26.     From the beginning of the Class Period to the present, Sprint has never clearly disclosed to Claimant and the Class the true nature of the Excise Taxes charged and collected.

Nothing provided to its new or existing customers advises them of the true nature of the Excise

Taxes charged and collected.  Nor could any reasonable customer unversed in the nuances of

New York Tax Law and faced with the inconsistencies between the customer Agreement and the

bill disclosures figure out what Sprint really is doing here with respect to the Excise Taxes –

shifting an operating cost in the guise of a pass-through to collect more than its advertised and

contractually promised monthly rate – all to unlawfully, deceptively and inequitably increase its

bottom-line profits.

      27.    But several things are now clear – at least to Claimant's counsel.  First, if Sprint

were authorized by New York Tax Law to pass through the Excise Taxes to its customers like it

is doing anyway, then the Excise Taxes would be included in the Taxes section of monthly

statement – consistent with the terms of the customer Agreement, which specifically distinguishes

between "taxes" and "surcharges," and definitionally excludes "surcharges" from being taxes.

Second, because Sprint has included the Excise Taxes in the "Surcharges & Fees" subsection of

its bill, and specifically has described the charge as a "New York State Excise Tax Surcharge"

since December, 2004, Sprint knows that it is not authorized under New York Tax Law to pass

the Excise Taxes through to it customers – unlike other taxes and fees that are specifically

authorized to be imposed on the customer under the relevant federal, state or local law.

      28.    That the Excise Taxes are an inequitable and deceptive tack-on is confirmed by the

practices of Sprint's largest wireless telephone competitor in New York, Verizon.  As opposed to

Sprint, Verizon does not include in its monthly bills or collect a "New York State Excise Tax"

from its wireless telephone customers, further confirming the deceptiveness and inequity of

Sprint's practices and conduct alleged herein.  But there is no reason for Sprint's customers to

know of the difference in the treatment of the Excise Taxes by Verizon, or even the possibility of

a difference of treatment – because Sprint's customers are being billed by Sprint, not Verizon, and

Sprint has misleadingly hidden from its customers the questionable and confusing basis for how

and why it treats the Excise Taxes differently.

29.     Claimant and the Class have paid Sprint for the unlawful, deceptive and

inequitable Excise Tax charges each month, unaware that Sprint is not authorized under the New

York Tax Law to collect such Excise Tax, and deceptively misled and confused by Sprint's

practice of including the charge for the Excise Tax in the portion of the bill suggesting to

reasonable consumers that its collection from the customer is properly authorized by the relevant

government body – rather than a bald-faced money grab.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

30.     Claimant realleges and reincorporates herein each and every allegation set forth in

the preceding paragraphs of this Second Amended Demand for Class Action Arbitration as if set

forth verbatim.

31.     Sprint's Agreement with Claimant and the Class is unclear and ambiguous as to

whether Respondent is entitled to assess and collect Excise Tax from Claimant and the Class

when New York Tax Law § 186-e does not affirmatively authorize its practices regarding those

Excise Taxes.  As such, the Agreement must be construed against Sprint, the drafter of the

adhesion contract, and in favor of Claimant and the Class.

32.     The passing through of the Excise Taxes under the facts alleged herein also violates the agreement between Sprint and its customers to provide wireless services at a prescribed monthly rate.

33.     Respondent's collection of the Excise Taxes is a breach of Respondent's Agreements with Claimant and the Class, as well as the covenant of good faith and fair dealing implied under every contract under controlling law, and Claimant and the Class have been injured thereby.

34.     Respondent is liable for the damages sustained by Claimant and the Class in an amount to be determined by the Arbitrator.

<u>**SECOND CLAIM FOR RELIEF**</u>

<u>**(Violations of KCPA)**</u>

35.     Claimant realleges and reincorporates herein each and every allegation set forth in the preceding paragraphs of this Second Amended Demand for Class Action Arbitration as if set forth verbatim.

36.     Respondent's conduct in imposing and collecting the Excise Tax as alleged herein, including, <u>inter alia</u>, its vague and inconsistent disclosures regarding the Excise Taxes that misleadingly and deceptively suggest that Sprint is authorized under New York Tax Law to pass through the Excise Taxes to its customers, as well as with respect to Sprint's advertising and promising of rates which are materially less than the rates actually charged, constitute materially deceptive acts or practices in connection with "consumer transactions" in violation of the KCPA. Among other things, Sprint's conduct wrongfully and deceptively leads consumers to believe that they are obligated to pay the Excise Tax under New York Tax Law when they are not, in

violation of KSA 50-626(a) & (b).  Respondent's conduct alleged herein also is unconscionable and in violation of KSA 50-627.

37.     Claimant and the Class have been injured by Respondent's deceptive acts and practices.

38.     Under KSA 50-634 of the KCPA, Claimant is specifically entitled and authorized to seek "private remedies" including declaratory and injunctive relief against Respondent, and to pursue a class action for the damages caused by Respondent's conduct alleged herein.  Under KSA 50-625 of the KCPA, Claimant's right to pursue these private remedies cannot be waived.

39.     Respondent is liable for the damages sustained by Claimant and the Class as allowable under the KCPA, in an amount to be determined by the Arbitrator, as well as the attorneys' fees provided for under the KCPA.

40.     Additionally, Respondent should be enjoined from continuing to engage in its wrongful violations of the KCPA for all of its customers with respect to the Excise Taxes, including Claimant and the Class, and should be required to clearly disclose the true nature of the Excise Taxes and the real price of its services at the beginning of and throughout its relationship with each New York customer.

## THIRD CLAIM FOR RELIEF

### (Alternatively, for Violations of GBL § 349)

41.     Claimant realleges and reincorporates herein each and every allegation set forth in the preceding paragraphs of this Second Amended Demand for Class Action Arbitration as if set forth verbatim.

42.    This claim for relief is asserted alternatively, in the event the Arbitrator determines that Respondent's conduct alleged herein either is not subject to or does not violate the KCPA.

43.    Respondent's conduct in collecting the Excise Tax, and in including such charge in a section of the bill that a reasonable consumer would have no reason to question, constitutes materially deceptive acts or practices in the conduct of business, trade or commerce or in the furnishing of services in the State of New York which affects the public interest under GBL § 349.

44.    Claimant and the Class have been injured by Respondent's deceptive acts and practices.

45.    Respondent is liable for actual damages sustained by Claimant and the Class as allowable under GBL § 349, in an amount to be determined by the Arbitrator, as well the attorneys' fees provided for under GBL § 349.

46.    Additionally, Respondent should be enjoined from continuing to engage in its wrongful violations of GBL § 349 for all of its customers with respect to the Excise Taxes, including Claimant and the Class, and should be required to clearly disclose the true nature of the Excise Taxes and the real price of its services at the beginning of and throughout its relationship with each New York customer.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

47.    Claimant realleges and reincorporates herein each and every allegation set forth in the preceding paragraphs of this Second Amended Demand for Class Action Arbitration as if set forth verbatim.

17

48.    Respondent has been unjustly enriched at the expense of and to the detriment of Claimant and the Class by Respondent's wrongful collection of the Excise Tax under the facts and circumstances alleged herein.  Respondent's retention of the monies wrongfully collected from Claimant and the Class violates fundamental principles of justice, equity and good conscience.

49.    Claimant and the Class are entitled to recover from Respondent all amounts as unjust enrichment that have been wrongfully and improperly collected by Respondent, and Respondent should be required to disgorge the monies which it has unjustly obtained.

## PRAYER FOR RELIEF

WHEREFORE, Claimant, on behalf of himself and the Class, prays for relief, and an arbitration award in his favor, as follows:

A.    Certifying this case as a class action arbitration pursuant to the JAMS rules and the relevant supplemental class action rules and procedures, with Claimant certified as representative of the Class;

B.    Awarding compensatory and/or actual damages, and/or disgorgement and/or restitution in favor of Claimant and the Class, in an amount to be determined through arbitration;

C.    Declaring that Sprint's collection of the Excise Tax is not authorized under Tax Law § 186-e, breaches Sprint's contract with Claimant and the Class, violates the KCPA (or alternatively, GBL § 349), and constitutes unjust enrichment;

D.    Enjoining Respondent from imposing and collecting the Excise Tax under the facts and circumstances alleged herein, and requiring Sprint to clearly disclose the true nature of Excise Taxes and the real price of its services at the beginning of and throughout its relationship with each New York customer;

E.    Awarding the costs and disbursements incurred in connection with this Class

Action Arbitration, including reasonable attorneys' fees and expenses;

F.    Awarding pre- and post-arbitration award interest; and

G.    Granting such other and further relief as the Arbitrator deems just and proper.


Dated: New York, New York
         February 20, 2007

                                 SANFORD WITTELS & HEISLER, LLP

                                 By:    /s/ William R. Weinstein
                                 950 Third Avenue, 10th Floor
                                 New York, NY 10022
                                 (646) 723-2947

                                 ATTORNEYS FOR CLAIMANT
                                 AND THE CLASS

**BEFORE JAMS**

VINCENT EMILIO,                          )
                                         )
                    Claimant,            )
                                         )
vs.                                      )    No. 1425000444
                                         )
SPRINT SPECTRUM L.P.,                    )
                                         )
                    Respondent.          )

## SPRINT SPECTRUM L.P.'S MOTION FOR SUMMARY DISPOSITION OF CLAIMANT'S ARBITRATION DEMAND BASED UPON THE *BENNEY/LUNDBERG* NATIONWIDE CLASS ACTION SETTLEMENT

Respondent Sprint Spectrum L.P. ("Sprint") moves for summary disposition of the arbitration demand of claimant Vincent Emilio ("Emilio"), based upon the *Benney/Lundberg* Class Action Settlement Agreement ("Settlement Agreement") (attached as Exhibit A), and the release given effect by the November 8, 2006 Order of the District Court of Wyandotte County, Kansas approving the Settlement Agreement (the "Order") (attached as Exhibit B). Emilio's claims are encompassed within the scope of the releases in *Benney/Lundberg*, which must be given effect in this proceeding. Furthermore, the Order (at paragraph 49) specifically requires class members who do not opt-out, but who have pending arbitration claims, to dismiss those claims. Although given an opportunity to opt-out of the settlement, Mr. Emilio chose not to do so (he also did not seek to intervene in the *Benney/Lundberg* proceedings to seek relief from the Order from the court or to appeal the entry of the Order). As a result, his claims are subject to the release in *Benney/Lundberg*, and subject to the Order in *Benney/Lundberg* that he dismiss his arbitration. Therefore, summary disposition in favor of Sprint should be granted.

## I.    STATEMENT OF FACTS

**A.    Emilio's Claims.**

1.    Claimant Vincent Emilio filed his original demand with JAMS on or about January 4, 2005, and filed his First Amended Arbitration Demand on June 2, 2006.  On February 20, 2007, Emilio filed his current Second Amended Demand for Class Action Arbitration ("Demand").  Emilio's Demand alleges that Sprint has been and is improperly charging Mr. Emilio as a Sprint wireless telephone customer to obtain reimbursement for  "New York State Excise Tax" ("Excise Tax") in his monthly billings.  Demand, ¶¶ 1-3.

2.    Emilio's First Claim alleges that Sprint breached its contract with Emilio because "[Sprint's] collection of the Excise Taxes is a breach of [Sprint's] Agreements with Claimant and Class."  *Id.* at ¶ 33.

3.    Emilio's Second Claim alleges a claim pursuant to the Kansas Consumer Protection Act ("KCPA"), claiming that Sprint's collection of the Excise Tax "leads consumers to believe that they are obligated to pay the Excise Tax under New York Tax Law when they are not."  *Id.* at ¶ 36.

4.    Emilio's Third Claim alleges that Sprint's "conduct in collecting the excise tax" constitutes deceptive acts and practices under New York General Business Law § 349.  *Id.* at ¶ 43.

5.    Emilio's Fourth Claim alleges that Sprint's "wrongful collection" of the charge for the excise tax, and retention of the monies collected, constitutes unjust enrichment.  *Id.* at ¶¶ 48-49.

6.    Emilio claims he has been a Sprint wireless telephone customer "at all times relevant hereto," and purports to bring a class action lawsuit on behalf of "Sprint wireless telephone customers [who] paid the Excise Tax as part of their monthly charges."  *Id.* at ¶¶ 5,7.

**B.**    **Background Of The *Benney/Lundberg* Settlement.**

7.      Beginning in 2002, Sprint was named as a defendant in a number of class action lawsuits around the country concerning Sprint's charges to wireless customers to recover, by billing surcharges, amounts that Sprint is required to pay to governmental entities (e.g., Universal Service Fund charges, as a component of the "USA Regulatory Fees" surcharge) or to fund government mandated programs (e.g., E911 services, number pooling and portability). Affidavit of Lee Lauridsen, ¶ 2. (attached as Exhibit C.)

8.      One such case, styled *Benney v. Sprint Spectrum, L.P.*, et al., was originally filed in Cole County, Missouri on November 27, 2002. Another such case, styled (following amendments to pleadings) *Lundberg and Barnes v. Sprint Corp.,* et al., was filed in the District Court of Wyandotte County, Kansas in October, 2002.  Settlement Agreement, Recitals.

9.      Eventually, the *Benney* and *Lundberg* cases were consolidated in the District Court of Wyandotte County, Kansas, along with cases from other jurisdictions -- *Brigman v. Sprint Corporation* (Richland County, South Carolina), and *Albaisa v. Sprint International* (San Diego County, California).  Settlement Agreement, Recitals.

10.     After both formal and informal discovery and lengthy settlement negotiations, including formal mediation meetings conducted before a retired judge, Sprint and plaintiffs in the *Benney/Lundberg* cases agreed to enter into the Settlement Agreement, signed on February 24, 2006.  Settlement Agreement, Recitals and Signature Page.

11.     On February 28, 2006, the Wyandotte County District Court issued an Order of Preliminary Approval of the Settlement Agreement (Exhibit D attached).

12.     In the Order of Preliminary Approval, the Court appointed plaintiffs' counsel in *Benney/Lundberg* as class counsel for two overlapping classes that included all current and past (for a period of several years) Sprint wireless customers nationwide. Plaintiffs' class counsel

was led by Edward D. Robertson, former Chief Justice of the Missouri Supreme Court. Exhibit D.

13.     Consistent with the Order of Preliminary Approval, Sprint provided notice of the *Benney/Lundberg* settlement to its current customers by bill insert and provided notice to its former customers via post card, notifying recipients of website and toll-free number references to obtain additional information and forms. *See* Exhibits A and D and Order, ¶ 18 (finding that notice pursuant to the Settlement Agreement had been given as previously ordered by the Court).

14.     Sprint also published notice of the *Benney/Lundberg* settlement in the *Wall Street Journal*, *USA Today*, *Vista*, and the national newspaper supplement *Parade* magazine. *Id.* In addition, plaintiffs' counsel maintained a website and toll-free number for potential claimants to obtain additional information and forms relating to the Settlement. *See* *http://www.sprintclassactionsettlement.com*.

15.     Approximately 635,672 class members ultimately submitted claim forms to receive benefits pursuant to the *Benney/Lundberg* settlement. Affidavit of Lee Lauridsen, ¶ 3.[1] In contrast, the Order recites that only 103 class members made objections, and an even smaller number -- 20 -- exercised their right to opt-out of the settlement. Order, ¶ 42.

16.     The District Court of Wyandotte County, Kansas held a final approval hearing on September 12, 2006. A number of objectors appeared, including several that (like Emilio) had alleged putative class actions in other forums. The Court approved the Settlement Agreement in the Order signed on November 8, 2006. Order (Exhibit B).

---

[1] As recited in the Order, approximately 425,000 claims had been received and counted at the time of the final approval hearing. Order, ¶ 42. Sprint has accepted the additional claims that were either uncounted at the time of the final approval hearing or were received after that date for a period of time.

17.     A handful of objectors initially appealed the Order. All objectors have now dismissed their appeals, and settlement benefits are in the process of being distributed, including but not limited to those claimants in the State of New York. Affidavit of Lee Lauridsen, ¶ 4.

**C.     The Terms Of The *Benney/Lundberg* Settlement.**

18.     The *Benney* Settlement Class consists of "all current and former Sprint wireless customers in the United States who were customers for any time during the period December 1, 2000 to the Effective Date, and who were charged Regulatory Fees as defined in paragraph 1.3(a).[2] Settlement Agreement, ¶ 7(a), p. 14.

19.     The *Lundberg* Settlement Class consists of "all current and former Sprint wireless customers in the United States who were customers at any time during the period January 1, 1997 to the Effective Date, and who could have asserted claims relating to directory assistance calls, Sprint's practice of rounding minutes up to the next whole minute, and Coverage and Capacity Issues." Settlement Agreement, ¶ 7(b), pp. 15-16.

20.     Settlement Agreement paragraphs 22(a)(1) and (a)(2) make clear that claims such as those raised by Emilio relating to Sprint's charging of a surcharge to recover excise taxes are encompassed in the settlement:

> 22(a)(1). Release. As of the Effective Date, the *Benney* Class Plaintiffs, on their own behalf and on behalf of all Settlement Class Members who do not properly opt out of the proposed Settlement Classes under K.S.A. 60-223, release and discharge Sprint (and its/their parents, subsidiaries, affiliates, predecessors, successors, and assigns, and each of their past, present and future officers, directors, employees, agents, representatives, attorneys, heirs, administrators, executors, predecessors, successors and assigns) (collectively, the "Releasees"), from any and all claims, demands, debts, liabilities, actions, causes of action of every kind and nature, obligations, damages, losses, and costs, whether known or

---

[2] "Effective Date" is defined at p. 9, ¶ 1.7 of the Settlement Agreement, to be the date after a Final Order when the order is no longer subject to further appeal or review. In this case, that date was triggered when the final appeal by an objector was dismissed, on March 8, 2007. (attached as Exhibit G.)

unknown, actual or potential, suspected or unsuspected, direct or indirect, contingent or fixed, that have been, could have been, or in the future might be asserted in the Actions or in any other court or proceeding which relate in any way to allegations that, on or before the Effective Date, Defendants failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes, including but not limited to the Regulatory Fees; and all other causes of action; claims; damages; equitable, legal, and administrative relief; interest; demands; or rights, whether presently known or unknown, whether based on facts in addition to or different from those which they now know or believe to be true, or whether based on federal, state, or local statute or ordinance, regulation, contract, common law, or any other source, that have been, could have been, may be, or could be alleged or asserted by any Class member, either directly or indirectly, on their own behalf, on behalf of the Class, or on behalf of any other person, against the Releasees relating to, on the basis of, in connection with, or arising out of, in whole or in part, the subject matter of any of the claims alleged in the *Benney* Action. All Class Members expressly waive any and all rights or benefits they may now have, or in the future may have, under any law relating to the releases of unknown claims, including, without limitation, California Civil Code Section 1542, which otherwise provides that "A general release does not extend to claims which the creditor does not know or suspect exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor," or under any other law or principle of common law of any State or territory of the United States, or of any foreign country, that is comparable or equivalent in substance or intent to California Civil Code Section 1542.

Settlement Agreement, p. 30-31 (emphasis added).

22(a)(2) Release. As of the Effective Date, the *Lundberg* Class Plaintiffs, on their own behalf and on behalf of all Settlement Class Members who do not properly opt out of the proposed Settlement Classes under K.S.A. 60-223, release and discharge Sprint (and its/their parents, subsidiaries, affiliates, predecessors, successors, and assigns, and each of their past, present and future officers, directors, employees, agents, representatives, attorneys, heirs, administrators, executors, predecessors, successors and assigns) (collectively, the "Releasees"), from any and all claims, demands, debts, liabilities, actions, causes of action of every kind and nature, obligations, damages, losses, and costs, whether known or unknown, actual or potential, suspected or unsuspected, direct or indirect, contingent or fixed, that have been, could have been, or in the future might be asserted in the Actions or in any other court or proceeding which relate in any way to allegations that, on or before the Effective Date, Defendants failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes, including but not limited to the Regulatory Fees; for directory assistance calls; the practice of rounding minutes up to the next whole minute; offered service without properly disclosing limitations on the coverage, capacity, and geographic scope of the Sprint PCS wireless network (including, but not

limited to, the availability or claimed necessity of software upgrades to phone handsets); Coverage and Capacity Issues; dropped customer calls; failed to connect customer calls; and all other causes of action; claims; damages; equitable, legal, and administrative relief; interest; demands; or rights, whether presently known or unknown, whether based on facts in addition to or different from those which they now know or believe to be true, or whether based on federal, state, or local statute or ordinance, regulation, contract, common law, or any other source, that have been, could have been, may be, or could be alleged or asserted by any Class member, either directly or indirectly, on their own behalf, on behalf of the Class, or on behalf of any other person, against the Releasees relating to, on the basis of, in connection with, or arising out of, in whole or in part, the subject matter of any of the claims alleged in the *Lundberg* Consolidated Action. All Class Members expressly waive any and all rights or benefits they may now have, or in the future may have, under any law relating to the releases of unknown claims, including, without limitation, California Civil Code Section 1542, which otherwise provides that "A general release does not extend to claims which the creditor does not know or suspect exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor," or under any other law or principle of common law of any State or territory of the United States, or of any foreign country, that is comparable or equivalent in substance or intent to California Civil Code Section 1542.

Settlement Agreement, pp. 31-32 (emphasis added).

### D.    The November 8, 2006 Order.

21.    The Order granting final approval to the Settlement Agreement states as follows:

46.    Sprint is hereby released and discharged from any liability to each and every *Benney* Class Plaintiff and Settlement Class members, with the sole exception of those Settlement Class members who timely excluded themselves from the class by filing a request for exclusion by the deadline set by the Court, arising from or relating to any and all claims that were or could have been alleged in the *Benney* matter, including but not limited to claims which relate in any way to allegations that, on or before the Effective Date as defined in the Settlement Agreement, Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes, including but not limited to the Regulatory Fees, as set forth in Paragraph 22(a)(1) of the Settlement Agreement.

47.    Sprint is hereby released and discharged from any liability to each and every *Lundberg* Class Plaintiff and Lundberg Settlement Class member, with the sole exception of those Settlement Class members who timely excluded themselves from the class by filing a request for exclusion by the deadline set by the Court, arising from or relating to any and all claims that were or could have been alleged in the *Lundberg* matter, including but not limited to claims that, on or before the Effective Date,

Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes, including but not limited to the Regulatory Fees; for directory assistance calls; the practice of rounding minutes up to the next whole minute; offered service without properly disclosing limitations on the coverage, capacity, and geographic scope of the Sprint PCS wireless network (including, but not limited to, the availability or claimed necessity for software upgrades to phone handsets); Coverage and Capacity Issues; dropped customer calls; or the failure to connect customer calls, as set forth in Paragraph 22(a)(2) of the Settlement Agreement.

Exhibit B, Order ¶ 47, p. 17 (emphasis added).

22.    In addition, paragraph 49 of the Order specifically orders class members who, like

Emilio, did not opt-out, but who have pending arbitrations against Sprint, to dismiss their claims:

Except as described in paragraph 48, . . .members of the Settlement Classes who did not timely exclude themselves from the classes by filing a request for exclusion . . . are hereby ordered to dismiss any and all Claims (as defined in the Settlement Agreement) currently pending against Sprint whether in arbitration or court proceedings.

23.    Emilio's counsel contends that he was advised of the *Benney/Lundberg* Settlement

in a November 8, 2006 telephone conference with counsel for Sprint.  (Weinstein December 6,

2006 Letter (attached as Exhibit E)).  At that time, the Order had just been entered and had not

become final.  Emilio did not seek leave to intervene in *Benney/Lundberg* to appeal the Order or

to challenge or seek relief from the Order from the District Court prior to the time that the Order

became final (or at any time thereafter).

24.    By e-mail dated December 1, 2006, counsel for Sprint conveyed to counsel for

Emilio Sprint's offer to permit Emilio to opt-out of the *Benney/Lundberg* Settlement (attached as

Exhibit F.)  Emilio did not accept this offer.

## II.    ARGUMENT

**A.    The *Benney/Lundberg* Settlement And Order Approving The Settlement Encompass Emilio's Claims, and the Order's Requirement To Dismiss Arbitration Claims Applies to Emilio.**

The Order of the District Court of Wyandotte County Kansas contains releases applicable to the *Benney* and *Lundberg* classes that release and discharge Sprint "from any liability ... arising from or relating to any and all claims that ... Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes . . . ." *See* Exhibit B, Order Granting Final Approval Of Class Action Settlement, ¶¶ 46, 47. The Order is consistent with ¶¶ 22(a)(1) and (2) of the Settlement Agreement that release claims that Sprint "failed to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes." Exhibit A, pp. 30-32. Because Emilio's claims squarely fall within the language of both the Order and Settlement Agreement, his claims should be dismissed.

Here, Emilio brings claims against Sprint based on allegations that Sprint "wrongfully and deceptively [led] consumers to believe that they are obligated to pay the Excise Tax under New York Tax Law when they are not" and that consumers were "deceptively misled and confused by Sprint's practice of including the charges for the Excise Tax in the portion of the bill suggesting to reasonable consumers that its collection from the customer is properly authorized by the relevant government body." Demand, ¶¶ 36, 29. There is no dispute that Mr. Emilio is a member of both the *Benney* and *Lundberg* classes. *See* Exhibit A, Settlement Agreement, ¶¶ 7(a) and 7(b), pp. 15-16. Thus, the *Benney/Lundberg* Settlement Agreement and Order releasing Sprint for "fail[ing] properly to disclose or otherwise improperly charg[ing] for ... excise taxes" clearly encompass this case.

Emilio argues that the *Benney/Lundberg* Settlement Agreement and Order do not apply to his claims because the Settlement Agreement does not specifically address excise taxes imposed

by New York or any other state. But there is no need for the Settlement Agreement to specifically mention each state's excise tax, or for that matter every possible surcharge or regulatory fee. As made clear above, the Settlement Agreement specifically releases claims related to "surcharges" and "excise taxes," which naturally includes as a subset New York's excise taxes and Sprint's surcharges to recover its excise tax payments. *See In re General American Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 803 (8th Cir. 2004) (rejecting claim that class member's individual action was not precluded by settlement that released claims related to "premium charges," because "premium charges" were included in "modal billing practices" that were released).

Furthermore, paragraph 49 of the Order plainly directs class members, including Emilio, to dismiss their arbitration claims. That Order also may not be collaterally attacked in this proceeding, and must be given effect.

**B.    The Releases Are Not Overly Broad.**

Emilio claims that the plaintiffs in the *Benney/Lundberg* cases did not have claims sufficiently similar to his claims relating to recovery of excise taxes, and thus the release was overbroad, relying upon *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). This argument is unavailing. *Amchem* involved review of a class certification decision, not collateral attack on a judgment obtained by class settlement. *Id.* at 597. Moreover, it did not concern the permissible scope of a release; rather, it addressed the absence of "predominance" and adequacy of representation in a sweeping settlement involving a class of all persons exposed to asbestos, and conflicts between the interests of those with a variety of medical conditions and those with no current medical problem. *Id.* at 622-28.

In contrast, a number of post-*Amchem* cases have made it clear that it is permissible for a class action settlement to release claims broader in scope than the claims alleged in the lawsuit

10

being settled, even future claims or claims over which the court approving the settlement would not have jurisdiction. *E.g., Ross v. Metropolitan Life Ins. Co.*, 411 F. Supp.2d 571, 576-77 (W.D. Pa. 2006) (release of all claims concerning insurance policies barred subsequent case concerning a rate scheme relating to those policies that had not been alleged in the settled class action); *Varacallo v. Massachusetts Mutual Life Ins. Co.*, 226 F.R.D. 207, 244 (D.N.J. 2005) (overruling objection to class release barring claims that were or could have been brought and would encompass claims not pled, claims unknown, or future claims based on past conduct); *In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) (objection to class settlement release overruled; settlement agreement may release claims with similar factual predicate, even if the claim was not presented and might not even have been presentable in the class action).

Emilio challenges Sprint's recovery by surcharge to customers of the New York excise tax paid by Sprint. Although plaintiffs in the *Benney* and *Lundberg* cases did not specifically claim deceptive charging and improper recovery of a surcharge for excise taxes, their claims involved the deceptive (claimed to be misleading as mandated payments or taxes) charging and improper recovery of a variety of surcharges for similar payments to, and costs of, other government programs (universal service fund, E911, number pooling and portability, recovery of amounts for E911 allegedly not permitted by state statutes). In short, the negotiated nationwide settlement was specifically designed to settle all claims and potential claims relating to Sprint's assessment of surcharges and excise taxes; the desire to resolve all such claims and potential claims was central to Sprint's willingness to enter into the Settlement Agreement. Just as unalleged claims could be settled in *Metropolitan Life* and *Varacallo*, claims concerning other types of alleged improper or deceptive surcharges for government charge or program cost

recovery could be settled in *Benny/Lundberg*. "There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this." *In re General American Life Ins. Co. Sales Practices Litig.*, 357 F.3d at 805.

**C.    The Validity Of The *Benney/Lundberg* Judgment Cannot Be Collaterally Attacked In This Proceeding.**

The *Benney/Lundberg* judgment is final, and is entitled to *res judicata* effect under Kansas law, even during the time an appeal (now dismissed) was pending. *Thompson v. Jiffy Lube International, Inc.*, Case No. 05-1203-WEB, 2006 U.S. Dist. LEXIS 39113, *50 (D. Kan. June 13, 2006) ("Kansas courts have adopted the now-majority view that the fact that an appeal is pending in a case does not vitiate the *res judicata* effect of a judgment.") (citations omitted). New York law is in accord. *Amica Mutual Ins. Co. v. Jones*, 85 A.D.2d 727, 728, 445 N.Y.2d 820 (1981) (holding that New York follows rule that a judgment is final for *res judicata* purposes even if an appeal of that judgment is pending). Thus, challenges to the terms of the Settlement Agreement, as raised by Emilio's counsel (December 6, 2006 Letter at 4-10 (attached as Exhibit E)) are not appropriate for collateral review in this forum. *In re Diet Drugs Products Liability Litigation,* 431 F.3d 141, 145-46 (3d Cir. 2005) (class members not entitled to challenge the adequacy of representation and notice in class settlement in a separate lawsuit); *In re Orthopedic Bone Screw Products Liab. Litig.*, 350 F.3d 360, 364-65 (3d Cir. 2003) (a "challenge to the propriety of the settlement agreement and its terms" is foreclosed by the approval of the settlement agreement in a final order).

The only issue properly raised in this proceeding is whether the scope of the Settlement Agreement encompasses the claims made by Emilio. As described in Sections A-B above, Emilio is undeniably a member of the *Benney/Lundberg* settlement classes, and his claims are

subject to the Release provisions of both the Settlement Agreement and the Order. Because the Order is given *res judicata* effect, even on appeal, Emilio's claims are subject to dismissal.

For these reasons, other questions raised by Emilio's counsel regarding the *Benney/Lundberg* settlement are both unnecessary and improper. However, for purposes of completeness, Sprint responds below to those issues. In so doing, Sprint does not agree that the Settlement Agreement, or the Order approving it, may be collaterally attacked in this proceeding, or that its validity or enforceability (or any other issue claimed to arise out of it) are properly within the scope of jurisdiction of this arbitration.

**D.    The Valuation Of Emilio's Claims In The *Benney/Lundberg* Settlement Is Irrelevant.**

Emilio's counsel has questioned how the value of claims relating to Sprint's recovery of excise tax entered into the *Benney/Lundberg* Settlement terms and benefits. As explained previously, this inquiry is an impermissible collateral attack on the Order that may not be heard in this arbitration. However, even if this issue was appropriate for consideration here, there is no requirement to apportion the benefits conferred under the settlement for the various potential claims of the class members. In *General American Life*, the plaintiff challenged the adequacy of the class representation, arguing that the class settlement gave away her claims based on "modal-billing" for nothing. 357 F.3d at 805. The Eighth Circuit rejected this argument and stated:

> It is simply not true that modal-billing claims were given away for nothing. It is true that no separately stated consideration was paid for those claims, but that is quite another thing. *In addition to the claims specifically pleaded in the class action, all claims related to policy charges, necessarily including modal-billing claims, were released.* The release of the latter category of claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this case has benefited . . . No part of the consideration on either side is keyed to any specific part of the consideration of the other. Each side gives up a number of things. This is the way settlements usually work.

*Id.* (emphasis added). Likewise, the value of any claims relating to recovery of excise taxes is deemed to be included in the overall value of the settlement relating to Sprint's recovery of amounts it pays or incurs for a variety of government programs and charges.

**E.    Emilio's Counsel Was Not Entitled To Notice Above And Beyond What Other Class Members Received.**

Emilio's counsel has claimed, without citation to any legal authority, that he was entitled to notice of the *Benney/Lundberg* settlement in addition to the settlement notices Sprint provided to other class members. However, notice to counsel of class members with other cases pending is not required. *See, e.g., Supermarkets General Corp. v. Grinnell Corp.*, 490 F.2d 1183, 1185-86 (2d Cir. 1974) (party argued that notice was not "best notice practicable under the circumstances" because notice was not given to attorneys for class members with individual actions; court rejected this argument, noting that while it would be desirable to do so, party "has cited no decision requiring this and no general practice to that effect."); *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 240 (D.N.J. 1997) ("Rule 23 and due process do not require or imply that counsel of class members pursuing individual actions are entitled to notice of the opt-out deadline"); *In re Prudential Secs. Inc. Ltd. Pshps. Litig.*, 164 F.R.D. 362, 370 (S.D.N.Y. 1996), *aff'd*, 107 F.3d 3 (class members with individual actions pending at time of opt-out period sought to be excluded from settlement on ground that their counsel were not given individual supplemental notice of settlement; court rejected this argument, ruling that "[s]ince initiation of separate litigation did not confer upon these Class Members a right to notice above and beyond that due other Class Members, the motions brought on this ground must fail."); *In re VMS Securities Litig.*, No. 89-C-9448, 1992 WL 203832, *3 (N.D. Ill. Aug. 13, 1992) (opposition on ground that counsel for certain individuals did not receive a supplemental notice advising of the effect of the class settlement on their clients' individual actions was unavailing).

**F.    Emilio Had Opportunities To Avoid The Impact Of The *Benney/Lundberg* Agreement, But Chose Not To Act.**

Moreover, the actions of Emilio's counsel after receiving notice of the *Benney/Lundberg* settlement demonstrate that Emilio was not harmed by any lack of notice, and that the effect of the settlement and Order on his case is a product of his own decisions. Once he *was* aware of the *Benney/Lundberg* settlement, Emilio's counsel made the tactical decision to challenge the Settlement Agreement in this proceeding instead of either opting out of the settlement, or seeking relief or appeal in the appropriate court. This choice to rely only on an improper collateral attack was claimant's choice.

After Emilio's counsel expressed dissatisfaction about not receiving notice of the settlement at an earlier time, Sprint offered Emilio a window of time in which he could opt-out of the settlement. Sprint's counsel made this offer in a December 1, 2006 e-mail, and told Emilio's counsel that if he wished to accept the offer, to "please notify us of that within the next two weeks." December 1, 2006 e-mail from Sprint's counsel Mark Hinderks to Emilio's counsel William Weinstein, attached as Exhibit F. This was a choice that the Lerach firm in San Diego exercised with regard to a claimant they represented. For whatever the reason, Emilio chose not to accept this offer, consciously leaving himself within the settlement classes. The offer expired by its own terms on December 15, 2006.

Counsel for Emilio also chose not to seek to intervene in the then still pending proceedings in Kansas to seek relief from or modification of the Order from the District Court, or to seek leave to participate in the appeal of the Order. Again, Emilio determined to avoid a direct attack on the Order or a direct effort to seek relief from the Order, apparently hoping instead to induce an improper collateral attack in an arbitration forum.

Thus, even after receiving notice of the *Benney/Lundberg* settlement on November 8, Emilio's counsel chose not to attack the settlement or its inclusion of claims relating to excise taxes in the release in the only proper forum to do so, and also chose not to have his client opt-out of the settlement. Instead, he chose the strategic plan to attempt to collaterally attack the Settlement Agreement and Order in this proceeding, an attack that is simply impermissible under applicable law. Emilio's claims are within the scope of the Settlement Agreement and the releases contained in the Order approved by the Kansas district court, as is every other member of the settling classes, and are therefore barred.

## CONCLUSION

Emilio's claims are subject to the Settlement Agreement and the Order approving it. Sprint is entitled to summary disposition in its favor.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By: _____

Mark D. Hinderks    Ks. #11293
10975 Benson, Suite 550
12 Corporate Woods
Overland Park, KS 66210
(913) 451-8600

Lee Lauridsen
6450 Sprint Parkway
Mailstop KSOPHN0412-4A203
Overland Park, KS 66251
Tel: 913-315-9099
Fax: 913-523-9840

COUNSEL FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of April, 2007, a copy of the foregoing was served via e-mail and FedEx, overnight, to:

William R. Weinstein
SANFORD WITTELS & HEISLER LLP
950 Third Avenue, 10th Floor
New York, NY 10022
Telephone: (646) 723-2451
Fax: (646) 723-29485

Attorney for Respondent

BEFORE JAMS

| | |
|---|---|
| VINCENT EMILIO, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) No. 1425000444 |
| | ) |
| SPRINT SPECTRUM L.P., | ) |
| | ) |
| Respondent. | ) |

## REPLY MEMORANDUM OF SPRINT SPECTRUM L.P. IN SUPPORT OF ITS MOTION FOR SUMMARY DISPOSITION BASED UPON THE *BENNEY/LUNDBERG* CLASS ACTION SETTLEMENT

### INTRODUCTION

While Emilio goes to great lengths to avoid federal preemption by emphasizing that the so-called "new" claims in his Second Amended Petition focus on Sprint's alleged inadequate description and disclosure of the New York Excise Tax, this characterization of his claims puts him even more directly within the scope of the *Benney/Lundberg* settlement than ever before. Indeed, Emilio does not deny that both the *Benney/Lundberg* Settlement Agreement and the Order approving that settlement both explicitly state that claims related to "surcharges," "excise taxes," and their alleged improper description and disclosure are released.

Regardless of Emilio's description of the claims he now makes, there is no question that the broad scope of the *Benney/Lundberg* Settlement Agreement, and the Order approving that settlement, encompass them. The Order of the District Court of Wyandotte County contains releases applicable to the *Benney* and *Lundberg* classes that discharge Sprint "from any liability... arising from or relating to any and all claims that... Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes...." *See* Exhibit B to

Sprint's original motion, Order granting Final Approval of Class Action Settlement, ¶¶ 46, 47 ("Order"). The Order is consistent with ¶¶ 22(a)(1) and (2) of the Settlement Agreement that release claims that Sprint "failed to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes." Exhibit A to Sprint's original motion, pp. 30-32. Because Emilio's claims, now more than ever, fall within the language of both the Order and Settlement Agreement, his claims should be dismissed. Exhibit A, pp. 30-32; Exhibit B, ¶¶ 46-47.

Emilio's heavy reliance on *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981) underscores another fatal flaw in his challenge to the *Benney/Lundberg* settlement. In *Nat'l Super Spuds*, a claimant who objected to a class settlement agreement filed an objection before the trial court that ultimately approved the settlement. *Id.* at 14. Critically, and as opposed to what Emilio attempts here, the objector did not collaterally attack the trial court's order in a separate lawsuit. Instead, the claimant properly took his challenge to the trial court's ruling to the Second Circuit Court of Appeals, the proper appellate court to hear such objections.

In this case, Emilio has chosen a different path. Rather than seeking to file any objection with the Wyandotte County District Court (which gave final approval to the *Benney/Lundberg* settlement), seeking reconsideration while the judgment was still non-final, or seeking to intervene for purposes of appeal, Emilio has strategically chosen to raise his objections only in this separate arbitration proceeding as a collateral attack on a judgment that is entitled to full faith and credit. Emilio's attempt to parrot the same arguments made in *Nat'l Super Spuds* ignores that most of his arguments are not appropriate in this collateral litigation, but can only be raised in a direct appellate challenge to the Order approving the settlement.

In a collateral proceeding such as this one, Emilio's proper challenges to the *Benney/Lundberg* settlement and subsequent Order are narrow and few. Emilio can rightfully challenge only the Notice to the settlement -- which the Wyandotte County District Court approved in February, 2006 before Sprint mailed it to its customers, and which the Court approved again in its September, 2006 Fairness Hearing -- and the adequacy of representation he received from the class representatives. As demonstrated below, the class representatives were not adverse to Emilio in any way, and as a result, were appropriate representatives of all class members, including Emilio.

## A.   Emilio's Claims Fall Within The Scope Of The *Benney/Lundberg* Settlement And Order And Must Be Dismissed As A Result.

The claims alleged by Emilio in this case fall well within the broad release language of the *Benney/Lundberg* settlement. That Emilio's claims deal with a New York Excise Tax, while other cases dealt with other surcharges and taxes, makes no difference. Just as Emilio claims in his Second Amended Demand that Sprint is deceptively describing and disclosing New York's Excise Tax, the numerous lawsuits giving rise to the *Benney/Lundberg* settlement claimed that Sprint was deceptively charging for and describing various surcharges and fees, and allegedly failing to disclose limits on its capability to provide wireless coverage across the nation.

While the plaintiffs in *Benney*, *Lundberg*, and many other cases across the nation subject to the settlement did not specifically claim deceptive charging and improper recovery of a surcharge for excise taxes, their claims alleged deceptive (claimed to be misleading as mandated payments or taxes) charging and improper recovery of a variety of surcharges for payments to, and costs of, other government programs (universal service fund, E911, number pooling and portability, recovery of amounts for E911 allegedly not permitted by state statutes). Likewise,

Emilio now claims that Sprint is improperly describing, charging and recovering the New York Excise Tax, another type of surcharge that is allegedly not permitted by state statute.

In light of Emilio's heightened emphasis on his claims regarding Sprint's alleged inadequate description and improper disclosure of the Excise Tax, his claims are more squarely within the scope of the *Benney/Lundberg* settlement than before. One common theme in the cases subject to the *Benney/Lundberg* settlement was that Sprint allegedly failed to disclose or describe a variety of surcharges supposedly not permitted by state statutes. By Emilio's own description, this is *exactly* what his case is about, except that his deals with the New York Excise Tax. But claims relating to the improper disclosure and description of surcharges, including excise taxes, are explicitly and unambiguously within the parameters of the *Benney/Lundberg* settlement. *See* Exhibit A, pp. 30-32; Exhibit B, ¶¶ 46-47. As a result, Emilio's claims are now barred.

Emilio argues that the *Benney/Lundberg* Order does not apply to this case because the Order does not specifically address Excise Taxes imposed by New York or any other state. But there is no need for the Order to specifically mention each state's excise tax, or for that matter every possible surcharge or regulatory fee. The Order specifically releases claims related to "surcharges" and "excise taxes", which naturally includes as a subset New York's excise taxes and Sprint's surcharges to recover its excise payments. *See In Re General American Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 803 (8th Cir. 2004) (rejecting claim that class member's individual action was not precluded by settlement that released claims related to "premium charges," because "premium charges" were included in "modal billing practices", which were released).

Just as unalleged claims arising out of insurance policies could be settled in *Metropolitan Life Ins. Co., v. Ross*, 411 F. Supp. 2d 571, 576-77 (W.D. Pa. 2006) (release of all claims concerning insurance policies barred subsequent case concerning a rate scheme relating to those policies that had not been alleged in the settled class action), and unalleged claims concerning sales of annuities could be settled in *Strube v. American Equity Investment Life Ins. Co.*, 226 F.R.D. 688, 699-701 (M.D.Fla. 2005) (court overruled objection that release in class action settlement dealing with claims involving the deceptive selling of equity indexed annuities, would improperly release claims not pled in settlement case, but present in another case, concerning the use of living trusts as a tool to sell annuities), claims concerning other types of alleged improper or deceptive surcharges for government charges or program cost recovery have been settled in *Benney/Lundberg*.

In *Nottingham Partners v. Trans-Lux Corp.*, 925 F.2d 29 (1st Cir. 1991), objectors to a class action settlement attempted to argue that their claims -- based on federal disclosure laws -- were not subject to a class settlement made by claimants who only made state disclosure claims. In fact, the state court approved the class action settlement -- which involved the release of federal claims -- although *it did not even have jurisdiction* over the federal claims. Nonetheless, the court noted "the two suits, notwithstanding any differences in remedies sought or theories of recovery pleaded, shared a common gravamen." *Id.* at 33. In sum, the claims alleging violations of state law bore a sufficiently close relation to the complaint involving federal law to come within the plain language of the general release formulated as part of the settlement. *See TBK Partners, LTD v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982). In fact, courts regularly approve settlements releasing claims not made in the case(s) before them. *See, e.g., In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (federal court can

approve a settlement releasing state claims not before it), *cert. denied,* 456 U.S. 998 (1982); *In re Washington Public Power Supply Sys. Sec. Litig.*, 720 F.Supp. 1379, 1413 (D.Ariz. 1989) ("State law claims that the federal court does not have power to adjudicate may be released over the objection of Class Members.").

That Emilio's complaint focuses upon the New York Excise Tax, while *Benney/Lundberg* addressed other surcharges and fees is, as noted in *Nottingham Partners*, "beside any relevant point." *Id* at 33. As in *Nottingham Partners*, Emilio's claims bear a "sufficiently close relationship" to the cases subject to the *Benney/Lundberg* settlement to come within the plain language of the general release formulated as part of the *Benney/Lundberg* settlement. *See TBK Partners*, 675 F.2d at 461. Emilio's claims, and the claims of the putative class Emilio seeks to represent, are subject to the *Benney/Lundberg* settlement agreement, and the Order approving that settlement. As a result, his claims, and those of the putative class, are barred.

**B. Emilio Can Make Only Due Process Challenges To The Settlement In This Collateral Proceeding.**

After determining that Emilio's claims are subject to the *Benney/Lundberg* settlement, the only remaining question is whether his due process rights have been protected. As set forth below, these considerations are more than satisfied in this instance.

The general rule is that "there has been a failure of due process only in those cases where it cannot be said that the procedure adopted fairly insures the protection of the interests of absent parties who are to be bound by it." *Hansberry v. Lee*, 311 U.S. 32, 42 (1940). In a class where opt out rights are afforded, such as this one, these protections are adequate representation by the class representatives, and notice of the class proceedings. *Phillips Petroleum v. Shutts,* 472 U.S. 797, 811-12 (1985).

Class members are not entitled to unlimited attacks on a class settlement. Once a court has decided that the due process protections did occur for a particular class member or group of class members, the issue may not be relitigated. In *Carlough v. Amchem Products, Inc.* 10 F.3d 189 (3d Cir. 1993), the Third Circuit held that notice[1] and failure to exercise an opportunity to "opt out" constitutes consent to the jurisdiction of the class action court by absent members of a plaintiff class, even when those members lack minimum contact with the class action forum. Then, in *Grimes v. Vitalink Communications Corp.*, 17 F.3d 1553 (3d Cir. 1994), the same court ruled that where the class action court has jurisdiction over an absent class member and therefore determines the adequacy of the representation of its members, the claimant is foreclosed from later relitigating that issue. Thus, challenges to the terms of a settlement agreement are not appropriate for collateral review. *See In re Orthopedic Bone Screw Products Liab. Litig.*, 350 F.3d 360, 364-65 (3d Cir. 2003) (holding that a "challenge to the propriety of the settlement agreement and its terms" is foreclosed by the approval of the settlement agreement in a final, unappealable order).

While Emilio refers repeatedly to the comments of Justice Ginsburg, who concurred in part and dissented in part in *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996), the reality is that her beliefs were not shared by the majority of the Court. As Emilio suggests, the *Matsushita* court did address additional due process requirements for binding absent class members, noting that due process for class action plaintiffs requires "notice plus an opportunity to be heard," and that "the named plaintiff at all times adequately represents the interests of the absent class members." *Id.* at 378-79 (quoting *Phillips Petroluem Co. v. Shutts*, 472 U.S. 797,

---

[1]     Emilio does not dispute – as he once hinted that he might – that he received the Notice of Class Action Settlement mailed by Sprint to all of its customers, including Emilio. That Notice advised Emilio of the *Benney/Lundberg* settlement, his right to object to the settlement, and his opportunity to "opt out" of the settlement. *See* Exhibit 1, pp. 6. Sprint gave Emilio an additional opportunity to opt out in December, 2006, which Emilio refused. *See* Exhibit F to Sprint's Original Motion.

812 (1985)). But the *Matsushita* Court satisfied itself that these requirements had been met by referencing the findings on these matters by the state court that *approved* the settlement, rather than independently determining whether the requirements were met.

As did an objector to a class action settlement in *Epstein v. MCA Inc.* 179 F.3d 641 (9th Cir. 1999), Emilio asserts that *Phillips Petroluem Co. v. Shutts*, 472 U.S. 797 (1985) creates a largely unfettered right to challenge collaterally the adequacy of representation in class action. However, *Shutts* does not support the broad collateral review that Emilio seeks in this proceeding. In *Shutts*, the Court identified various procedural safeguards that are necessary to bind absent class members, including notice, the opportunity to be heard, the opportunity to opt out, and adequate representation. 472 U.S. at 812. However, nowhere in *Shutts* did the Court state that where the certifying court makes a determination of the adequacy of representation, this determination is subject to collateral review. *Epstein,* 179 F.3d at 648. *Shutts*, in fact, implies that such review is unwarranted by emphasizing that the certifying court is charged with protecting the interests of the absent class members. *Id.* Simply put, the absent class members' due process right to adequate representation is protected not by collateral review, but by the certifying court initially, and thereafter by appeal within the state system and by direct review in the United State Supreme Court. *See, e.g., Grimes*, 17 F.3d at 1558 (3rd Cir. 1994) (refusing to allow absent class members collaterally to challenge adequacy of representation because the opportunity to challenge that determination by appeal to Delaware Supreme Court, and thereafter to the United States Supreme Court, "granted all the process that was due"); *Nottingham Partners*, 925 F.2d at 33 (1st Cir. 1991) (so long as procedural safeguards were employed, objections to the determinations of a certifying court had to be remedied on appeal to the state

supreme court or the United States Supreme Court, and not by recourse to the "federal courts in the vain pursuit of back-door relief").

As the Supreme Court stated in *Hansberry v. Lee*, "there has been a failure of due process only in those cases where it cannot be said that the procedure adopted fairly insures the protection of the interests of absent parties who are to be bound by it." 311 U.S. 32, 42 (1940). Contrary to Emilio's belief, due process requires that an absent class member's right to adequate representation be protected by the adoption of the appropriate procedures by the certifying court and by the courts that review its determinations; due process does not require collateral second-guessing of those determinations and that review.

The cases upon which Emilio relies do not indicate otherwise. Instead, they merely hold that a judgment is not entitled to full faith and credit "if there is reason to doubt the quality, extensiveness or fairness of procedures followed in prior litigation." *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 481 (1982). Limited collateral review is appropriate, therefore, only to consider whether the procedures in prior litigation afforded the parties against whom the earlier judgment is asserted a "full and fair opportunity" to litigate the claim or issue. *Id.* at 480. This review would not, however, include reconsideration of the merits of the claim or issue. Such claims almost always fail because "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process clause in order to qualify for the full faith and credit guaranteed by federal law." *Id.* at 481. Indeed, state proceedings, such as the approval of the class action settlement by the Wyandotte County District Court, need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law. *Id.* at 481.

As the case law referenced above makes clear, collateral review is only available when class members are raising an issue that was not properly considered by the District Court at an earlier stage in the litigation. Here, the Wyandotte County District Court carefully examined the adequacy of representation and of the class action notice. Order ¶¶ 21-25, 29-30. That examination duly addressed the objections now presented by Emilio in this collateral proceeding. *Id.* Emilio was provided all the process he was due, and his attack on the *Benney/Lundberg* settlement must fail as a result.

### C.    Emilio's Due Process Concerns Were Addressed By The Wyandotte County District Court.

The Kansas District Court's approval of the Settlement Agreement included a specific finding that the notice provided was adequate. Order ¶¶ 29-30. Again, despite all the bluster, Emilio does not argue that he failed to receive actual notice of the settlement that Sprint provided to its current customers in their monthly bills. Instead, Emilio asserts due process challenges to the settlement which have already been addressed, and rejected, by Judge Duncan.

The Wyandotte County District Court considered, and overruled, objections as to both the adequacy of the class action notice and the adequacy of representation by class representatives. Order ¶¶ 29-30, 21-25. Numerous written objections were presented to the Court prior to the final approval hearing, many of them directed at the Notice provided by Sprint. But after considering all these objections, Judge Duncan ruled at the conclusion of the hearing that "I still don't find anything about the form of the Notice to be defective." *See* Exhibit 2, Transcript of Court's Decision at Fairness Hearing, p. 4.

Likewise, several class members objected to the adequacy of the class representatives. *See, e.g.,* Objections attached as Exhibit 3. But again, the Court carefully considered these

objections, and overruled them. Order ¶¶ 21-25. As a result, Emilio's due process challenge must fail.

1.  **Emilio Received Adequate Notice**

    a.  **Emilio Was Not Entitled To Any Greater Notice Than Any Other Class Member.**

    Despite his repeated complaints that Sprint failed to give him proper notice of the *Benney/Lundberg* settlement, Emilio cites not a single case to dispute the numerous cases holding that notice to counsel of class members with similar cases pending is not required. *See, e.g.*, *Supermarkets General Corp. v. Grinnell Corp.*, 490 F.2d 1183, 1185-86 (2d Cir. 1974); *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 240 (D.N.J. 1997); *In re Prudential Secs. Inc. Ltd. Ptshps. Litig.*, 164 F.R.D. 362, 370 (S.D.N.Y. 1986), *aff'd*, 107 F.3d 3; *In re VMS Securities Litig.*, No. 89-C-9448, 1992 WL 203832 (N.D. Ill. Aug. 13, 1992). And, as set forth below, the Notice that Emilio received more than adequately addressed his due process rights.

    b.  **The Class Action Notice Satisfies Emilio's Right To Due Process.**

    The standard for the adequacy of a settlement notice in a class action under the Due Process Clause is measured by reasonableness. *See Soberal-Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir. 1983). There are no rigid rules to determine whether a settlement notice to the class satisfied constitutional requirements; the settlement notice must "fairly approve the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982). Notice is "adequate if it may be understood by the average class member." 4 NEWBERG Section 11:53, at 167.

    Emilio's argument that the Notice failed to advise him that claims relating to Excise Taxes were subject to the settlement is simply wrong. That Notice specifically advised Emilio of

the impact of the *Benney/Lundberg* settlement. Despite Emilio's argument to the contrary, (Appendix B Brief at 11-12), the Notice specifically references claims relating to the description and disclosure of Excise Taxes as among the claims subject to the *Benney/Lundberg* settlement, as the italicized language below makes clear:

### IX  LEGAL EFFECT OF THE SETTLEMENT (RELEASE OF CLAIMS)

*Upon the Court's approval of the settlement in Benney and/or Lundberg, the class members who do not properly opt out of the proposed Settlement Classes,* regardless of whether or not a claim for benefits is filed, *will release and forever discharge Sprint* (as defined in the Settlement Agreement) *from any and all claims,* demands, debts, liabilities, actions, causes of action of every kind and nature, obligations, damages, losses, and costs, whether known or unknown, actual or potential, suspected or unsuspected, direct or indirect, contingent or fixed, that have been, could have been, or in the future might be asserted in the *Benney* Lawsuit or *Lundberg* Lawsuit or in any other court or proceeding *which relate in any way to the allegations that defendants failed to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes,* including but not limited to claims relating to directory assistance calls, Sprint's practice of rounding minutes up to the next whole minute, the offering of service without properly disclosing limitations on the coverage, capacity, and geographic scope of the Sprint PCS wireless network (including, but not limited to, the availability of claimed necessity of software upgrades to phone handsets); dropped customer calls; the failure to connect customer calls; Coverage and Capacity Issues; and other claims that were brought in the *Benney* and *Lundberg* Lawsuits.

Exhibit 1, p. 8 (italics added).

It was appropriate that the Notice contain such information, of course, because the language of both the *Benney/Lundberg* Settlement Agreement and the Order approving that settlement recognized that claims regarding the description and the alleged improper disclosure of Excise Taxes are subject to the settlement. By Emilio's own description of the claims in his Second Amended Complaint, those are the precise claims that he makes in this case.

*Wolfert v. Transamerica*, 439 F.3d 165 (2d Cir. 2006) also addressed alleged inadequacies in a class action notice. As does Emilio, the *Wolfert* claimant argued that the notice failed to sufficiently advise class members that they were losing the right to sue for certain

claims. However, the *Wolfert* court noted that the broad language of the notice adequately warned class members that claims were released "even if the claim has not been asserted in the underlying lawsuits, or it is too individualized in its facts or relevant law to be suitable for class certification." *Id.* at 176. Similarly, the Notice sent to Emilio states that claims relating to Excise Taxes "whether known or unknown, actual or potential, suspected or unsuspected... that have been, could have been, or in the future might be" are all subject to the *Benney/Lundberg* settlement. Exhibit 1, pp. 8.

2. **The Class Representation in *Benney/Lundberg* Satisfied Emilio's Due Process Rights.**

In determining the adequacy of class representation, the issue is not -- contrary to Emilio's belief -- whether the class representatives make identical (or even similar) claims. Instead, "the essential question in determining whether the Settlement complies with the adequate representation doctrine is whether the interests that were served by the Settlement were compatible" when the class plaintiffs negotiated a release of the claims. *Wal-Mart Stores, Inc. v. Visa, Inc.*, 396 F.3d 96, 110 (2d Cir. 2005).

In *Super Spuds*, upon which Emilio relies so heavily, an objector group received *no* benefit in exchange for the claims which were distinguished as a result of the settlement at issue. In this case, however, the claimants whom Emilio purports to represent in his putative class action – those who paid the New York Excise Tax – received benefits as a result of the *Benney/Lundberg* settlement. It was in the *Benney/Lundberg* class representatives' best interests to obtain the most benefits possible from Sprint for the entire class as a result of the class settlement. As a result, there is no basis to conclude that they did not seek, as in *Wal-Mart*, "to obtain the best possible settlement" by extracting the greatest amount of concessions from the defendant as possible. *Id.* at 112. As the *Wal-Mart* court held, if a class has different claims involving similar factual predicates, "adequate representation of a particular claim is determined

by the alignment of interests of class members, not proof of vigorous pursuit of that claim." *Id.* at 113.

Of course, not every variation between the interests of an absent class member and those of the class generally will render the class representatives inadequate. The adequacy-of-representation determination turns on whether the interests of the class were 'compatible' with those of the party attempting to attack the class action judgment collaterally. *See Wal-Mart*, 396 F.3d at 110; *see also In re Joint Eastern and Southern District Asbestos Litigation*, 78 F.3d 764, 778 (2d Cir. 1996) (explaining that for representation to be adequate, class members must not have interests that are antagonistic to one another); *Wolfert*, 439 F.3d at 173-75 (after analyzing claimant's purported causes of action under New York law, court ruled that claimant's interests were more than adequately protected by the California class representatives, and that no due process violation occurred as a result). There was no conflict of interest between the class representatives in *Benney/Lundberg* and Emilio. In fact, they shared Emilio's desire to obtain the most benefits possible from Sprint. Emilio, as a class member, was entitled to share in those benefits. Emilio's claim of inadequate representation is simply wrong.

Emilio's contention that the alleged inadequate representation is demonstrated by inadequate consideration paid for release of the claims relating to the Excise Tax fares no better. This identical argument was made, and rejected, in *In re Gen. Am. Life Ins. Co., Sales Practices Litig.*, 357 F.3d 800 (8th Cir. 2004) ("*General American*"). Like the plaintiff in *General American*, who claimed that his class representatives gave away claims (in releases) and received nothing in return, Emilio essentially seeks greater compensation for the claims asserted in this arbitration. The plaintiff who objected to a national class action settlement in *General American* complained that "the class representative gave away all modal-billing claims (in the release) and

received nothing in exchange for them." *Id.* at 805.    Similarly, Emilio seeks greater compensation for the claims asserted in his lawsuit. His contention that he was inadequately represented is more appropriately cast as a challenge to the fairness of the *Benney/Lundberg* settlement than as a due process claim, since his position is grounded in the notion that the *Benney/Lundberg* settlement resulted in a class recovery that was too low. This collateral attack is improper and must be rejected.

### D.    Emilio Chose To Make A Collateral Attack On The Order Approving The Settlement After Receiving Notice.

Emilio's claims about the alleged inadequate Notice (which boil down to his counsel not receiving a courtesy copy) are undercut by his actions after his counsel unquestionably learned of the settlement. If Emilio learned of the *Benney/Lundberg* settlement prior to November, 2006 (when there is no doubt that his counsel knew of the settlement), his options were to: (1) object to the settlement in the Kansas courts; or (2) opt out of the settlement. To address the concerns of Emilio's counsel about the alleged lack of Notice, Sprint provided Emilio the opportunity to opt out in December, 2006. This opportunity to opt out, months past the deadline for doing so, was a special accommodation given to Emilio. By that time, Emilio was fully aware of the scope of the settlement, the notice Sprint provided to class members (including himself), and the benefits provided pursuant to the settlement. Emilio rejected Sprint's offer.

Nor did Emilio attempt to make any appearance at that time before the Wyandotte County District Court which approved the settlement, to seek modification of the Order or to intervene so as to appeal the Order. Approximately 106 class members filed objections to the *Benney/Lundberg* settlement, and a handful of them chose the proper path of appealing the Order to the Kansas Court of Appeals. *See* Affidavit of Lee Lauridsen (attached as Exhibit C to Sprint's Original Motion). Sprint provided Emilio with each of the objections filed with the

Wyandotte County Court, as well as their Notices of Appeal to the Kansas Court of Appeals. Despite being aware of this avenue to raise his objections, Emilio did not pursue this option.

In short, after choosing not to "opt out" of the settlement, and choosing not to participate in the pending proceedings in Kansas appealing the Order, Emilio asks this Court to rule that the Order that applies to all other class members does not apply to him. After having the same opportunity to opt out in December, 2006 that he would have had if he had learned of the settlement at an earlier time, Emilio cannot now complain that he has been harmed by allegedly inadequate notice. Presumably for strategic or other reasons known only to his counsel and himself, Emilio has chosen to collaterally attack the Settlement Agreement and Order in this proceeding, an attack that is simply impermissible. For this additional reason, his attempt to attack the *Benney/Lundberg* settlement must fail.

### E.    Emilio's Continued Attack On Sprint's Counsel Is Utterly and Literally Baseless.

Sprint has provided this Court with substantial case law demonstrating that neither Emilio nor his counsel was entitled to notice of the *Benney/Lundberg* settlement beyond the settlement notices Sprint provided to other class members. Emilio provides not a single citation to any authority from any jurisdiction to dispute this fact. Instead, Emilio shamelessly resorts to casting aspersions on Sprint's counsel with accusations of "highly improper and unethical behavior," without citing any applicable rule of professional conduct that Sprint's counsel allegedly violated. Emilio's complaint regarding candor to the tribunal is likewise barren of both legal authority and factual support. There was no breach of candor to the tribunal, as alluded to by Emilio. The *Benney/Lundberg* settlement first became final (and therefore in a position to have any effect on this case) on November 8, 2006. In a previously scheduled telephone conference, Sprint's counsel advised Emilio's counsel of the settlement on that same date. After doing so,

Sprint's counsel continued communications with Emilio's counsel regarding the effect of the settlement, and other potential issues to raise in a status conference with Your Honor in light of the October 25, 2006 ruling on the class preclusion language of Sprint's customer contracts. Notably, Emilio cites no case law, or any other authority, to support his unsupportable claim that Sprint's counsel has acted improperly in any way. By raising this issue, Emilio attempts to create a "smoke screen" to direct attention away from the broad scope of the *Benney/Lundberg* release and the fact that Emilio's claims fall squarely within it.

## CONCLUSION

The *Benney/Lundberg* settlement represented an enormous effort to provide a fair and consistent framework for the global resolution of numerous lawsuits and potential lawsuits concerning the surcharges used by Sprint, including surcharges for excise taxes. Although Emilio appears to make a vague appeal to equity to avoid the substantial case law cited by Sprint, those cases rely upon important public interests. National class action settlements must be honored; otherwise, defendants in large class actions "would always be concerned that a settlement would leave them exposed to countless other suits, a consequence that would seriously undermine the possibility for settling any large class action." *In re Prudential Ins. Co. Sales Practice Litig.: Lowe*, 261 F.3d 355, 367 (3d Cir. 2001).

Emilio's claims are subject to the *Benney/Lundberg* Settlement Agreement and the Order approving it. Sprint is entitled to summary disposition in its favor.

Respectfully submitted,

STINSON MORRISON HECKER LLP

_____

Mark D. Hinderks             KS #11293
9200 Indian Creek Parkway
9 Corporate Woods, Suite 450
Overland Park, KS 66210
Phone: 913-451-8600
Fax: 913-344-6794

William E. Hanna             KS#14480
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Phone: 816-842-8600
Fax: 816-691-3495

and

SPRINT LAW DEPARTMENT
Lee T. Lauridsen
6450 Sprint Parkway
Mailstop KSOPHN0412-4A203
Overland Park, KS 66251
Phone: 913/315-9099
Fax: 913/523-9840

**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 25th day of July, 2007, a copy of the foregoing was sent via email and United States mail, postage prepaid, to:

William R. Weinstein
SANFORD WITTELS & HEISLER LLP
950 Third Avenue, 10th Floor
New York, NY 10022

ATTORNEY FOR CLAIMANT

_____

ATTORNEY FOR RESPONDENT

JAMS NEW YORK

---------------------------------------------------X

Vincent Emilio,

                 Claimant,

        -v-                         DECISION ON
                                         RESPONDENT'S MOTIONS

Sprint Spectrum L.P.,                   FOR SUMMARY DISPOSITION

                 Respondent.

---------------------------------------------------X

## BACKGROUND

      The background of this arbitration is set forth in my October 25, 2006 Decision, in which I found that the class action preclusion provision in the Sprint customer agreement is unenforceable because it violates the anti-waiver provisions of the Kansas Consumer Protection Act.

      On February 20, 2007, Claimant filed a Second Amended Demand for Class Action Arbitration ("Second Amended Demand"). Claimant alleges that the Excise Tax that Sprint has collected from Claimant and the other members of the proposed class ("Class") is "an unlawful, deceptive and inequitable attempt by Respondent to obtain reimbursement for amounts that Sprint was and is not authorized to pass directly on to its customers under New York Tax Law ("Tax Law") § 186-e." Claimant asserts that he and the Class are "led to believe that these Excise Taxes are amounts imposed directly on customers and collected and remitted by Sprint to the New York taxing authorities on the customers' behalf, when in reality the Excise Taxes are imposed only on Sprint." The Second Amended Demand also alleges that the collection of the Excise Tax constitutes a

breach of Sprint's Agreement with Claimant and the Class because "it is unclear and ambiguous as to whether Respondent is entitled to assess and collect the Excise Tax from Claimant and the Class when New York Tax Law § 186-e does not affirmatively authorize its practices regarding those Excise Taxes," and that "[a]s such, the Agreement must be construed against Sprint, the drafter of the adhesion contract, and in favor of Claimant and the Class." Claimant seeks compensatory damages, restitution, and an order enjoining Sprint from "collecting Excise Tax from all of its customers under its current practices," and requiring that Sprint "clearly disclose the true nature of the Excise Taxes."

Since the filing of the Second Amended Demand, Claimant has acknowledged that the Tax Law does not prohibit Sprint from collecting or recouping the Excise Tax from customers. Accordingly, the focus of the Claimant's allegations of deceptive billing practices is Sprint's failure to disclose that the Excise Tax is a tax imposed on Sprint, not the customer, which Sprint is permitted, but not required to pass on to customers.

## MOTIONS FOR SUMMARY DISPOSITION

Sprint has filed three motions for summary disposition: (1) based upon federal preemption; (2) based upon the Benney/Lundberg Settlement; and (3) based on grounds other than settlement and preemption.

## Federal Preemption

This motion is addressed to the Second Amended Demand insofar as it asserts that New York State Tax Law § 186-e "prohibits" Sprint from charging its customers for the Excise Tax. Claimant concedes that the State of New York is preempted from attempting to regulate the rates that Sprint charges for its services, and concedes that New

2

York cannot affirmatively "prohibit" Sprint's collection of the Excise Tax.  As noted above, however, Claimant has effectively withdrawn this allegation.  Sprint acknowledges that Claimant's breach of contract and deceptive practices claims are not preempted.  Accordingly, Sprint's motion for summary disposition based upon federal preemption is denied.

Benney/Lundberg Settlement

Prior to and during the pendency of this arbitration, Sprint was named as a defendant in a number of class action lawsuits around the country concerning Sprint's charges to wireless customers to recover, by billing surcharges, various amounts that Sprint is required to pay governmental entities or to fund government mandated programs.  One such case, Benney v. Sprint Spectrum L.P., was originally filed in Cole County, Missouri on November 27, 2002.  Another such case, Lundberg and Barnes v. Sprint Corp, et al., was filed in the District Court of Wyandotte County, Kansas, in October 2002.  These two cases, along with cases from other jurisdictions, were eventually consolidated in the District Court of Wyandotte County, Kansas (the "Benney/Lundberg Cases"), and on February 24, 2006, Sprint and the plaintiffs in those cases entered into a Settlement Agreement, which was preliminarily approved by Order dated February 28, 2006.  Pursuant to the Order of Preliminary Approval, Sprint provided notice of the Benney/Lundberg settlement to its current customers by bill insert and provided notice to its former customers via post card.  Sprint also published notice of the Benney/Lundberg settlement in various national newspapers.  Sprint asserts that Claimant received notice of the Benney/Lundberg Settlement because at the time of the notice, Claimant was a current Sprint customer.  Claimant does not recall receiving or seeing any

3

notice of the Benney/Lundberg Settlement. Following a final approval hearing on September 12, 2006, at which a number of objectors appeared, the Court approved the Settlement in an Order signed on November 8, 2006.

The Settlement Agreement and Order contains releases applicable to the Benney/Lundberg Classes that release and discharge Sprint "from any liability * * * arising from or relating to any and all claims that * * * Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes * * *." Sprint contends that the claims asserted in this arbitration are encompassed by this language, and have therefore been released by Claimant and any member of the Class who, like Claimant, failed to opt out of the Benney/Lundberg Settlement.

Notably, Sprint did not advise Claimant's counsel (or this Arbitrator) of the Benney/Lundberg settlement proceedings. Sprint's counsel first mentioned the Benney/Lundberg Settlement in a telephone conference with Claimant's counsel and the Arbitrator on November 8, 2006, the date that the Kansas court approved the settlement. Claimant's counsel did not move to intervene in the Kansas proceedings for the purpose of challenging the settlement, either in the trial court, or on appeal. Claimant also rejected Sprint's offer to permit him to opt out of the settlement although the time to do so had passed.

At the direction of the Arbitrator, Sprint provided additional information and documentation regarding the Benney/Lundberg cases and the settlement proceedings.

It is undisputed that none of the twenty-three complaints that were the subject of the Benney/Lundberg Settlement asserted any claim based on Sprint's practices regarding state excise taxes, including, in particular, New York State Excise Taxes. It is also

4

undisputed that no Settlement class representative was a New York resident or ever paid the New York State Excise Tax.

The term "excise taxes" was apparently unilaterally inserted into the final execution version of the Settlement Memorandum of Understanding by Sprint's counsel, and Sprint's counsel has acknowledged that the issue of state excise taxes was never a subject of discussion between the parties at any time.

Based upon these facts, Claimant contends that the Benney/Lundberg Settlement is legally and constitutionally inadequate to bar this arbitration. Claimant's position rests principally upon *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F2d 9 (2d Cir. 1981) ("*Super Spuds*"). In that case an objecting class member appealed the approval of a settlement that attempted to release claims relating both to liquidated and unliquidated potato futures contracts. The Second Circuit struck down the settlement because, *inter alia*, (i) the class representatives for the liquidated contracts had never sought authority to represent the holders of the unliquidated contracts, (ii) the settlement compensation formula was based solely on the liquidated contracts and provided nothing in connection with the unliquidated contracts, and (iii) the notice did not advise any class members of their potential claims relating to the unliquidated contract claims that were being released.

Sprint argues that Claimant's reliance on *Super Spuds* is fatally flawed because that case involved a class member who filed an objection before the trial court that ultimately approved the settlement, and challenged the trial court's ruling by appeal, whereas, Claimant is attempting to collaterally attack the Order of the Kansas court in a separate lawsuit. Sprint acknowledges, however, that Claimant can properly raise in this

proceeding due process challenges to the settlement, based on the inadequacy of the notice of the settlement and/or the inadequacy of representation he received from the Benney/Lundberg class representatives.

Based upon the facts of this case, I find that Claimant and the Class he seeks to represent were not adequately represented in the Benney/Lundberg Settlement. This finding is based upon the failure of the Benney/Lundberg class representatives to assert the same claims based on the same factual predicate, their lack of standing to assert claims pertaining to the New York Excise Tax, and the admission of Sprint's counsel that the issue of state excise taxes was never a subject of discussion between the parties at any time. In addition, it is impossible for any consideration to have been paid for the release of the excise tax claims that no one ever discussed in the course of the settlement, no certified class representative or class counsel knew existed, and no certified class representative had standing to assert or release. I therefore find that the Benney/Lundberg Settlement does not bar the individual or class claims asserted in this arbitration. Sprint's motion for summary disposition on this ground is therefore denied.

<u>Other Grounds</u>

Sprint asserts five further grounds for dismissal of all or part of the Second Amended Demand.

<u>Section 186-e</u>

Sprint asserts that all of Claimant's claims should be dismissed because § 186-e does not prohibit Sprint from recovering the Excise Tax from customers. In light of

Claimant's withdrawal of any claim that § 186-e prohibits recovery of the Excise Tax, this argument is moot and the motion for summary disposition on this ground is denied.

Breach of Contract

Claimant's breach of contract claim is based upon the assertion that the Sprint Agreement with its customer does not "clearly" authorize pass through of the Excise Tax. Put another way, Claimant asserts that the contract is "ambiguous" on this point, and that this ambiguity should be construed against Sprint as the drafter of an adhesion contract, i.e., the Agreement should be read to prohibit recovery of the Excise Tax from customers.

Sprint moves for summary disposition dismissing this claim because the Agreement clearly and unambiguously permits recovery of the Excise Tax. I agree. Although the "Terms and Conditions of Services" governing the relationship between Sprint and its customers, and the explanation and presentation of charges on Sprint's billing statements has changed during the time that Claimant has been a Sprint customer, it has consistently provided broad and comprehensive authority for the recovery of taxes or other charges levied by the government. For example, the Terms and Conditions of Services in effect at the time Claimant first entered into a contract with Sprint provides: "We invoice you for taxes, regulatory related obligations and other charges levied by federal, state or local authorities * * * if we pay these taxes or other regulatory related charges." The Excise Tax is clearly a "charge" levied by state authorities that is paid by Sprint. Later versions of the Terms and Conditions of Services are even more specific regarding the recovery of the Excise Tax. Claimant's breach of contract claim is therefore dismissed.

7

Kansas Consumer Protection Act

Sprint contends that the Second Amended Demand fails to state a claim under the KCPA. This argument was previously raised by Sprint and is again rejected for the reasons set forth in my October 25, 2006 Decision, as well as the reasons set forth by Claimant in opposition to this motion.

New York General Business Law § 349

Sprint asserts that Claimant "cannot bring a claim under GBL § 349 for the same reasons that all of his claims fail; namely, that § 186-e allows Sprint to pass through to its customers the Excise Tax," and that "any prohibition of the type he alleges would be preempted by federal law and is also precluded by the releases of the Benney/Lundberg Settlement." This is essentially a reiteration of arguments that have been rejected elsewhere in this Decision, and the motion for summary disposition on this basis is therefore denied for the same reasons.

Unjust Enrichment

Claimant has consented to the dismissal of this claim.

Class Claims

Sprint asserts that Claimant's class claims should be dismissed because at the time this arbitration was commenced, there was no applicable JAMS rule authorizing JAMS to exercise jurisdiction over class action claims. This argument was previously raised by Sprint and is again rejected for the reasons set forth in my October 25, 2006 Decision.

Claimant concedes that he is prohibited by the Sprint Agreement from bringing a class action with respect to his claim for violation of GBL § 349.

8

For the reasons set forth above, Claimant's claims for breach of contract and for unjust enrichment are dismissed; and Claimant is precluded from prosecuting his claims for violation of GBL § 349 as a class action. Sprint's motions for summary disposition are otherwise denied.

Counsel are requested to contact Melanie O'Harra at 212-607-2707 to set up a telephone conference to discuss class certification procedures with respect to Claimant's KCPA claim.

SO ORDERED.

KATHLEEN A. ROBERTS
ARBITRATOR

DATED:  July 16, 2008

9

## Bill Weinstein

| | |
|---|---|
| **From:** | Hinderks, Mark [MHinderks@stinson.com] |
| **Sent:** | Friday, August 08, 2008 1:50 PM |
| **To:** | kroberts@jamsadr.com |
| **Cc:** | Melanie O'Harra; Bill Weinstein; lee.lauridsen@sprint.com; Hanna, William |

**Subject:** Emilio v. Sprint

Judge Roberts,

I am writing to advise you of an action that we plan to take today, of which I have provided notice to Mr. Weinstein. We respectfully disagree with your Honor's ruling that Mr. Emilio's claims may proceed within the jurisdiction of this arbitration in light of the Benney/Lundberg settlement and final judgment. Accordingly, we are filing today a motion in the Benney/Lundberg court (the District of Wyandotte County, Kansas) to enforce the settlement and to preclude Mr. Emilio from proceeding to arbitrate claims that we believe are already the subject of the final judgment. The Judgment order in Benney/Lundberg provides that the Court retained jurisdiction to enforce the Judgment, and Mr. Emilio did not opt out of the Benney/Lundberg class.

We will provide you with courtesy copies of our filing (and of course, are serving them on Mr. Weinstein as well as class counsel in Benney/Lundberg).

We certainly mean no disrespect by this action, but feel that we must proceed with this action. We hope that you will understand and ask that this be considered in further scheduling in this matter (i.e., allowing a reasonable time for this matter to be heard before proceeding with the next phase of the arbitration). We are prepared to discuss in a scheduling call and suggest that this be done. Thank you.

Mark D. Hinderks
Stinson Morrison Hecker LLP
12 Corporate Woods
10975 Benson, Suite 550
Overland Park, Kansas 66210-2008
(913) 344-6706 Office Direct
(913) 707-6706 Mobile
(913) 344-6794 Direct Fax
mhinderks@stinson.com

This communication is from a law firm and may contain confidential and/or privileged information. If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

## IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS
## TWENTY-NINTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| TOM LUNDBERG, et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 02CV-4551 |
| | ) | Division No. 3 |
| SPRINT CORPORATION, et al., | ) | Chapter 60 |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| GREG BENNEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 05CV-1422 |
| | ) | Division No. 3 |
| v. | ) | Chapter 60 |
| | ) | |
| SPRINT INTERNATIONAL | ) | |
| COMMUNICATIONS CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT SPRINT SPECTRUM, L.P.'S
## MOTION TO ENFORCE ORDER

On November 8, 2006, this Court issued an Order approving a nationwide class settlement of claims against Sprint Spectrum, L.P. ("Sprint") and certain affiliates of Sprint concerning, among other things, Sprint's surcharges and other billing related issues. In its Order approving the settlement, this Court ruled that class members must dismiss any and all claims currently pending against Sprint "whether in arbitration or in court proceedings." Order Granting Final Approval of Class Action Settlement ("Order"), ¶ 49, p.18.[1]

---

[1] The Order is attached as Exhibit A to Sprint's Memorandum in Support of Motion to Enforce Order.

Vincent Emilio ("Emilio") asserts claims against Sprint in an arbitration proceeding styled *Emilio v. Sprint Spectrum, L.P. d/b/a Sprint PCS*, Arbitration Reference # 1425000444 ("the Arbitration"), pending before the Hon. Kathleen Roberts, relating to a surcharge on Sprint's bills to New York customers to recover the cost of a certain state excise tax. Emilio asserts both individual claims against Sprint, as well as claims on behalf of a putative class. Although Emilio initially challenged Sprint's authority to assess the surcharge to recover excise taxes paid by Sprint, he now has abandoned that argument and is alleging that Sprint misled customers concerning whether the surcharge was a mandatory tax or other mandatory charge. Emilio's claims are squarely covered by the nationwide settlement and this Court's judgment, which released all claims that "relate in any way to allegations that . . . Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes, including but not limited to the Regulatory Fees, as set forth in Paragraph 22(a)(1) of the Settlement Agreement." Order, ¶ 46, p. 17. Nonetheless, Emilio has refused to dismiss his pending Arbitration against Sprint, even after Sprint filed a Motion for Summary Disposition in the Arbitration based upon this Court's Order. The arbitrator recently denied Sprint's motion, thus necessitating this motion before this Court.

In its Order, this Court explicitly retained jurisdiction to resolve issues that arise from the implementation of the Settlement Agreement approved by the Order, including the scope of the releases contained therein:

> This Court shall retain jurisdiction over this case to assure implementation of the Settlement Agreement and to resolve any issues that may arise with respect to the interpretation of the Settlement Agreement, including but not limited to the scope of the releases contained therein as well as any issues involving the decisions of the Claims Administration.

Exhibit A, Order ¶ 52, p. 18 (emphasis added).

This Court also has jurisdiction because a Kansas court has inherent discretionary power to enforce its Orders when such orders are disregarded by a party. *Jones v. Boardman*, 243 Kan. 444, 459, 759 P.2d 953 (Kan. 1988); *see also* K.S.A. § 20-1204a (allowing a court to order a party that fails to comply with a civil order to appear and show cause). This Court therefore maintains jurisdiction over Emilio and the other members of the *Benney* and *Lundberg* classes with respect to the claims resolved in the Settlement Agreement and the Order approving the settlement agreement.

As explained in greater detail in the Memorandum in Support of this Motion, which is incorporated by reference herein, the claims that Emilio has brought on behalf of himself and his putative class in the Arbitration were resolved by the nationwide class action settlement in this case. Emilio's claims are covered by the plain language of the *Benney/Lundberg* Settlement Agreement and this Court's Order. This Court's Order directed members of the classes to dismiss any actions then pending, whether in arbitration or court proceedings. Emilio's refusal to dismiss his claims in the Arbitration is an effort to circumvent this Court's Order. This Court should stop him from re-litigating claims this Court has already resolved and Sprint has already settled.

The public has a strong interest in protecting the authority of this Court and the binding nature of its holdings, as well as in resolving cases without unnecessary expense or delay. Emilio's attempt to re-litigate a case which this Court has resolved pursuant to a final Order goes directly against this interest. Obviously, such a result would frustrate one of the primary purposes of the *Benney/Lundberg* Settlement Agreement – to bring an end to expensive and lengthy class action litigation. The *Benney/Lundberg* settlement represented an enormous effort to provide a fair and consistent framework for the global resolution of numerous lawsuits and

potential lawsuits concerning the surcharges used by Sprint, including surcharges for excise taxes.    This Court should enforce the Order and prohibit Emilio from circumventing the *Benney/Lundberg* settlement.

Accordingly, Sprint requests that this Court enforce its Order by prohibiting Vincent Emilio from:

- (a) proceeding with his individual claims against Sprint in the arbitration proceeding styled *Emilio vs. Sprint Spectrum, L.P. d/b/a Sprint PCS*, Arbitration Reference # 1425000444 ("the Arbitration") pending before the Hon. Kathleen Roberts;

- (b) proceeding with putative class claims against Sprint in the arbitration proceeding styled *Emilio v. Sprint Spectrum, L.P. d/b/a Sprint PCS*, Arbitration Reference # 1425000444 ("the Arbitration") pending before the Hon. Kathleen Roberts;

- (c) bringing any legal action (1) in any court or arbitration forum; (2) against Sprint or its employees, agent or representatives; and (3) related in any way to any claim that Sprint failed to properly disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes, including the New York Excise Tax.

- (d) In the alternative, Sprint requests that this Court issue an Order requiring Emilio to appear and show cause why his actions do not violate this Court's Order; and

- (e) Sprint further requests the Court to grant such relief as the Court deems just and proper under the circumstances, including its costs and attorneys' fees.

Respectfully submitted,

STINSON MORRISON HECKER LLP

Mark D. Hinderks                    KS Bar #11293
Dan Crabtree                        KS Bar #10903
William E. Hanna                    KS Bar #14480
10975 Benson, Suite 550
12 Corporate Woods
Overland Park, Kansas 66210
Telephone: (913) 344-6706
Facsimile: (913) 344-6794

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document was delivered via e-mail and U.S. Mail, postage prepaid, this 8th day of August, 2008, to:

William Weinstein
SANFORD WITTELS & HEISLER LLP
950 Third Avenue, 10th Floor
New York, NY 10022

COUNSEL FOR VINCENT EMILIO

Charles F. Speer
SPEER LAW FIRM, P.A.
104 West 9th Street, Suite 305
Kansas City, Missouri 64105

Stephen B. Morris
401 West "A" Street, Suite 2200
San Diego, California 92101

Joe Whatley
WHATLEY DRAKE, LLC
2001 Park Place North
1000 Park Place Tower
Birmingham, Alabama 35203

Stephen M. Gorny
BARTIMUS, FRICKLETON, ROBERTSON
& OBETZ
11150 Overbrook Road, Suite 200
Leawood, Kansas 66211

Edward D. Robertson, Jr.
Mary D. Winter
BARTIMUS, FRICKLETON, ROBERTSON
& OBETZ
715 Swifts Hwy.
Jefferson City, MO 65109

Matthew A. Clement
Timothy W. Van Ronzelen
COOK, VETTER, DOERHOFF &
LANDWEHR, PC
231 Madison
Jefferson City, Missouri 65101

CLASS COUNSEL FOR
*BENNEY/LUNDBERG* SETTLEMENT
CLASSES

Attorney for Sprint Spectrum

**IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS**
**TWENTY-NINTH JUDICIAL DISTRICT**

| | | |
|---|---|---|
| TOM LUNDBERG, et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 02CV-4551 |
| | ) | Division No. 3 |
| SPRINT CORPORATION, et al., | ) | Chapter 60 |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| GREG BENNEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 05CV-1422 |
| | ) | Division No. 3 |
| v. | ) | Chapter 60 |
| | ) | |
| SPRINT INTERNATIONAL | ) | |
| COMMUNICATIONS CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT SPRINT SPECTRUM, L.P.'S**
**MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE ORDER**

**INTRODUCTION**

Defendant Sprint Spectrum, L.P. ("Sprint") requests that this Court enforce its November 8, 2006 Order Granting Final Approval of Class Action Settlement, Attorneys Fees and Expenses ("Order") in this case by ordering Vincent Emilio, a member of the *Benney/Lundberg* settlement class, to dismiss claims against Sprint in an arbitration proceeding styled *Emilio v. Sprint Spectrum, L.P. d/b/a Sprint PCS*, Arbitration Reference # 1425000444 ("Arbitration"). This Court's Order approved a nationwide class action settlement of numerous class action lawsuits against Sprint concerning, among other things, Sprint's surcharges and other billing related issues. In its Order approving the *Benney/Lundberg* settlement, this Court ruled

that class members such as Emilio must dismiss any and all claims currently pending against Sprint "whether in arbitration or in court proceedings." Exhibit A, Order, ¶ 49, p. 18. Emilio's claims are squarely barred by the settlement and this Court's Order approving the settlement and releasing all claims that "relate in any way to allegations that . . . Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes, including but not limited to the Regulatory Fees, as set forth in Paragraph 22(a)(1) of the Settlement Agreement." Exhibit A, Order, ¶ 46, p. 17. Nonetheless, Emilio has refused to dismiss his pending Arbitration against Sprint, even after Sprint filed a Motion for Summary Disposition in the Arbitration based upon this Court's Order.

In its Order, this Court explicitly retained jurisdiction to resolve issues with respect to the interpretation of the Settlement Agreement giving rise to the *Benney/Lundberg* settlement, including, but not limited to, the scope of the releases contained therein. Exhibit A, Order, ¶ 52, p. 18. Accordingly, Sprint requests that this Court order Emilio to comply with its Order and prohibit him from proceeding in the Arbitration. By proceeding with claims against Sprint in the Arbitration, Emilio is effectively circumventing and undermining this Court's Order and authority. As a member of both the *Benney* and *Lundberg* classes approved by this Court, Emilio was represented as a party in both cases, as were the putative class members he purports to represent in the Arbitration. Both Emilio and his putative class in the Arbitration were eligible to receive benefits pursuant to the *Benney/Lundberg* settlement. Indeed, many New York citizens whom Emilio seeks to represent in the Arbitration ultimately submitted claim forms to receive benefits to which they and other members of the *Benney* and *Lundberg* classes were entitled. Because Sprint already has disbursed benefits pursuant to the *Benney/Lundberg* settlement, Emilio seeks a "double recovery" on behalf of his putative class members by seeking damages in

the Arbitration for claims which already were settled in *Benney/Lundberg*. Moreover, to the extent that Emilio and members of his putative class chose not to opt out of the settlement, any claims they may have had relating to the allegedly deceptive labeling of the surcharge to recover New York state excise taxes were released by the Settlement Agreement and Order. This Court should enforce its Order and prohibit Emilio and his putative class from circumventing the *Benney/Lundberg* settlement.

## FACTUAL BACKGROUND

### The *Benney/Lundberg* Settlement[1]

1.      Beginning in 2002, Sprint was named as a defendant in a number of class action lawsuits around the country concerning various surcharges that Sprint assessed on its wireless customers' invoices to recover amounts that Sprint is required to pay to governmental entities (e.g., Universal Service Fund charges, as a component of the "USA Regulatory Fees" surcharge) or to fund government mandated programs (e.g., E911 services, number pooling and number portability). A common denominator in the various class allegations was an allegation that Sprint had deceptively mislead customers by implying that the surcharges were taxes or other governmentally required fees that Sprint was required to collect from customers.

2.      Several cases were consolidated in this Court, including *Lundberg and Barnes v. Sprint Corp., et al.*, (originally filed in Wyandotte County, Kansas), *Benney v. Sprint Spectrum, L.P., et al.*, (originally filed in Cole County, Missouri), *Brigman v. Sprint Corporation* (originally filed in Richland County, South Carolina), and *Albaisa v. Sprint International* (originally filed in San Diego County, California). Exhibit B, Settlement Agreement, p. 4.

---

[1] Although the Court is well-versed in the facts of this action, Sprint provides a brief history of the cases to put Mr. Emilio's claims into context.

3.      After both formal and informal discovery and lengthy settlement negotiations, including formal mediation meetings conducted before a retired judge, Sprint and plaintiffs in the *Benney/Lundberg* cases agreed to enter into the Settlement Agreement, signed on February 24, 2006. Exhibit B, Settlement Agreement.

4.      On February 28, 2006, this Court issued an Order of Preliminary Approval of the Settlement Agreement. Exhibit C.

5.      In its Order of Preliminary Approval, this Court appointed plaintiffs' counsel in *Benney/Lundberg* as class counsel for two overlapping classes that included all current and past (for a period of several years) Sprint wireless customers nationwide. Exhibit C, p. 4.

6.      Consistent with the Order of Preliminary Approval, Sprint provided notice of the *Benney/Lundberg* settlement to its current customers by bill insert and provided notice to its former customers via postcard, notifying recipients of website and toll-free number references to obtain additional information and forms. *See* Exhibit A ¶18 (finding that notice pursuant to the Settlement Agreement had been given as previously ordered by the Court).

7.      Sprint also published notice of the *Benney/Lundberg* settlement in the *Wall Street Journal*, *USA Today*, *Vista*, and the national newspaper supplement *Parade* magazine. *Id.* In addition, plaintiffs' counsel maintained a website and toll-free number for potential claimants to obtain    additional    information    and    forms    relating    to    the    Settlement.    *See* *http://www.sprintclassactionsettlement.com.*

8.      This Court held a final approval hearing on September 12, 2006. A number of objectors appeared, including several that (like Emilio) had alleged putative class actions in other forums. The Court approved the Settlement Agreement in its Order signed on November 8, 2006. Exhibit A.

9.     Approximately 635,672 class members ultimately submitted claim forms to receive benefits pursuant to the *Benney/Lundberg* settlement. In contrast, the Order recites that only 103 class members made objections, and an even smaller number – 20 – exercised their right to opt-out of the settlement. Exhibit A, Order, ¶ 42.

10.    A handful of objectors initially appealed the Order. All objectors have now dismissed their appeals, and settlement benefits are in the process of being distributed, including, but not limited to, those claimants in the State of New York – the same claimants Emilio purports to represent, as explained below, as their putative class representative in the Arbitration.

## The Terms Of The *Benney/Lundberg* Settlement.

11.    The *Benney* Settlement Class consists of "all current and former Sprint wireless customers in the United States who were customers for any time during the period December 1, 2000 to the Effective Date, and who were charged Regulatory Fees (as defined in paragraph 1.3(a))." Exhibit B, Settlement Agreement, ¶ 7(a), p. 14.

12.    The *Lundberg* Settlement Class consists of "all current and former Sprint wireless customers in the United States who were customers at any time during the period January 1, 1997 to the Effective Date, and who could have asserted claims relating to directory assistance calls, Sprint's practice of rounding minutes up to the next whole minute, and Coverage and Capacity Issues." Exhibit B, Settlement Agreement, ¶ 7(b), pp. 15-16.

13.    Settlement Agreement paragraphs 22(a)(1) and (a)(2) make clear that claims such as those raised by Emilio relating to Sprint's charging of a surcharge to recover excise taxes are encompassed in the settlement:

22(a)(1). Release. As of the Effective Date, the *Benney* Class Plaintiffs, on their own behalf and on behalf of all Settlement Class Members who do not properly opt out of the proposed Settlement Classes under K.S.A. 60-223, release and discharge Sprint . . . from any and all claims, demands, debts, liabilities, actions, causes of action of every kind and nature, obligations, damages, losses, and costs,

whether known or unknown, actual or potential, suspected or unsuspected, direct or indirect, contingent or fixed, that <u>have been, could have been, or in the future might be asserted</u> in the Actions or <u>in any other court or proceeding which relate in any way to allegations that,</u> on or before the Effective Date, [Sprint] failed <u>properly to disclose or otherwise improperly charged</u> for surcharges, regulatory fees <u>or excise taxes.</u> . . .

Exhibit B, Settlement Agreement, pp. 30-31 (emphasis added).  Similarly, the Settlement

Agreement also provides that

22(a)(2) Release.  As of the Effective Date, the *Lundberg* Class Plaintiffs, on their own behalf and on behalf of all Settlement Class Members who do not properly opt out of the proposed Settlement Classes under K.S.A. 60-223, <u>release and discharge Sprint</u> . . . <u>from any and all claims, demands, debts, liabilities, actions, causes of action of every kind and nature,</u> obligations, damages, losses, and costs, whether known or unknown, actual or potential, suspected or unsuspected, direct or indirect, contingent or fixed, <u>that have been, could have been, or in the future might be asserted</u> in the Actions or <u>in any other court or proceeding which relate in any way to allegations that,</u> on or before the Effective Date, [Sprint] failed <u>properly to disclose or otherwise improperly charged</u> for surcharges, regulatory fees or <u>excise taxes</u> . . . .

Exhibit B, Settlement Agreement, pp. 31-32 (emphasis added).

**The Order.**

14.    This Court's Order granting final approval to the Settlement Agreement states as

follows:

46.    <u>Sprint is hereby released and discharged from any liability to each and every *Benney* Class Plaintiff and Settlement Class members,</u> with the sole exception of those Settlement Class members who timely excluded themselves from the class by filing a request for exclusion by the deadline set by the Court, <u>arising from or relating to any and all claims that were or could have been alleged in the *Benney* matter, including but not limited to claims which relate in any way to allegations that,</u> on or before the Effective Date as defined in the Settlement Agreement, <u>Sprint failed properly to disclose or otherwise improperly charged</u> for surcharges, regulatory fees or <u>excise taxes,</u> including but not limited to the Regulatory Fees, as set forth in Paragraph 22(a)(1) of the Settlement Agreement.

47.    <u>Sprint is hereby released and discharged from any liability to each and every *Lundberg* Class Plaintiff and *Lundberg* Settlement Class member,</u> with the sole exception of those Settlement Class members who timely excluded themselves from the class by filing a request for exclusion by the deadline set by the Court, <u>arising from or relating to any and all claims that were or could have</u>

been alleged in the *Lundberg* matter, including but not limited to claims that, on or before the Effective Date, Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes, including but not limited to the Regulatory Fees; for directory assistance calls; the practice of rounding minutes up to the next whole minute; offered service without properly disclosing limitations on the coverage, capacity, and geographic scope of the Sprint PCS wireless network (including, but not limited to, the availability or claimed necessity for software upgrades to phone handsets); Coverage and Capacity Issues; dropped customer calls; or the failure to connect customer calls, as set forth in Paragraph 22(a)(2) of the Settlement Agreement.

Exhibit A, Order ¶¶ 46-47, p. 17 (emphasis added).

15.     In addition, paragraph 49 of the Order specifically orders class members who, like

Emilio, did not opt-out, but who have pending arbitrations against Sprint, to dismiss their claims:

Except as described in paragraph 48, . . .members of the Settlement Classes who did not timely exclude themselves from the classes by filing a request for exclusion . . . are hereby ordered to dismiss any and all Claims (as defined in the Settlement Agreement) currently pending against Sprint whether in arbitration or court proceedings.

Exhibit A, Order, ¶ 49, p. 18 (emphasis added).

16.     This Court explicitly retained jurisdiction to resolve issues that arise from

the implementation of the Settlement Agreement.

This Court shall retain jurisdiction over this case to assure implementation of the Settlement Agreement and to resolve any issues that may arise with respect to the interpretation of the Settlement Agreement, including but not limited to the scope of the releases contained therein as well as any issues involving the decisions of the Claims Administrator.

Exhibit A, Order, ¶ 52, p. 18 (emphasis added).

### Emilio's Claims

17.     Vincent Emilio filed his original demand with JAMS on or about January 4, 2005,

before the *Benney/Lundberg* settlement was reached. He filed his First Amended Arbitration

Demand on June 2, 2006. In both his original and First Amended Demand, Emilio alleged that

Sprint was prohibited under New York law from charging a "New York State Excise Tax" in his

monthly billings, specifically alleging that "[d]espite the lack of a right to do so under New York State Tax Law, Sprint has included a charge for the Excise Tax in its bills to customers, and has collected the Excise Tax from its customers, including Claimant and the Class." Exhibit D, Original Demand, ¶ 19; Exhibit E, First Amended Demand, ¶ 20.

18.    On February 20, 2007, Emilio filed his current Second Amended Demand for Class Action Arbitration ("Demand"). Emilio's Demand alleges that Sprint has been and is improperly charging Emilio as a Sprint wireless telephone customer to obtain reimbursement for "New York State Excise Tax" ("Excise Tax") in his monthly billings. Exhibit F, Demand, ¶¶ 1-3.

19.    Emilio's first cause of action alleges that Sprint breached its contract with Emilio because "[Sprint's] collection of the Excise Taxes is a breach of [Sprint's] Agreements with Claimant and Class." Exhibit F, Demand at ¶ 33.

20.    Emilio's second cause of action alleges a claim pursuant to the Kansas Consumer Protection Act ("KCPA"), claiming that Sprint's collection of the Excise Tax "leads consumers to believe that they are obligated to pay the Excise Tax under New York Tax Law when they are not." Exhibit F, Demand at ¶ 36.

21.    Emilio's third cause of action alleges that Sprint's "conduct in collecting the Excise Tax" constitutes deceptive acts and practices under New York General Business Law § 349. Exhibit F, Demand at ¶ 43.

22.    Emilio's fourth cause of action alleges that Sprint's "wrongful collection" of the charge for the Excise Tax, and its retention of the monies collected, constitutes unjust enrichment. Exhibit F, Demand at ¶¶ 48-49.

23. Emilio claims he has been a Sprint wireless telephone customer "at all times relevant hereto," and purports to bring a class action lawsuit on behalf of "Sprint wireless telephone customers [who] paid the Excise Tax as part of their monthly charges." Exhibit F, Demand at ¶ 7.

24. No class has been certified in the Arbitration.[2]

## Emilio Had Opportunities To Avoid The Impact Of The *Benney/Lundberg* Settlement But Chose Not To Act

25. Emilio, as a member of the *Benney/Lundberg* settlement class, was provided notice as set forth in the Settlement Agreement. Emilio did not exercise his right to opt-out of the *Benney/Lundberg* settlement.

26. Sprint's counsel advised Emilio's counsel of the *Benney/Lundberg* Settlement in a previously scheduled November 8, 2006 telephone conference. At that time, the Order had just been entered and had not become final. Emilio did not seek leave to intervene in *Benney/Lundberg* to appeal the Order or to challenge or seek relief from the Order prior to the time that the Order became final (or at any time thereafter).

27. After Emilio's counsel expressed dissatisfaction about not receiving notice of the settlement at an earlier time, Sprint offered Emilio a window of time in which he could opt-out of the *Benney/Lundberg* settlement.

28. By e-mail dated December 1, 2006, Sprint's counsel offered Emilio's counsel the chance for Emilio to opt-out of the *Benney/Lundberg* Settlement. Exhibit G. Emilio's counsel made the tactical decision to circumvent this Court's Order by attempting to challenge the Settlement Agreement in the Arbitration rather than "opting out" of the settlement, or seeking relief or appeal in the appropriate court.

---

[2] Emilio's claims for breach of contract and unjust enrichment have been dismissed in the Arbitration for reasons other than the *Benney/Lundberg* settlement.

29.     Counsel for Emilio also chose not to intervene in the then still-pending proceedings in Kansas to seek relief from or modification of the Order, or to seek leave to participate in the appeal of the Order approving the settlement.

30.     In contravention of the Order and the specific language set forth in paragraph 49 therein, Emilio did not dismiss his claims pending against Sprint in the Arbitration.

### Sprint Sought Dismissal Of The Arbitration Pursuant To This Court's Order Approving The *Benney/Lundberg* Settlement.

31.     The last objector to the *Benney/Lundberg* settlement dismissed his appeal from the Order on March 8, 2007. Exhibit H.

32.     Shortly thereafter, on April 5, 2007, Sprint sought dismissal of Emilio's claims in the Arbitration pursuant to a Motion for Summary Disposition. Exhibit I, Sprint's Motion for Summary Disposition Based Upon The *Benney/Lundberg* Nationwide Class Action Settlement.

33.     In its motion, Sprint noted that this Court's Order contains releases applicable to the *Benney* and *Lundberg* classes that release and discharge Sprint "from any liability . . . arising from or relating to any and all claims that . . . Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes..." Exhibit I, Sprint's Motion for Summary Disposition Based Upon the *Benney/Lundberg* Nationwide Class Action Settlement (citing the Order, Exhibit A, p. 17, ¶ 46-47).

34.     In support of its motion, Sprint noted that since this Court's Order extinguished claims against Sprint premised on the same type of allegations made by Emilio in the Arbitration, this Court's Order was entitled to *res judicata* effect in the Arbitration. Exhibit I, Sprint's Motion for Summary Disposition Based Upon The *Benney/Lundberg* Nationwide Class Action Settlement, pp. 9-14.

35.     Despite Sprint's motion and in violation of this Court's Order, Emilio refused to dismiss his claims in the Arbitration, even after Sprint filed its motion for summary disposition in the Arbitration.

36.     Sprint provided the arbitrator with two recent decisions applying the *Benney/Lundberg* settlement to bar further litigation against Sprint. In both *Olson v. Sprint Spectrum, L.P.*, No. C06-0592-JCC, 2008 WL 474063 (W.D. Wash.) (Exhibit J) and *Montgomery v. Sprint Spectrum L.P.*, No. 2:07-CV-2227-JTM-KMH, 2007 WL 3274833 (D.Kan.) (Exhibit K), the courts held the *Benney/Lundberg* settlement precluded claims related to Washington and Texas surcharges even though no Washington or Texas citizens were among the *Benney/Lundberg* class representatives and the specific surcharges at issue in *Olson* and *Montgomery* were not specifically referenced in the *Benney/Lundberg* settlement agreement.[3]

37.     The arbitrator declined to enforce the Order on the grounds that Emilio was not adequately represented before this Court because: (1) the class representatives were not asserting claims based on the Excise Tax; (2) the class representatives lacked standing to assert claims based on the Excise Tax; and (3) the admission of Sprint's counsel that the issue of state excise taxes was not a subject of discussion between the parties. *See* Exhibit L, July 16, 2008 Decision on Respondent's Motions for Summary Disposition.

38.     Accordingly, Emilio continues to seek to represent a putative class in the Arbitration based on his allegation that Sprint failed to properly disclose or otherwise improperly charged for excise taxes.

---

[3] The *Montgomery* court also ruled that plaintiff could not state a claim under the Kansas Consumer Protection Act ("KCPA") because "[t]he KCPA is not intended to serve as a nationwide basis for liability against Kansas companies." 2007 WL 3274833 at *6. Declining to follow *Montgomery* and other cases reaching this same conclusion, the arbitration order misapplies Kansas law to allow Emilio to attempt to certify a class of New York customers in the Arbitration based on alleged violations of the KCPA.

39.    The applicable rules to the Arbitration do not allow Sprint to make an interlocutory appeal of the ruling in the Arbitration. Sprint seeks relief from this Court to avoid having to defend itself in an arbitration that litigates claims this Court has already resolved.

40.    Because the claims made by Emilio in the Arbitration were already adjudicated and settled in *Benney/Lundberg* and the Order approving the settlement, the Arbitration lacks jurisdiction to proceed not only as to Emilio's individual claims, but also as to the claims Emilio purports to make on behalf of the putative class.

41.    After studying the arbitrator's ruling, and before the Arbitration proceeded further, Sprint promptly filed this motion before the Court.

## ARGUMENT

### I.    This Court Retained Jurisdiction To Settle Disputes Over The Scope Of Sprint's Release.

In its Order, this Court specifically retained jurisdiction to resolve disputes such as this one related to the interpretation and scope of the *Benney/Lundberg* settlement and this Court's Order approving the settlement. Exhibit A, Order, p. 18, ¶ 52. This exercise of jurisdiction is appropriate because a Kansas court has inherent discretionary power to enforce its orders that are not followed by the parties. *Jones v. Boardman*, 243 Kan. 444, 459, 759 P.2d 953 (Kan. 1988); *see also* K.S.A. § 20-1204a (allowing a court to order a party that fails to comply with a civil order to appear and show cause). This Court is uniquely situated to interpret its own Order, and it is particularly appropriate for this Court to hear this motion concerning the enforcement of an Order this Court previously rendered.

Courts have the power to defend their own judgments, including the power to enjoin or stay subsequent arbitrations. *Y & A Group Securities Litigation v. Y & A Group, Inc.*, 38 F.3d 380, 382 (8th Cir. 1994). The *res judicata* effect of prior litigation with respect to a demand for

arbitration is a matter for judicial determination. *Jackson Track Group v. Mid States Port Authority*, 242 Kan. 683, 692 (Kan. 1988). Indeed, under 28 U.S.C. § 1738, judicial proceedings of a state court "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of each State, Territory or Possession from which they are taken." This statute dictates that "[t]he preclusive effect of a state court decision…is a matter of state law." *Wilkinson v. Pitkin County Bd. Of County Comm'rs*, 142 F.3d 1319, 1321 (10th Cir. 1998).

This Court's jurisdiction over Emilio and the other members of the *Benney/Lundberg* settlement class gives it the authority to determine whether the Settlement Agreement and Order resolved Emilio's claims, and upon such a determination, to prohibit him from proceeding with the resolved claims in any forum. The majority rule is "the preclusive effect of a judgment is determined by the tribunal that rendered it." *Miller v. Runyon*, 77 F.3d 189, 194 (7th Cir. 1996). If the Court was forced to sit idly by as a party ignored its Order by bringing claims in another forum that the Court has already resolved, the result would be "a procedure that would transform otherwise binding judicial decisions into mere advisory opinions." *Leon C. Baker, P.C. V. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 821 So. 2d 158, 164 (Ala. 2001) (internal quotation omitted).

Emilio has refused to comply with the Order by dismissing his claims asserted in the Arbitration. He was a member of the classes that voluntarily sued Sprint in this Court in the cases that gave rise to the *Benney/Lundberg* settlement, and he availed himself to the jurisdiction of this Court as a result. The Restatement (Second) of Judgments § 41 states that "[a] person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party." Section 41 specifically states that such a

person "is represented by a party who is: . . . (e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member." In light of Emilio's efforts to circumvent this Court's prior Order, this Court must exercise its jurisdiction to prohibit Emilio from attempting to relitigate in the Arbitration claims that already have been litigated and released.

## II.    The *Benney/Lundberg* Settlement And Order Approving The Settlement Encompass Emilio's Claims, And The Order's Requirement To Dismiss Arbitration Claims Applies To Emilio.

This Court's Order releases and discharges Sprint "from any liability ... arising from or relating to any and all claims that ... Sprint failed properly to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes . . . ." *See* Exhibit A, Order, ¶¶ 46, 47. The Order is consistent with ¶¶ 22(a)(1) and (2) of the Settlement Agreement that release claims that Sprint "failed to disclose or otherwise improperly charged for surcharges, regulatory fees or excise taxes." Exhibit B, pp. 30-32. Because Emilio's claims fall squarely within the language of both the Order and Settlement Agreement, his claims were released.

Here, Emilio brings claims against Sprint based on allegations that Sprint "wrongfully and deceptively [led] consumers to believe that they are obligated to pay the Excise Tax under New York Tax Law when they are not," and that consumers were "deceptively misled and confused by Sprint's practice of including the charges for the Excise Tax in the portion of the bill suggesting to reasonable consumers that its collection from the customer is properly authorized by the relevant government body." Exhibit F, Demand, ¶¶ 36, 29. In other words, Emilio's allegations focus on Sprint's surcharge to recover the Excise Tax, which is precisely the same type of allegedly misleading and deceptive practice claims made by the plaintiffs in *Benney/Lundberg* and numerous other class actions that were released by the Settlement Agreement and Order in this action. There is no dispute that Emilio is a member of both the

*Benney* and *Lundberg* classes (*see* Exhibit B, Settlement Agreement, ¶¶ 7(a) and 7(b), pp. 14-16), and Emilio has never argued to the contrary in the Arbitration. Thus, the *Benney/Lundberg* Settlement Agreement and Order releasing Sprint for "fail[ing] properly to disclose or otherwise improperly charg[ing] for ... excise taxes" clearly encompasses this case.

### III.    Emilio's Claims Are Subject To The *Benney/Lundberg* Settlement Regardless Of Whether the Named Class Representatives Had Standing And/Or Asserted Claims Involving The New York Excise Tax.

Emilio contends that the Order does not apply to his claims because the Settlement Agreement does not specifically address the New York Excise Tax. But there is no need for the Settlement Agreement to specifically mention each state's excise tax, or for that matter every possible surcharge or regulatory fee. The Settlement Agreement specifically releases claims related to "surcharges" and "excise taxes," which naturally includes New York's excise taxes and Sprint's surcharges to recover its excise tax payments. *See In re General American Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 803 (8th Cir. 2004) (rejecting claim that class member's individual action was not precluded by settlement that released claims related to "premium charges," because "premium charges" were included in "modal billing practices" that were released).

Numerous cases have made it clear that it is permissible for a class action settlement to release claims broader in scope than the claims alleged in the lawsuit being settled, including claims over which the court approving the settlement would not have jurisdiction. *E.g., Ross v. Metropolitan Life Ins. Co.*, 411 F. Supp. 2d 571, 576-77 (W.D. Pa. 2006) (release of all claims concerning insurance policies barred subsequent case concerning a rate scheme relating to those policies that had not been alleged in the settled class action); *Varacallo v. Massachusetts Mutual Life Ins. Co.*, 226 F.R.D. 207, 244 (D.N.J. 2005) (overruling objection to class release barring claims that were or could have been brought and would encompass claims not pled, claims

unknown, or future claims based on past conduct); *In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) (objection to class settlement release overruled; settlement agreement may release claims with similar factual predicate, even if such claims were not presented and might not even have been presentable in the class action); *Strube v. American Equity Investment Life Ins. Co.*, 226 F.R.D. 688, 699-701 (M.D.Fla. 2005) (overruling objection that release in class action settlement dealing with claims involving the deceptive selling of equity indexed annuities would improperly release claims not pled in settlement case, but present in another case, concerning the use of living trusts as a tool to sell annuities),

Although plaintiffs in the *Benney* and *Lundberg* cases did not specifically claim deceptive charging and improper recovery of a surcharge for excise taxes, their claims involved the deceptive (claimed to be misleading as mandated payments or taxes) charging and improper recovery of a variety of surcharges for similar payments to, and costs of, other government programs (universal service fund, E911, number pooling and portability, and recovery of amounts for E911 allegedly not permitted by state statutes). Because Emilio's allegations relate to the same type of allegedly misleading conduct that was the focus of *Benney/Lundberg*, and Emilio's claims directly fall within the plain language of the general release formulated as part of the *Benney/Lundberg* settlement, there can be no reasonable dispute that his claims (and those of his putative class) were released by the Settlement Agreement and Order. *See TBK Partners, LTD v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982).

In short, the negotiated nationwide settlement was specifically designed to settle all claims and potential claims relating to Sprint's assessment of surcharges and excise taxes. Indeed, the desire to resolve all such claims and potential claims was central to Sprint's willingness to enter into the Settlement Agreement. Sprint provided millions of dollars in

16

benefits to reach a nationwide settlement, precisely so it could resolve disputes relating to all types of surcharges that vary from state to state. Sprint provided benefits to 41,330 Sprint customers in the state of New York pursuant to the settlement – the same customers for whom Emilio seeks to "double-dip" by asserting a putative class action on their behalf in the Arbitration. Emilio's challenge to this Court's authority, and the nationwide class settlement this Court approved, threatens class action settlements as a vehicle for resolving litigation. If a defendant cannot obtain nationwide relief for similar and potential class claims, it has no incentive to attempt to reach settlement agreements.

Accordingly, just as un-alleged claims could be settled in *Metropolitan Life* and *Varacallo*, claims concerning other types of alleged improper or deceptive surcharges for government charges or program cost recovery could be settled in *Benney/Lundberg*. "There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded. In fact, most settling defendants insist on this." *In re General American Life Ins. Co. Sales Practices Litig.*, 357 F.3d at 805.

Multiple courts have taken this reasoning one step further, holding that a class settlement can release claims that the court lacks jurisdiction to hear. In *Nottingham Partners v. Trans-Lux Corp.*, 925 F.2d 29 (1st Cir. 1991), objectors to a class action settlement attempted to argue that their claims -- based on federal disclosure laws -- were not subject to a class settlement made by claimants who only asserted state disclosure claims. The state court nevertheless approved the class action settlement -- which involved the release of federal claims -- although *it did not even have jurisdiction* over the federal claims. The court noted "the two suits, notwithstanding any differences in remedies sought or theories of recovery pleaded, shared a common gravamen." *Id.* at 33. *See also, In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981)

17

(federal court can approve a settlement releasing state claims not before it), *cert. denied,* 456 U.S. 998 (1982); *In re Washington Public Power Supply Sys. Sec. Litig.*, 720 F.Supp. 1379, 1413 (D.Ariz. 1989) ("State law claims that the federal court does not have power to adjudicate may be released over the objection of Class Members.").

The claims alleged by Emilio in this case fall squarely within the broad release language of the *Benney/Lundberg* settlement. That Emilio's claims happen to deal with a surcharge to recover the New York Excise Tax, while the *Benney/Lundberg* cases dealt with other surcharges and taxes, makes no difference. The common theme in the cases subject to the *Benney/Lundberg* settlement was that Sprint allegedly failed to disclose properly that the charge at issue is not a government-imposed tax on customers and that Sprint was not required to assess the charge on its customers. By Emilio's own description in his Demand, this is *exactly* what his case is about, except that his deals with the New York Excise Tax. But claims relating to the improper disclosure and description of surcharges, including excise taxes, are explicitly and unambiguously within the parameters of the *Benney/Lundberg* settlement. *See* Exhibit B, pp. 30-32; Exhibit A, ¶¶ 46-47. As a result, Emilio's claims are now barred.

## IV.    Other Courts Appropriately Have Recognized The Broad Scope Of This Court's Order.

Two recent decisions have applied the *Benney/Lundberg* settlement to bar further litigation against Sprint. In both *Olson v. Sprint Spectrum, L.P.*, No. C06-0592-JCC, 2008 WL 474063 (W.D. Wash.) and *Montgomery v. Sprint Spectrum, L.P.*, No. 2:07-cv-2227-JTM-KMH, 2007 WL 3274833 (D.Kan.), courts held that the *Benney/Lundberg* settlement precluded claims related to Washington and Texas surcharges even though no Washington or Texas citizens were among the *Benney/Lundberg* class representatives, and the specific surcharges at issue in *Olson* and *Montgomery* were not specifically referenced in the *Benney/Lundberg* settlement agreement.

In *Olson*, plaintiffs filed a putative class action lawsuit against Sprint alleging that Sprint impermissibly billed a Washington Business and Occupation ("B&O") tax surcharge to its Washington customers.     The federal district court granted Sprint's motion for summary judgment. In so ruling, the court rejected the very argument made by Emilio in the Arbitration – that claims relating to a state surcharge or excise tax were not subject to the *Benney/Lundberg* settlement, since none of the parties in *Benney/Lundberg* asserted that same claim against Sprint. The court rejected plaintiff's argument that, in order to effectively release Sprint from liability for the claims brought in the instant action, the settlement had to specifically list each and every surcharge, regulatory fee, or excise tax potentially covered by the settlement. As the court stated, "such a requirement would be impractical and would certainly discourage settlement, which would run contrary to the long standing policy of *encouraging* settlement – a policy Judge Duncan emphasized in approving the Settlement Agreement." 2008 WL 474063 at *3 (emphasis in original).

The *Olson* court also dismissed one of the primary arguments made by Emilio – that the *Benney/Lundberg* settlement and its implementing order encompass only claims related to "regulatory fee" surcharges, but do not apply to an excise tax or surcharge such as Washington's B&O tax. *Id.* at *6. The *Olson* court bluntly stated:

"The reading Plaintiffs press contradicts the plain language of the Agreement and the order approving the settlement. The latter releases Sprint from liability for 'any and all claims that were or could have been alleged in the *Benney* matter, including but not limited to claims which related in any way to allegations that . . . Sprint failed properly to disclose or otherwise improperly charged for *surcharges, regulatory fees or excise taxes* . . .'"

*Id.* (emphasis in original). Just as plaintiffs' claims in *Olson* relating to a Washington surcharge are subject to the *Benney/Lundberg* settlement, so are Emilio's claims relating to the New York Excise Tax.

In *Montgomery*, plaintiff filed a putative class action lawsuit on behalf of Sprint consumers in Texas who were charged a Texas Margin Reimbursement Fee. The United States District Court for the District of Kansas granted Sprint's motion to dismiss based upon the *Benney/Lundberg* settlement. The court ruled that the *Benney/Lundberg* settlement encompasses the claims made by plaintiff in her Complaint regarding the "unlawful, deceptive and unfair" collection of the Margin Reimbursement Fee. Since claims relating to both the collection and allegedly deceptive description of this fee were covered by the *Benney/Lundberg* settlement, plaintiff's claims were barred as a result. 2007 WL 3274833 at *6. *Montgomery* provides further support for the same arguments Sprint makes here. Emilio's claims should be dismissed because they are encompassed within the scope of the releases in the *Benney/Lundberg* settlement.

## V.    Emilio Received Adequate Representation And Consideration For His Claims.

Emilio also questions how the value of claims relating to Sprint's recovery of excise taxes entered into the *Benney/Lundberg* Settlement terms and benefits. The answer is irrelevant, for there is no requirement to apportion the benefits conferred under the settlement for the various potential claims of the class members. In *General American Life*, the plaintiff challenged the adequacy of the class representation, arguing that the class settlement gave away her claims based on "modal-billing" for nothing. 357 F.3d at 805. The Eighth Circuit rejected this argument and stated:

> It is simply not true that modal-billing claims were given away for nothing. It is true that no separately stated consideration was paid for those claims, but that is quite another thing. *In addition to the claims specifically pleaded in the class action, all claims related to policy charges, necessarily including modal-billing claims, were released.* The release of the latter category of claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this case has benefited . . . No part of the consideration on either side is keyed to any specific part of the consideration of the other. Each side gives up a number of things. This is the way settlements usually work.

*Id.* (emphasis added). Likewise, the value of any claims relating to recovery of excise taxes is deemed to be included in the overall value of the settlement relating to Sprint's recovery of amounts it pays or incurs for a variety of government programs and charges.

In determining the adequacy of class representation, the issue is not -- contrary to Emilio's belief -- whether the class representatives make identical (or even similar) claims. Instead, "the essential question in determining whether the Settlement complies with the adequate representation doctrine is whether the interests that were served by the Settlement were compatible" when the class plaintiffs negotiated a release of the claims. *Wal-Mart Stores, Inc. v. Visa, Inc.*, 396 F.3d 96, 110 (2d Cir. 2005).

It was in the *Benney/Lundberg* class representatives' best interests to obtain the most benefits possible from Sprint for the entire class as a result of the class settlement. As a result, there is no basis to conclude that they did not seek, as in *Wal-Mart*, "to obtain the best possible settlement" by extracting the greatest amount of concessions from the defendant as possible. *Id.* at 112. As the *Wal-Mart* court held, if a class has different claims involving similar factual predicates, "adequate representation of a particular claim is determined by the alignment of interests of class members, not proof of vigorous pursuit of that claim." *Id.* at 113.

Of course, not every variation between the interests of an absent class member and those of the class generally will render the class representatives inadequate. The adequacy-of-representation determination turns on whether the interests of the class were 'compatible' with those of the party attempting to attack the class action judgment collaterally. *See Wal-Mart*, 396 F.3d at 110; *see also In re Joint Eastern and Southern District Asbestos Litigation,* 78 F.3d 764, 778 (2d Cir. 1996) (explaining that for representation to be adequate, class members must not have interests that are antagonistic to one another); *Wolfert v. Transamerica,* 439 F.3d 165, 173-

75 (2d Cir. 2006) (after analyzing claimant's purported causes of action under New York law, court ruled that claimant's interests were more than adequately protected by the California class representatives, and that no due process violation occurred as a result). There was no conflict of interest between the class representatives in *Benney/Lundberg* and Emilio. In fact, they *shared* Emilio's desire to obtain the most benefits possible from Sprint. Emilio, as a class member, was entitled to share in those benefits. Emilio's claim of inadequate representation is simply wrong.

## CONCLUSION

Sprint's Motion To Enforce Order should be granted. In particular, this Court should issue an Order that:

a.   Emilio is enjoined from proceeding with his individual claims against Sprint in the arbitration proceeding captioned *Emilio v. Sprint Spectrum L.P., d/b/a Sprint PCS,* Arbitration Reference #1425000444, pending before the Hon. Kathleen Roberts.

b.   Emilio is enjoined from proceeding with putative class claims against Sprint in the arbitration proceeding captioned *Emilio v. Sprint Spectrum L.P., d/b/a Sprint PCS,* Arbitration Reference #1425000444, pending before the Hon. Kathleen Roberts.

c.   Emilio is further enjoined from bringing any legal proceeding (1) in any case or arbitration forum; (2) against Sprint or its employees, agents, or attorneys; (3) related in any way to any claim that Sprint failed to properly disclose or otherwise improperly charged for surcharging, regulatory fees or excise taxes, including the New York State Excise Tax;

d.     In the alternative, Sprint requests this Court issue an Order requiring Emilio to appear and show cause why his actions do not violate this Court's Order; and

e.     Sprint further requests the Court to grant such relief as the Court deems just and proper under the circumstances, including its costs and attorneys' fees.

Respectfully submitted,

STINSON MORRISON HECKER LLP

Mark D. Hinderks                    KS Bar #11293
Dan Crabtree                        KS Bar #10903
William Hanna                       KS Bar #23602
10975 Benson, Suite 550
12 Corporate Woods
Overland Park, Kansas 66210
Telephone: (913) 344-6706
Facsimile: (913) 344-6794

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document was delivered via e-mail and U.S. Mail, postage prepaid, this 8th day of August, 2008, to:

William Weinstein
SANFORD WITTELS & HEISLER LLP
950 Third Avenue, 10th Floor
New York, NY 10022

COUNSEL FOR VINCENT EMILIO

Charles F. Speer
SPEER LAW FIRM, P.A.
104 West 9th Street, Suite 305
Kansas City, Missouri 64105

Stephen B. Morris
401 West "A" Street, Suite 2200
San Diego, California 92101

Joe Whatley
WHATLEY DRAKE, LLC
2001 Park Place North
1000 Park Place Tower
Birmingham, Alabama 35203

Stephen M. Gorny
BARTIMUS, FRICKLETON, ROBERTSON
& OBETZ
11150 Overbrook Road, Suite 200
Leawood, Kansas 66211

Edward D. Robertson, Jr.
Mary D. Winter
BARTIMUS, FRICKLETON, ROBERTSON
& OBETZ
715 Swifts Hwy.
Jefferson City, MO 65109

Matthew A. Clement
Timothy W. Van Ronzelen
COOK, VETTER, DOERHOFF &
LANDWEHR, PC
231 Madison
Jefferson City, Missouri 65101

CLASS COUNSEL FOR
*BENNEY/LUNDBERG* SETTLEMENT
CLASSES

Attorney for Sprint Spectrum

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: SPRINT SPECTRUM L.P.

Selected Entity Status Information

| | |
|---:|---|
| **Current Entity Name:** | SPRINT SPECTRUM L.P. |
| **Initial DOS Filing Date:** | MAY 14, 1996 |
| **County:** | ALBANY |
| **Jurisdiction:** | DELAWARE |
| **Entity Type:** | FOREIGN LIMITED PARTNERSHIP |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O THE PRENTICE-HALL CORPORATION SYSTEM, INC.
80 STATE STREET
ALBANY, NEW YORK, 12207

**Registered Agent**
THE PRENTICE-HALL CORPORATION SYSTEM, INC.
80 STATE STREET
ALBANY, NEW YORK, 12207

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

```
<DOCUMENT>
<TYPE>10-Q
<SEQUENCE>1
<FILENAME>sslp2q01.txt
<DESCRIPTION>SPRINT SPECTRUM LP FORM 10-Q
<TEXT>
```

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549


FORM 10-Q


[x] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES  EXCHANGE
ACT OF 1934

For the quarterly period ended                  June 30, 2001
                               -------------------------------------------------


                                   OR


[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934

For the transition period from                  to
                              -----------------------  -----------------------


                                      333-06609-01
Commission file number                333-06609-02
                       ---------------------------------------------------------


                            SPRINT SPECTRUM L.P.
                     SPRINT SPECTRUM FINANCE CORPORATION
--------------------------------------------------------------------------------
                (Exact name of registrant as specified in its charter)



         DELAWARE                               48-1165245
         DELAWARE                               43-1746537
------------------------------------    ------------------------------------
   (State or other jurisdiction of            (IRS Employer
    incorporation or organization)         Identification Nos.)


  6160 Sprint Parkway, Overland Park, Kansas            66251
--------------------------------------------    --------------------------
   (Address of principal executive offices)           (Zip Code)


Registrant's telephone number, including area code    (800) 829-0965
                                                   --------------------------


Securities registered pursuant to Section 12(b) and 12(g) of the Act: None

The registrants  meet the conditions set forth in General  Instruction H (1) (a)
and (b) of Form  10-Q and are  therefore  filing  this  Form  with  the  reduced
disclosure format.


Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during

10-Q 1 d10q.htm FORM 10-Q

<u>**Table of Contents**</u>

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2008**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from        to**

**Commission file number 1-04721**

# SPRINT NEXTEL CORPORATION
### (Exact name of registrant as specified in its charter)

| **Kansas** | **48-0457967** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **6200 Sprint Parkway, Overland Park, Kansas** | **66251** |
| (Address of principal executive offices) | (Zip code) |

**Registrant's telephone number, including area code:**
**(800) 829-0965**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (check one):

Large accelerated filer ☒                                         Accelerated filer ☐

Non-accelerated filer ☐       (Do not check if a smaller reporting company)       Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.)   Yes ☐   No ☒

### COMMON SHARES OUTSTANDING AT JULY 31, 2008:

VOTING COMMON STOCK
| | |
|---|---|
| Series 1 | 2,779,361,969 |
| Series 2 | 74,831,333 |

**Item 2.**   *Management's Discussion and Analysis of Financial Condition and Results of Operations*

**Forward-Looking Statements**

    We include certain estimates, projections and other forward-looking statements in our annual, quarterly and current reports, and in other publicly available material. Statements regarding expectations, including performance assumptions and estimates relating to capital requirements, as well as other statements that are not historical facts, are forward-looking statements.

    These statements reflect management's judgments based on currently available information and involve a number of risks and uncertainties that could cause actual results to differ materially from those in the forward-looking statements. With respect to these forward-looking statements, management has made assumptions regarding, among other things, customer and network usage, customer growth and retention, pricing, operating costs, the timing of various events and the economic and regulatory environment.

    Future performance cannot be assured. Actual results may differ materially from those in the forward-looking statements. Some factors that could cause actual results to differ include:

- the effects of vigorous competition, including the impact of competition on the price we are able to charge customers for services and equipment we provide and our ability to attract new customers and retain existing customers; the overall demand for our service offerings, including the impact of decisions of new subscribers between our post-paid and prepaid services offerings and between our two network platforms; and the impact of new, emerging and competing technologies on our business;

- the impact of overall wireless market penetration on our ability to attract and retain customers with good credit standing and the intensified competition among wireless carriers for those customers;

- the uncertainties related to the implementation of our business strategies, investments in our networks, our systems, and other businesses, including current investments and additional investments that will be required in connection with the planned deployment of a next generation broadband wireless network;

- the costs and business risks associated with providing new services and entering new geographic markets, including in connection with the planned deployment of a next generation broadband wireless network;

- uncertainty regarding satisfaction of the conditions to completion of the transaction with Clearwire Corporation, including receipt of the necessary approvals and satisfaction of the other conditions to closing;

- the impact of recent downgrades and potential further downgrades in the ratings afforded our debt securities by ratings agencies;

- the impact of difficulties we may encounter in implementing actions designed to maintain compliance with our financial covenants, including the success of actions involving third parties;

- the effects of mergers and consolidations and new entrants in the communications industry and unexpected announcements or developments from others in the communications industry;

- unexpected results of litigation filed against us or our suppliers or vendors;

- the impact of third parties not meeting our business requirements, including a significant adverse change in the ability or willingness of such parties to provide handset devices or infrastructure equipment for our code division multiple access, or CDMA, network, or Motorola, Inc's ability or willingness to provide related handset devices, infrastructure equipment and software applications, or to develop new technologies or features, for our integrated Digital Enhanced Network, or iDEN, network;

- the impact of adverse network performance;

25

**Table of Contents**

- the costs and/or potential customer impacts of compliance with regulatory mandates, particularly requirements related to the reconfiguration of the 800 megahertz, or MHz, band used to operate our iDEN network, as contemplated by the Federal Communications Commission's, or FCC's, Report and Order released in August 2004 as supplemented by subsequent memoranda;

- equipment failure, natural disasters, terrorist acts, or other breaches of network or information technology security;

- one or more of the markets in which we compete being impacted by changes in political, economic or other factors such as monetary policy, legal and regulatory changes or other external factors over which we have no control;

- the impact of difficulties we may continue to encounter in connection with the integration of the pre-merger Sprint and Nextel Communications, Inc. businesses, and the integration of the businesses and assets of Nextel Partners, Inc. and the third-party affiliates, or PCS Affiliates, that provide wireless personal communications services, or PCS, under the Sprint® brand name, that we have acquired, including the risk that these difficulties may limit our ability to fully integrate the operations of these businesses and the risk that we will be unable to continue to retain key employees; and

- other risks referenced from time to time in this report and other filings of ours with the Securities and Exchange Commission, or SEC, including in our annual report on Form 10-K for the year ended December 31, 2007 in Part I, Item 1A, "Risk Factors."

The words "may," "could," "estimate," "project," "forecast," "intend," "expect," "anticipate," "believe," "target," "providing guidance" and similar expressions are intended to identify forward-looking statements. Forward-looking statements are found throughout this Management's Discussion and Analysis of Financial Condition and Results of Operations, and elsewhere in this report. The reader should not place undue reliance on forward-looking statements, which speak only as of the date of this report. We are not obligated to publicly release any revisions to forward-looking statements to reflect events after the date of this report, including unforeseen events.

## Overview

We are a global communications company offering a comprehensive range of wireless and wireline communications products and services that are designed to meet the needs of individual consumers, businesses and government customers. We have organized our operations to meet the needs of our targeted customer groups through focused communications solutions that incorporate the capabilities of our wireless and wireline services. We are one of the three largest wireless companies in the United States based on the number of wireless subscribers. We also are one of the largest providers of Wireline long distance services and one of the largest carriers of Internet traffic in the nation. We own extensive wireless networks and a global long distance, Tier 1 Internet backbone.

Over the past several months, we have been reviewing our overall business strategy, including our sales, distribution and marketing plans, and working to streamline operations by changing the internal organizational structure of our company. As part of this reorganization, we have named new executives to lead key elements of our business, which we believe when fully implemented, will support quick decision-making, improve execution, strengthen our ability to retain our customer base and deliver on the opportunity provided by our assets. This reorganization is ongoing and is expected to be largely completed in the second half of the current year and fully developed by early 2009. As we refine our business strategy, we continue to evaluate opportunities to strengthen our business and implement cost reduction initiatives which may include de-levering and disposing of assets. For example, we are exploring alternatives for our iDEN network and related operations that include improving operations, making additional investments, entering into strategic partnerships and considering potential divestitures. We have not identified all strategic and structural alternatives that may be available to us, and do not know whether we will elect to pursue any alternatives. We may at any time be discussing or negotiating

26

**Table of Contents**

transactions that, if consummated, could have a material effect on our business, financial condition, liquidity or results of operations.

   We believe the communications industry has been and will continue to be highly competitive on the basis of price, the types of services and devices offered and quality of service. Although we believe that many of our targeted customers base their purchase decisions on quality of service and the availability of differentiated features and services, competitive pricing, both in terms of the monthly recurring charges and the number of minutes or other features available under a particular rate plan, and handset offerings and pricing are often important factors in potential customers' purchase decisions. We also believe consumer and business spending is impacted by changes in the United States economy, and we will monitor any impacts to our business.

   The FCC regulates the licensing, operation, acquisition and sale of the licensed radio spectrum that is essential to our business. The FCC and state Public Utilities Commissions also regulate, in whole or part, the provision of communications services. Future changes in regulations or legislation related to spectrum licensing or other matters related to our business could impose significant additional costs either in the form of direct out-of-pocket costs or additional compliance obligations.

**Business Segments**

   We have two reportable segments: Wireless and Wireline. See note 8 of the Notes to Consolidated Financial Statements for additional information on our segments.

*Wireless*

   *Products and Services*

   Our strategy is to utilize state-of-the-art technology to provide differentiated wireless services and applications in order to acquire and retain high-quality wireless subscribers. We offer a wide array of wireless mobile telephone and wireless data transmission services on networks that utilize CDMA and iDEN technologies to meet the needs of individual consumers, businesses and government customers.

   Through our Wireless segment, we, together with the PCS Affiliates and resellers of our wholesale wireless services, offer digital wireless service in all 50 states, Puerto Rico and the U.S. Virgin Islands, providing wireless coverage in over 360 metropolitan markets, including 344 of the 349 largest U.S. metropolitan areas, and serving about 52 million wireless subscribers as of June 30, 2008. We offer wireless international voice roaming for subscribers of both CDMA and iDEN-based services in numerous countries. Our CDMA network utilizes high-speed evolution data optimized, or EV-DO, technology to provide high-speed data applications. We have incorporated EV-DO Rev. A, the most recent version of EV-DO technology that is designed to support a variety of internet protocol, or IP, video, and high performance walkie-talkie applications, using QUALCOMM Incorporated's Q-Chat® technology (which we market as Nextel Direct Connect, or NDC, on CDMA), into over 86% of our CDMA network.

   We offer a wide array of wireless mobile telephone and data transmission services and features in a variety of pricing plans, typically on a contract basis, for one or two year periods. Services are billed on a monthly basis according to the applicable pricing plan, which typically includes a fixed charge for certain services and variable charges for other services. We also offer wireless services that focus on the youth market, including our Boost Mobile prepaid wireless service on our iDEN network and our Boost Unlimited℠ local calling wireless service on our CDMA network. We also offer wholesale CDMA-based wireless services to resellers, commonly known as mobile virtual network operators, or MVNOs, which purchase wireless services from us at wholesale rates and resell the services to their customers under their own brand names. Under these MVNO arrangements, the operators bear the costs of subscriber acquisition, billing and customer service. In light of current industry conditions, it is possible that our MVNOs may reevaluate their long-term business strategies.